1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK


--------------------------------X
WILLIAM ENRIQUE SANCHEZ ALFARO,
                              :  26-cv-766
                                 (GRB)
          Petitioner,
                              :  United States Courthouse
     -against-                   Central Islip, New York

ALMODOVAR, et al.,
                              :  February 25, 2026
             Respondents.        1:30 p.m.
--------------------------------X

               TRANSCRIPT OF EVIDENTIARY HEARING
               BEFORE THE HONORABLE GARY R. BROWN
               UNITED STATES DISTRICT COURT JUDGE


APPEARANCES:

For the Petitioner:        CHARTRISSE A ADLAM, ESQ.
                           Law Offices of David M. Sperling
                           81 Carleton Ave
                           Central Islip, NY 11722



For the Respondents:       THOMAS RUSSELL PRICE, AUSA
                           DOJ-USAO
                           610 Federal Plaza
                           Central Islip, NY 11722



Official Court Reporter:   Paul J. Lombardi, RMR, FCRR
Ph. (631) 712-6106         100 Federal Plaza - Suite 570
                           Central Islip, New York 11722




          Proceedings recorded by mechanical stenography.
               Transcript produced by CAT.

2

THE CLERK:  Calling case civil 26-766, Sanchez Alfaro versus Almodovar.

Counsel please state your appearance for the record.

MS. ADLAM:  Chartrisse Adlam for the petitioner, Your Honor.

Good afternoon, your Honor.

THE COURT:  Good afternoon.

And the petitioner's here?

MS. ADLAM:  Yes.

THE COURT:  And we have a court interpreter who we'll swear in.

Why don't you stand up, sir.

(Interpreter sworn.)

THE COURT:  Thank you.  Have a seat.

Counsel.

MR. PRICE:  Good afternoon, Your Honor.

Thomas Price, Assistant United States Attorney, on behalf of respondents.

THE COURT:  Very good, Mr. Price.

We are here for a hearing.  Mr. Price, are you ready to call your first witness?

MR. PRICE:  Yes, Your Honor.

Do you want the other witnesses to remain out of the courtroom during testimony?

3

THE COURT:  That's up to you all.

Counsel, do you want me to invoke the rule here and exclude all witnesses?  Or do you not care?

MS. ADLAM:  You can exclude other witnesses, Your Honor.

THE COURT:  Okay.

Why don't you have the other witnesses step out, please.  They can use the witness rooms on either side of the outside the door.

(There was a pause in the proceedings.)

MR. PRICE:  Your Honor, I call deportation officer Jason Mascia, M-A-S-C-I-A.

THE COURT:  All right.

Officer, step right up to the witness stand and remain standing while you are sworn in and then you can have a seat and testify.

THE CLERK:  Please raise your right hand.

**JASON MASCIA**,

having been duly sworn, testified as follows:

THE CLERK:  Please be seated.

State your name and spell your last name for the record.

THE WITNESS:  My name is Jason Mascia, that's M-A-S-C-I-A.

THE COURT:  All right.

**Mascia - Direct/Price**

4

Counsel, you may proceed.

DIRECT EXAMINATION

BY MR. PRICE:

Q.    Mr. Mascia, good morning.

You work for ICE, is that correct?

A.    Yes.

Q.    What's your position or title with ICE?

A.    I'm a deportation officer with ICE in New York

City -- well, Long Island, sub-office.

Q.    How long have you been in that position?

A.    So I have been with ICE since 2012.

I have been a deportation officer since 2015.

Q.    Did you participate in the stop and arrest of the

petitioner, Mr. Sanchez Alfaro?

A.    Yes.

Q.    And that was on February 6, 2026?

A.    Yes.

Q.    What was your assignment that morning on February 6?

A.    So we were targeting another subject, actually --

essentially we were assigned to apprehend somebody who was

post order.

So they were ordered removed.  Their BIA appeal

was dismissed.  The motion to reopen was denied.  The

address we were watching was 35 Pauls Path.

THE COURT:  Wait.  Slow down one second.  Thank

you.

BY MR. PRICE:

Q.    During the -- were you personally present at that address?

A.    Yes, yes.

Q.    You were observing the address looking for your target, correct?

A.    Yes.

I was on an adjacent street, it's a corner house.

Q.    During the course of your observation, did someone appearing to fit the description of the target appear?

A.    Yes.

Q.    Can you tell us what happened?

A.    Yes.

Okay.  So essentially I'm watching the residence from the adjacent street.  I have a view from the side, across the front yard 'cause it's -- you know, it's a corner house with two driveways.  A vehicle, a black, I believe, Ford Expedition pulled up to the residence.  I observed two individuals walking around on the property, you know, getting ready to leave, possibly for work.

One of the individuals did strongly resemble the target of the enforcement effort.  He loaded some stuff in from a pickup truck that was on the driveway, in other

**Mascia - Direct/Price**

6

words, he was taking stuff out of a pickup truck and putting it in the Expedition.

And then they departed in the vehicle.

THE COURT:  Can we stop for one second.

Did you suggest that the petitioner and someone else, they approached the residence you were looking at or a different residence?

THE WITNESS:  Oh, no, it's the residence I'm watching, sir.

THE COURT:  Okay.

THE WITNESS:  It's the correct residence.

THE COURT:  Okay.

BY MR. PRICE:

Q.   If you were across the street how well were you able to observe the individual you thought was the target?

A.   Okay.

It was a good observation.  I was using binoculars.  I was using ten times magnification binoculars.

Q.   And was it the petitioner who you believed looked like the target?

A.   I believe so, yes.

Q.   Did you approach those individuals or the car at the time?

A.   No, I did not approach them.

7

So at the same time, you know, just by chance at the same time this was happening, I was approached by agitators.  So often during our operations we are followed around by a group of activists or agitators that they will announce our presence to the area if they can locate us and they will attempt to hinder our operations by both, you know, slowing us down and just notifying the community that we are in the area.

An individual -- well, actually it was two vehicles actually approached me.  An individual got out of his car and started screaming, ICE is here.  ICE is in the neighborhood.  In my judgment I stood at my location.  So, in other words, I'm observing the residence.  I stood there essentially to distract the agitators, to slow them down.

And when his vehicle pulled away I called over the radio for another officer to assist and pull over the vehicle.

THE COURT:  Were you in a marked vehicle?

THE WITNESS:  No, sir.

I'm in an unmarked vehicle.  This would be, like, akin to, like, a stakeout.  We call it sitting at a residence.  I'm waiting outside a residence.  I'm hoping to see a target.  If I hadn't been approached by these agitators I would have followed him myself.  I would have

8

still called for the assistance of another officer because there was three individuals in the vehicle.

But essentially, when the vehicle pulls out, I call for assistance for somebody to go follow the vehicle and make the vehicle stop while I slow down the agitators. I actually turned the opposite direction down the street to lead them away in hopes -- so the vehicle stop itself would be worse if the agitators are there with me.

THE COURT:  If you know, how did they know you were with ICE?

THE WITNESS:  So without disclosing too much, the unmarked vehicle that I'm in is very well known with the agitators.

There is an app that tracks us and often posts the license plate numbers and the pictures of the vehicle and, unfortunately, I have a vehicle that is very well known because of its color.

THE COURT:  Okay.

Go ahead.  Sorry, counsel.

BY MR. PRICE:

Q.   So you drove off in another direction.

Do you know if that vehicle was stopped?

A.   Yes, it was stopped.

Q.   Did you, yourself, go to the scene of the stop?

A.   Yes.

9

So I arrived at the scene, I'm estimating, 15 minutes or maybe ten minutes after the stop. I drove away from them and eventually I lost the agitators and I circled back to the scene.

Q. Once you were at the scene of the stop, did you have any interaction or conversations with any of the occupants in the vehicle?

A. Yes.

So I walked over to the vehicle and I actually walked over to the front passenger's side of the vehicle. There was an adult male in the front passenger's side. You know, everyone was being cooperative. It was actually a very -- you know, in the beginning it was a calm setting. The agitators, the agitator did show up eventually. The person in the front passenger's side, he was cooperative. I spoke to him. I asked him if he had an ID and he informed me he had already given it to somebody else.

Then I briefly took a view into the vehicle and looked at everyone and that was it. I was essentially just waiting there for our records checks to come back.

Q. Do you recognize the petitioner as being one of the occupants of the vehicle?

A. Yes.

That --

10

THE COURT:  Hold on.

Was the petitioner the person that said that he had given his ID to someone else?

THE WITNESS:  No, Your Honor.

THE COURT:  All right.

THE WITNESS:  I believe it may have been his father.  I'm not sure.

BY MR. PRICE:

Q.   Just taking one step back.

Do you know which officer actually made the stop of the vehicle?

A.   Yes.

It was officer Hassell.

Q.   Other than that conversation with the front passenger occupant, did you have any other conversations with any of the occupants?

A.   No, I don't believe I did.

Q.   Did you have any -- did you take any further action, substantive action at the scene?

A.   No, sir.

Q.   Did you transport any of the occupants to a detention facility?

A.   Oh, yes.  I'm sorry.

So I did take action after the records checks came back.  So I was informed by another officer that

11

these individuals were going to be taken in custody, that they were, you know, essentially subject to arrest and I did remove the person who I was standing next to, the passenger's side front.

Q.   When you say remove him, did you have to physically remove him or --

A.   No.

I just asked him to come out of the car.  He was cooperative.  So there's no breaking windows or, you know, forcing anyone out of the car.  This was a very cooperative vehicle stop.

Q.   I don't think you answered this question but were you involved in the actual transportation of any of these individuals to a detention facility?

A.   No, I don't believe I was.

MR. PRICE:  That's all I have for this officer.

THE COURT:  Just stay there for one second in case you want to follow up.

Was the petitioner the person you thought looked like the target that you were after?

THE WITNESS:  Yes, I believe so, sir.

THE COURT:  And you said a moment ago after the records check, did you say you were informed by another officer they were going to be taken into custody?

THE WITNESS:  Yes.

12

So essentially I'm just standing outside the door to make sure, you know, everything was secure, I guess. And another officer -- at the same time, the officer who has their IDs is at his vehicle. He's not there. He's at his vehicle in contact with somebody else over the phone who is running the records checks.

THE COURT: Did you learn at the scene whether or not the petitioner was, in fact, your target?

THE WITNESS: Yeah.

So actually, when I first approached the vehicle, when I first came on the scene I don't recall who I asked, but when I first walked over I did ask -- when I peeked in I thought he still was a target and I said, oh, is that the target? And nobody -- the records checks hadn't come back yet so nobody replied. But from talking -- from speaking with the person I was speaking to in the window, the adult male -- I'm sorry -- they are all adults -- but the person I was talking to, you know, it became evident after a little bit that it wasn't the target.

I actually showed this person in the front seat, I showed him a picture of the actual target and he acknowledged that he knows him. So he said -- you know, I showed him the picture and he said, yeah, I do know that person. I think he moved recently from the address.

THE COURT: So it became clear to you at some point that this was --

THE WITNESS: Yes.

THE COURT: That the petitioner was not the target.

THE WITNESS: Yes.

THE COURT: And someone told you they would be arrested anyway.

THE WITNESS: Yes.

So, you know, they are already running checks on his biographic information through our databases, and, yes. So essentially I was standing there waiting to see, you know, how the checks came back, if he was subject to detention and removal.

THE COURT: Were you speaking to these individuals, meaning the petitioner and/or the people with him, in English or in Spanish?

THE WITNESS: Oh, they speak English.

So that was one of the conversations I had with the person in the front seat. I think I even asked him why he speaks such good English and he actually told me he is here unlawfully. He said he had work authorization and he owned a company -- not -- I'm sorry -- not this individual. It was somebody else. I want to make that clear.

**Mascia - Cross/Adlam**

14

THE COURT:  The other individual said he was here lawfully or unlawfully.

THE WITNESS:  He admitted, he said he came to the country many years ago, I don't recall exactly, I think he said 20 years ago.

THE COURT:  And was he taken into custody too?

THE WITNESS:  Yes, he was, sir.

THE COURT:  I'm sorry.

Anything you want to follow up on?

MR. PRICE:  No, Your Honor.

THE COURT:  Counsel, your witness.

CROSS-EXAMINATION

BY MS. ADLAM:

Q.   Good afternoon, Officer.

A.   Good afternoon, ma'am.

Q.   You testified that the individual that you were --

THE COURT:  Counsel, excuse me.

The microphone is the other one.

MS. ADLAM:  Sorry, Your Honor.  Thank you.

BY MS. ADLAM:

Q.   You testified that the person you were looking for had a post order BIA dismissal.

Is that correct?

A.   He was post order meaning, like -- so he was subject to INA 241(a)(2) meaning this person that we were

**Mascia - Cross/Adlam**

15

targeting, he had been through his proceedings already. He had seen an immigration judge, ordered remove.

He filed the BIA appeal, the BIA appeal had been dismissed. He filed a motion and that was motion was denied. You don't necessarily have to go through all those steps but it was a good target because in theory this person exhausted their proceedings.

Q.   I understand.

I'm just asking you --

A.   I'm sorry.

Yes. I'm sorry.

Q.   Once the record checks came back, did the records show that the petitioner was the subject of who you were looking for?

A.   It showed that it was not the subject.

Q.   Okay.

And did the records checks show anything else?

A.   I will say at that time I did not receive, for instance, the actual record checks for your client.

You know, I was aware that he would be another case, but, you know, all I was aware of was that we were going to take all of them into custody because they were all amenable. In other words, if you are asking, you know, did it show that he was in proceedings or that he would be enrolled in proceedings, at that time, no. I

16

wasn't -- I didn't communicate with your client at that time, and I wasn't given the actual, like, records checks for your client.

Q.   So you weren't given any records checks, just that he was to be taken into custody?

A.   Yes, yes, exactly.

Q.   How long did it take to do record checks?

A.   We try to do them as quickly as possible because we have been having a lot of issues -- you know, we would like to sit on a location for an extended period of time and run checks and, you know, take our time and make decisions.

But agitators did eventually show up at the location.  There was somebody that came from across the street and started cursing at us and filming us and it was a little rushed.  But I would say it was probably, probably 15, 20 minutes at the scene.

Q.   What's involved when looking for records checks?

A.   I did not perform his records checks.  So I can't say exactly what was involved.

But I will say typically we are going to run them through all of the immigration databases, right.  So we are going to see if this person's already in proceedings.  We are going to see if this person entered the country lawfully or unlawfully.  We are going to check

Mascia - Cross/Adlam

17

to see if, you know, he's adjusted status.

We are going to check to see if any status -- if there is any reason not to take him into custody and what detention authority -- if we are taking him into custody what detention authority it would fall under.

Q.   So you testified that you checked to see if there is any status.

Do you check to see if there is any petitions pending?

A.   Yeah, they would check petitions, yes.

Q.   And with my client, did you -- were you informed of any petitions that were pending?

A.   No, ma'am.

Q.   You said that you also checked that they also check to see if there was any prior proceedings.

Does that include any issuances of NTAs?

A.   Yes.

Q.   Did your findings find that there was a prior NTA issued but never filed with EOIR?

A.   I can't speak to the findings of the record check.

Obviously I now reviewed your client's case.  So I know what the records checks would show right now, but because I didn't run the records checks and I didn't receive them on the scene, I really can't say to what was received at the scene when the decision was made to take

Mascia - Cross/Adlam

18

him into custody.

You know, another officer that, you know, that I believe is present today may be able to testify more to that.  But, you know, I think that's what you are asking, is specifically to what's at the scene.

Q.   The address, can you repeat the address that you were watching from across the street?

A.   I believe it was 35 Pauls Path.

So it's a corner address.  I was actually adjacent -- I was on the side street to the house, and I was looking at an angle across the two driveways.

Q.   And who did you say was in the front seat, the driver?

A.   Not the driver, I didn't speak to the driver.

I spoke to the front passenger.

Q.   Okay.

A.   I believe I said I think it was his father.  I'm not sure, honestly.

Q.   Okay.

A.   That individual's also -- so that individual was also taken into custody.

All three individuals were taken into custody.

MS. ADLAM:  Your Honor, I have no further questions.

THE COURT:  Okay.

19

I have a quick follow up and then anybody who wants to follow up on that can do that.

When you say all of the, I think you said all of the immigration databases, if I got that right, you now know what this individual had in terms of SIJ --

THE WITNESS:  Yes.

THE COURT:  Deferred action, work authorization, yes?

THE WITNESS:  Yes, sir.

THE COURT:  Would that information show up on the databases that you can check?

THE WITNESS:  Yes.

THE COURT:  Does ICE have access to those?

THE WITNESS:  Yes, sir.  Yes, we do.

THE COURT:  So you have been an officer for a long time.

THE WITNESS:  Yes.

THE COURT:  You have had a lot of training, I presume.

THE WITNESS:  Yes.

THE COURT:  You are familiar with SIJ status and what deferred action means, yes?

THE WITNESS:  Yes.

THE COURT:  If you knew that at the time, would you have effected the arrest?

20

THE WITNESS:  Yes, I would, sir, yes.

THE COURT:  Why?

THE WITNESS:  So SIJ status does not confer a lawful status, right.

It's a classification.  So essentially the deferral, the deferral part is what has, you know, become confusing.  To deferral is specific to his removal.  He would have -- I would have detained him at the time to place him in the removal proceedings.

So, you know --

THE COURT:  But you get to make that decision?

THE WITNESS:  So -- no, oh, no, sir.

THE COURT:  Who does?

THE WITNESS:  Essentially -- there is direct custody determinations done by management.

So in this case an I-200 was issued for this individual.  But even after -- I want to point out -- so actually his attorney brought up that his initial -- he was initially put into removal proceedings through the issuance of a notice to appear.

THE COURT:  Yes.

THE WITNESS:  It was not correctly filed with the court.

THE COURT:  Right.

THE WITNESS:  So another one would need to be

21

issued for him to be placed in removal proceedings.

So he would come into custody, a new NTA would be issued, which one was.  Deferred action is specific to his removal at the end of those removal proceedings, but he's still coming into custody to be placed in those proceedings, right.  That does not necessarily mean he's going to remain in custody.

So management does continuously review these cases for --

MR. PRICE:  Your Honor, I just want to object here in that he's getting far afield from what his actual duties are --

THE COURT:  But it's fascinating.

Your objection is noted.  But it's fascinating for me.

Please finish because I'm trying to understand.

THE WITNESS:  So he would come into custody.

The management does have the ability to continuously review whether somebody's going to stay in custody or not.

THE COURT:  So in this case, though, you said you detain him pending removal proceedings being commenced.

Who makes that decision?  Who says, okay.  We are going to file removal proceedings against him?

Mascia - Cross/Adlam

22

THE WITNESS:  So somebody -- a supervisor has to issue the notice to appear.

THE COURT:  A supervisor meaning a supervisory field agent?

THE WITNESS:  Yes, yes.

We call it a supervisory detention deportation officer.

THE COURT:  And you are not in that position?

THE WITNESS:  No, no.

I would not be issuing the notice to appear.  So the removal proceedings are commenced by the issuance of a notice to appear.

THE COURT:  Okay.

You have never been -- or have you been trained on the question of what deferred action means in this context in terms of when removal proceedings would be commenced?

THE WITNESS:  Yes.

So it's my understanding that deferred action does not affect removal proceedings.  In other words, for instance, he was granted deferred action and at that time he was already, you know, issued a notice to appear.  That notice to appear was just not correctly filed with the court.

THE COURT:  Okay.

23

Do you have anything to follow up on, counsel?

MR. PRICE:  Briefly.

REDIRECT EXAMINATION

BY MR. PRICE:

Q.   Officer Mascia, I believe you testified that when the records checks would come back they would say whether or not they were amenable to detention and what the detention authority was.

Do you have an understanding of what the detention authority was in this instance when you took him into custody?

A.   Yes.

So because of the method of entry into the country it would be detained under INA 235.

MR. PRICE:  No further questions, Your Honor.

THE COURT:  Anything further?

MS. ADLAM:  Yes, Your Honor.

RECROSS-EXAMINATION

BY MS. ADLAM:

Q.   You said that the NTA that he had prior was not properly filed with the court.

Who didn't properly file it?

A.   I don't know, ma'am.

Q.   Whose job is it to file it with the court, with the immigration court?

24

A.    So, you know, I really can't say.

I believe his initial apprehension -- I believe it was by border patrol, correct?

Q.    Yes.

A.    Often it would be either US Border Patrol, ICE -- Immigration Customs Enforcement.

Sometimes USCIS will file the NTAs because he filed for status, right, or a classification, but there is -- any agency can encounter this individual and file the NTA.

Q.    And so if the NTA was never filed by -- it would be basically a government entity -- and then you found out also he had deferred action, could you have just refiled the original NTA that was never filed with the court?

A.    Well, he needs to be served it.

So he would need to be served it.  There is the option to serve through mail.  But, yeah.  He needs to be served the NTA.  There would be -- to be a new court date issued, a new location.

Q.    And at the time that he was detained, he still had deferred action, is that correct?

A.    Yes.

Q.    Thank you.

MS. ADLAM:  Nothing further.

THE COURT:  Anything further?

Hassell - Direct/Price

25

MR. PRICE:  No, Your Honor.

THE COURT:  Sir, you can step down.

Thank you.

(Witness steps down.)

THE WITNESS:  Okay.

THE COURT:  Call your next witness, please.

MR. PRICE:  Your Honor, calling Deportation Officer Peter Hassell.

THE COURT:  Okay.

(There was a pause in the proceedings.)

THE COURT:  Sir, come on up to the witness stand.

Remain standing and you'll be sworn in.

THE CLERK:  Please raise your right hand.

**PETER HASSELL**,

     having been duly sworn, testified as follows:

THE CLERK:  Please be seated.

Please state your name and spell your last name for the record.

THE WITNESS:  Peter Hassell, H-A-S-S-E-L-L.

THE COURT:  You can proceed, Counsel, please.

DIRECT EXAMINATION

BY MR. PRICE:

Q.   Good afternoon, Officer Hassell.

You are employed by ICE, is that correct?

26

A.    Yes.

Q.    Can you tell us what your position or title with ICE is?

A.    I'm a deportation officer.

Q.    You might just want to get a little closer.

A.    A deportation officer.

Q.    How long have you been in that position?

A.    Approximately 16 years -- well, I started out as an immigration enforcement agent and then deportation officer since 2015.

Q.    2015?

A.    Correct.

Q.    When did you start with ICE initially?

A.    2008.

Q.    Did you participate in the stop and arrest of the petitioner here?

A.    Yes.

Q.    That was on February 6, 2026?

A.    Yes.

Q.    Officer Mascia testified that you were the officer who actually made the physical stop of the vehicle.

      Is that correct?

A.    Correct.

Q.    Can you tell me what led you to stop the Ford Expedition?

27

A.   I was working a different case that was local to that case, and I was getting, like, harassed by agitators so I ended up driving away.

On my way back I ended up on Pauls Path, where Mascia was, and he called out who we believed was the target, entered a Ford Expedition, a black one, and the car just happened to pass me as I was on that road.

Q.   And so then did you immediately stop the vehicle or what did you do?

A.   No.

Our radios don't work the best.  So I turned around and started following the vehicle and I made sure I had somebody to support me to initiate the stop.  Then the radios, again, weren't working that good.  So I went over the radio, I'm going to stop the car and wait for people to come support me.

THE COURT:  Were you in a marked vehicle?

THE WITNESS:  Unmarked.

BY MR. PRICE:

Q.   Once you made the stop, and you had support with you, what did you do?

A.   I approached the driver's side, the driver of the vehicle.

Q.   Did you have any conversations with the driver or occupants?

28

A.   Limited.

I asked for identification, got their identification from them.

Q.   Did they comply with the request or did anybody object?

A.   No, they complied.

Q.   So throughout the duration of the stop did you have any conversations with any of the occupants of the vehicle?

A.   Not really, not besides getting the identification.

Q.   Did there come a point in time where you were notified that the individuals were to be detained?

A.   Yes.

Q.   What steps did you take after that?

A.   So another officer took the identification for me, ran the checks.

I was pretty much holding security on the car, making sure nobody was reaching for any weapons or anything.  Once we got the okay we can apprehend them, we started -- there was a bunch of people there and the other officers started and took the guys out of the car.

Q.   So you didn't run the ID checks, is that right?

A.   No.

Q.   Do you know who did?

A.   I didn't make the phone call, but I know who I

29

believe did.

Q.   And who was that?

A.   Michael O'Donoghue.

Q.   Which officer at the scene called in the ID information?

A.   Officer Paoli.

Q.   Did you -- were you involved with physically detaining the individuals, putting handcuffs on or anything like that?

A.   I believe I cuffed the driver.

Q.   Were you involved in the transportation of any of the --

A.   No.

MR. PRICE:  I don't have anything further.

THE COURT:  Why don't you stay there in case you want to follow up.

You said you were provided ID by the three people in the car.

THE WITNESS:  Correct.

THE COURT:  Including this gentleman.

THE WITNESS:  Yes.  I believe he was sitting in the back seat.

THE COURT:  Did he give you a work authorization card as his ID?

THE WITNESS:  I don't recall, honestly.

30

THE COURT:  Would it have been significant to you if he gave you his work authorization card?

THE WITNESS:  Would it have been significant?

THE COURT:  Yes.

THE WITNESS:  So work authorization to me -- I have seen people with orders of deportation with them.

So I still would have ran it.

THE COURT:  Okay.

According to your testimony, all three individuals were placed under arrest.

THE WITNESS:  Correct.

THE COURT:  Were all three ultimately detained, if you know, or do you know?

THE WITNESS:  I know they got transported away from that scene.

THE COURT:  And who made the decision to arrest this petitioner, do you know?

THE WITNESS:  I was told that -- I was told by another officer that they were all -- we could take them.

THE COURT:  As you sit here today, you are aware he has SIJ status --

THE WITNESS:  I am aware now, yes.

THE COURT:  Deferred action and work authorization, yes?

THE WITNESS:  I didn't know about the work

Hassell - Cross/Adlam

31

authorization but I knew he had SIJ, yes.

THE COURT: Does that affect your determination as to whether or not to arrest somebody?

THE WITNESS: Well, it's my understanding that if you have SIJ status it doesn't make you not removable.

You have to petition or apply to get further status in order to make yourself legally here in the United States.

THE COURT: Okay.

You want to follow up on any of those questions, counsel?

MR. PRICE: No, Your Honor.

THE COURT: All right.

Any questions?

MS. ADLAM: Yes, Your Honor. Thank you.

CROSS-EXAMINATION

BY MS. ADLAM:

Q. Good afternoon, Officer.

A. Good afternoon.

Q. Were you aware of what the checks showed, or were you told about the checks, what the checks revealed?

A. No.

Q. When did you find out that he had an approved I 560 SIJ petition?

A. When I got contacted after testifying.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

Hassell - Cross/Adlam

32

Q.   When did you become aware that he also had deferred action?

A.   I wasn't even aware of the deferred action.

Q.   And you said that in order to get the adjustment of status or in order to get the green card, they have to file something after the approval.

Is that correct?

A.   That's what I believe, yes.

Q.   And were you aware at the time that it was backlogged, the time to get green cards, based on the SIJ?

A.   I don't work in that department.

I don't know how backlogged they are.

Q.   Do you know what the congressional intent of SIJ is, or deferred action?

THE COURT:   I'll sustain the objection to that.

MS. ADLAM:   I have no further questions, Your Honor.

THE COURT:   Okay.

Any follow up?

MR. PRICE:   No, Your Honor.

THE COURT:   Give me one second.

(There was a pause in the proceedings.)

THE COURT:   We heard from another officer, obviously I think you know that.  Did you understand that you were targeting a particular individual that morning?

33

THE WITNESS:  I understood he was targeting a different individual, yes.

THE COURT:  Right.

Did it become clear at the scene that this petitioner was not the targeted individual?

THE WITNESS:  Once we received the IDs, yes.

THE COURT:  All right.

Anything else?

MR. PRICE:  No, Your Honor.

MS. ADLAM:  No, Your Honor.

THE COURT:  You can step down, sir.

Thank you.

THE WITNESS:  Thank you.

(Witness steps down.)

THE COURT:  Counsel, any other witnesses?

MR. PRICE:  One more, Deportation Officer Geraldo Paoli.

THE COURT:  Okay.

(There was a pause in the proceedings.)

THE COURT:  Sir, come on up.

Stand next to the witness stand and you will be sworn in.

THE CLERK:  Please raise your right hand.

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

34

**GERALDO PAOLI**,

having been duly sworn, testified as follows:

THE CLERK:  You can be seated.

Please state your name and spell your last name for the record.

THE WITNESS:  My name is Geraldo Paoli, last name is spelled P-A-O-L-I.

THE COURT:  Counsel, you may proceed.

DIRECT EXAMINATION

BY MR. PRICE:

Q.   Officer Paoli, good afternoon.

You work for ICE, is that correct?

A.   Correct.

Q.   Can you tell us what your position or title with ICE is?

A.   My title is deportation officer.

Q.   How long have you been in that position?

A.   As a deportation officer, I was promoted to deportation officer in 2015, but I started with immigration in 2007 as an IEA, or immigration enforcement agent.

Q.   Did you take part, any part, in the stop or detention of the petitioner here?

A.   Yes.

Q.   Can you explain to -- strike that.

35

Were you involved in the actual stop of the vehicle?

A.   No, no.

Q.   At what point did you come on to the arrest scene?

A.   When I arrived, the vehicle was already pulled over, and I believe the officer that was here before, he got the IDs from all the subjects inside the vehicle.

Q.   Do you know what he did with those IDs?

A.   He forwarded to the officers to run record checks.

Q.   Did you have any role in running the records checks?

A.   Yes.

So when I got there, I got into -- I got back in my vehicle with the IDs and I called the officer that was running the record checks just to kind of, like, expedite the process and try to get these people, you know, to get out of that situation as quickly as possible.

Q.   Do you have the capability of running the records checks yourself?

A.   Yes, but it would take much longer if I did it myself.

I would have to, like, boot up my computer and it would take a lot longer.

Q.   So the officer that you were speaking to at some point returned results of checks to you, is that correct?

A.   Correct.

36

Q.    What were the results of the check?

A.    That they are all amenable to removal proceedings.

Q.    When --

THE COURT:  Wait, wait.

What does that mean?  Explain that, please.

THE WITNESS:  Me?

THE COURT:  Yes.

THE WITNESS:  That they can -- basically, they can be taken into ICE custody and placed into removal proceedings.

THE COURT:  So there are no proceedings pending based on the record checks, yes?

THE WITNESS:  No, there were not -- I don't believe there were removal proceedings at that time.

THE COURT:  But that --

THE WITNESS:  We could place them into removal proceedings.

THE COURT:  And when you say we, who's the we?

Who makes that decision?

THE WITNESS:  So, I mean, at that time the officer that was running the record checks, he ran the record checks saying there is nothing prohibiting us from placing them into removal proceedings, but immigration basically subject to removal proceedings.

THE COURT:  Who makes that determination as to

37

whether or not that happens?

THE WITNESS:  Can you explain that again?

THE COURT:  Sure.

In other words, you say they might be placed into removal proceedings, but who makes the decision?

Is that your decision?

THE WITNESS:  Well, yes.

Ultimately, like, you know, we -- so once the record checks come saying the subjects are amenable to removal proceedings, us, as officers, take them into custody and place them into removal proceedings, and then a supervisor, you know, signs the documents you know, putting them with the notice to appear and going through the whole removal proceedings.

THE COURT:  Okay.

Counsel.

BY MR. PRICE:

Q.   Just to be clear, you said place them in removal proceedings.

You are not doing removal paperwork or any of that?

A.   No, no.  At that time, no.  We are not doing any of the removal paperwork.

Q.   That's something that occurs later on?

A.   Yes.

38

So we just take them into custody, take them to the processing center and at the processing center they serve them with all the papers for the removal proceedings.

Q.    When you get the results, you said that you were informed that they were amenable to detention.

Are you given more specifics, like the basis for the amenability, or is it just you can pick them up?

A.    No.

For the -- it's usually like, no, they are good to pick up.  There is nothing prohibiting us from placing them into, you know, custody.

Q.    Did you have any conversations with anyone in the occupants of the vehicle?

A.    I know I spoke to them.

I believe once I was notified that we can place them into custody, I believe I told them, like, hey, you guys are going to come into custody with us.  You guys are going to be all detained with immigration.

You are going to go to the office with us.  We are going to serve you with the documents.  You can speak to your attorney or get an attorney if you don't have one. You don't have to sign anything if you don't want to sign and you don't have to talk to anybody if you don't want to talk to anybody.

Q.   Did you convey that information in English or Spanish or both?

A.   I believe I did it in Spanish.

I may have started in English and then I spoke to them in Spanish.

Q.   Did you -- as part of the report that came back, were you informed that anyone in the vehicle had SIJ status?

A.   I don't recall if anybody mentioned anything about the, SIJ.

I believe one -- I think one of them came back with a U visa.  I don't think it was him, it was another subject.  But, like I said previously, subjects were still -- can be placed into removal proceedings, even with those -- whatever applications they had pending or approved.

THE COURT:  Hold on a second.

Officer, it is your understanding, based on your training and experience, that somebody with a U visa can be put into removal proceedings?

THE WITNESS:  Yes, sir -- Your Honor, yes.

THE COURT:  Wow.

And you know the basis for a U visa, yes?

THE WITNESS:  More or less, yes.

THE COURT:  What's your understanding of that?

THE WITNESS:  I mean, I can't really answer,

**Paoli - Direct/Price**

40

like, I guess I'm, like, a little unfamiliar with it at that moment.

But from what I understanding is that, yes, they can be place into removal proceedings.  Like, that is not something that can stop somebody from being placed into removal proceedings.  That they can be placed into removal proceedings and then --

THE COURT:  Okay.

And your understanding is the same with respect to people who have SIJ status?

THE WITNESS:  Yes, Your Honor.

THE COURT:  And are you familiar with the notion of deferred action?

THE WITNESS:  Yes, Your Honor.

THE COURT:  Your understanding is they can be placed in removal proceedings while they have the deferred action?

THE WITNESS:  Yes, Your Honor.

THE COURT:  And that's been part of your training as an agent?

THE WITNESS:  There have been other person who have been placed into removal proceedings with deferred action.

There have been subjects who have been deported that had approved U visas before as well.

**Real ID**

41

THE COURT:  Thank you.

Go ahead.

MR. PRICE:  I don't have anything further for direct.

THE COURT:  Stay there for one second.

The ID that was provided, do you know if he provided a work authorization card?

THE WITNESS:  I believe, yes.

I think they all had work authorization cards.

THE COURT:  And that's something that you know is issued through the US Government, through immigration proceedings, yes?

THE WITNESS:  Yes, Your Honor.

THE COURT:  So he has authorization to work here, but he can be arrested and put into removal proceedings any time, yes?

THE WITNESS:  Yes, Your Honor.

If they have no legal status in the United States, then, yes.  They can be placed into removal proceedings.

THE COURT:  When you saw the work authorization card, did that mean anything to you about what his status might be?

THE WITNESS:  Usually -- you know, I usually ask them.  If I see, like, a work authorization I always ask

42

them what do you have pending with immigration?

I always ask them do you have, like, TPS or do you have anything that would preclude us from you -- from being detained with ICE and I guess, like I said previously, you know, we run the record checks and the officers that run the record checks showed that there was nothing precluding us from detaining these subjects and putting them into removal proceedings.

THE COURT:  Anything further?

BY MR. PRICE:

Q.   Just to be clear, you said that you typically ask those questions of an individual who gives you a work authorization?

A.   Yes, usually.

Q.   Did you ask that of this petitioner?

A.   I believe so.

I believe I asked them if they had any TPS or what do they have pending with immigration.

MR. PRICE:  Nothing further.

THE COURT:  Okay.

Counsel.

MS. ADLAM:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MS. ADLAM:

Q.   Good afternoon, Officer.

A.    Good afternoon.

Q.    Did you receive the results of the record checks?

A.    It was just over a phone conversation.

Q.    And what were the results that was on the phone conversation about the record checks?

A.    As I said, that there was nothing precluding us from detaining any of the subjects and putting them into removal proceedings.

Q.    Well, did the record checks reveal any criminal history for my client?

A.    I don't believe so.

Q.    Did the record checks show that he had any applications pending?

A.    I believe -- like I said earlier, I think one of them had a U visa and I believe he had, like, the SIJ.

Q.    As part of the record checks, does it also show that he had deferred action?

A.    I don't recall if the officer relayed that information to me if he had deferred action.

      But, again, the deferred action wouldn't -- not allow us to take him into custody to put him into removal proceedings.

Q.    You testified that you saw his work authorization?

A.    I believe so, yes.

Q.    Do you know what code is on the work authorization?

44

A.   I don't recall.

Q.   So even though you said that there was nothing stopping you from placing him into custody, as to your knowledge, what does deferred action mean?

A.   What does deferred action mean to me?

Q.   Yes, in regards to immigration.

A.   It just means -- from my knowledge it usually means we can't remove him at that time, you know, they won't be able to be removed from the United States until we clear up that deferred action stating that this person can't be removed at that time.

But, like I said, we can still place him into removal proceedings.

Q.   And to your knowledge, was an NTA ever issued since the time he entered the United States?

A.   I don't recall if he was served an NTA.

Q.   Do you know what year he came into the United States?

A.   I don't recall, no.

Q.   When you encountered my client, was he already stopped or were you part of the stop?

A.   He was -- the car was already stopped.

Q.   You said that you did find out that he was SIJS, is that correct?

A.   Yes.

Q.   What does having an approved SIJS application mean to

45

you in the capacity in your role?

A.   As I said, it wouldn't stop us from placing somebody -- to place somebody into immigration custody and put him into removal proceedings.

Q.   But what does SIJS mean other than it doesn't stop you from putting him into custody?

A.   Special -- something with, like, juvenile -- I can't recall exactly off the top of my head.

It's, like, Special Immigrant Juvenile, I believe, something of that nature.

Q.   Do you know how one obtains an approved SIJS?

A.   Not in great detail, no.

Q.   When someone is granted deferred action, do you know what office grants the deferred action?

A.   USCIS, I believe.

Q.   And you said that you have been a deportation officer since 2015?

A.   Yes.

Q.   So has it been since 2015 -- has it been the normal procedure to put youth who have deferred action into removal proceedings?

MR. PRICE:  Objection.

THE COURT:  I'm sorry.

You can answer that question.

A.   Can you repeat the question?

46

Q.   Since you have been in office since 2015, that the normal procedure to put youth into removal proceedings who have deferred action?

A.   I mean, it's happened before, yes.

MS. ADLAM:  Your Honor, I have no further questions.

THE COURT:  I'm going to follow up with something and either one of you can follow up.

You mentioned TPS status as a result you might get to suggest you shouldn't put somebody into custody. Are there other categories like that?

THE WITNESS:  I'm sure there are.  I couldn't tell you off the top of my head but I'm sure there are other categories that would preclude.

I mean, sometimes they have lawful permanent status, they have work authorization as well.  Sometimes if they get withholding or removal as well they can apply and they get the work authorization and sometimes that's something where you would not take that person into custody.

THE COURT:  When you do your record check, are you also checking USCIS records?

THE WITNESS:  Yes.

THE COURT:  What about State Department records?

THE WITNESS:  So the officer that ran the record

Paoli - Cross/Adlam

47

checks, I believe he runs the State Department as well.

I couldn't tell you exactly what website he was on, but I'm sure that's one of his websites that he checks.

THE COURT:  Based on your experience, I just want to understand.

THE WITNESS:  Yes.

THE COURT:  You picked up something who was actually born in the United States.

THE WITNESS:  I --

THE COURT:  Let me finish, a natural born citizen, right, and you pull him over and they say whatever they say.  You run the record check.

Is there anything in that record check that would suggest that they were not amenable to removal proceedings?

THE WITNESS:  I mean, so if -- I have not arrested a US citizen.

Usually if someone's a US citizen, you know, on their -- a lot of times they have the US passport with them.  On -- their Real IDs have a little star on it now.

THE COURT:  Say that again.

THE WITNESS:  A lot of times they have, like, the driver's license has, like, the Real ID, and there's a lot of times when someone has -- US citizen, they will

48

tell you right away.  I'm a US citizen, and we run record checks and that confirms they are a US citizen.

THE COURT:  How does the record check confirm they are a US citizen?

In other words, you are not checking for birth certificates from Brooklyn, right?

THE WITNESS:  It just says adjusted status.

A lot of times on our side it says USC, United States citizen.

THE COURT:  But someone who is born here they don't have adjusted status.

They have status from when they were born.

THE WITNESS:  So if they had a passport issued by the United States we would have that record as well.

We could check and that it say US passport and the only person getting a US passport is a US citizen.

THE COURT:  Okay.

Are you familiar with the concept of individuals who have been paroled into the United States?

THE WITNESS:  Yes, Your Honor.

THE COURT:  If someone comes back who was being paroled, are they subject to arrest and removal, or no?

THE WITNESS:  I believe so, Your Honor.

THE COURT:  People who have been paroled can be arrested by you?

THE WITNESS:  Yes, Your Honor.

THE COURT:  Wow.  Okay.

Any further follow-up questions?

REDIRECT EXAMINATION

BY MR. PRICE:

Q.    Officer Paoli, in terms of when you are told someone is amenable to being detained, are you given any specifics for the basis for the detention?

A.    Can you repeat the question?

Q.    Are you given a specific reason, like INA 212 or some other basis?

A.    Usually no.

Q.    When you said that whoever is doing the record checks is accessing these different databases, is that your suspicion or do you know for certain that they actually have access to other databases besides ICE databases?

A.    They for sure have access to other databases.

Q.    Okay.

A.    I can't tell you exactly all the databases they have access to because everyone has different access level. You have to request it individually.

It's not like once you become an officer they give you all these databases.  Everybody has to apply for these individually.  So I can't tell you for sure which databases he has and doesn't have.

50

Q.   To your knowledge, each agency, ICE, CIS, DHS, State, they all have their own individual databases.

They are not all just one big database, is that right?

A.   Correct, yes.

MR. PRICE:  No further questions, Your Honor.

THE COURT:  Anything further?

MS. ADLAM:  Yes, Your Honor, couple questions.

RECROSS-EXAMINATION

BY MS. ADLAM:

Q.   Officer, who is the person who actually ran these record checks?

A.   I believe that was Officer O'Donoghue.

Q.   You also said something about parole.

Would a person who has deferred action under the INA, would they be considered being a parolee?

MR. PRICE:  Objection.

THE COURT:  You object?

MR. PRICE:  Objection, outside the scope of his knowledge.

THE COURT:  If you know the answer, you can answer it.

If you don't, that's fine.

A.   I don't know.

Q.   Thank you.

51

MS. ADLAM:  No further questions, Your Honor.

THE COURT:  Anything further?

MR. PRICE:  No, Your Honor.

THE COURT:  Sir, you can step down.

Thank you for your time.

THE WITNESS:  Thank you.

(Witness steps down.)

THE COURT:  Does the government have any more witnesses?

MR. PRICE:  No, Your Honor.

THE COURT:  Does the petitioner want to call anybody?

MS. ADLAM:  Your Honor, just one second.

THE COURT:  Sure.

Take your time.

(There was a pause in the proceedings.)

MS. ADLAM:  Your Honor, I'd like to call the petitioner.

THE COURT:  Okay.

Sir, come on up.  We'll let the interpreter get set up.

THE CLERK:  Please raise your right hand.

52

**WILLIAM ENRIQUE SANCHEZ ALFARO**,

    having been duly sworn, testified as follows:

       THE CLERK:  Please be seated.

       THE COURT:  Counsel, when you are ready you can proceed.

       MS. ADLAM:  Thank you, Your Honor.

DIRECT EXAMINATION

BY MS. ADLAM:

Q.   William, can you please state your full name for the record?

A.   William Enrique Sanchez Alfaro.

Q.   Where were you living on February 6, 2026?

A.   At 35 Pauls Path, Coram -- Pauls Path, Coram.

Q.   On the morning of February 6, 2026, what were your plans for that day?

A.   My friend was going to pick up my father and me to go to work.

Q.   What time was that?

A.   Around 7 or 8.

Q.   Morning or afternoon, evening?

A.   In the morning.

Q.   Did your friend pick you up?

A.   Yes.

Q.   How did they pick you up?

A.   He came to pick us up in his car.

Sanchez Alfaro - Direct/Adlam

53

Q.    What kind of car did he drive?

A.    A Ford Expedition.

Q.    What color?

A.    Black.

Q.    Did there come a time where you got in the car?

A.    Yes.

Q.    And you said he was coming to pick you up to go to work.

You were employed at that time; is that correct?

A.    Yes, we were going to work.

Q.    And were you authorized to work in the United States?

A.    Yes.

Q.    When you were granted authorization to work in the United States, did you have to get fingerprinted?

A.    Yes.

Q.    Where were you sitting in the car?

A.    In the back.

Q.    When you got in the car, was there anybody on the street at the time that you saw?

A.    No.

Q.    Did there come a time that the car was stopped?

A.    Yes.

Q.    Where was the car stopped at?

A.    On Horse Block.

Q.    Horse Block?

Sanchez Alfaro - Direct/Adlam

54

A.   Horse Block, yeah.

Q.   And how far is Horse Block away from Pauls Path?

A.   About nine or ten minutes away.

Q.   When you were stopped, who were you stopped by?

A.   The person, the last person who was here.

Q.   Was there anybody else who was around when you were stopped?

A.   There were three who were outside the doors of the car, outside the driver's side and outside of the passenger's side.

Q.   Did the individuals identify themselves?

A.   No.

They just came and they stopped us and asked us for our IDs.

Q.   When those individuals asked you for your ID, were there any other cars around?

A.   Yes.

There were about five other cars.

Q.   Were those cars stopped?

A.   Yes.

Q.   The persons who were around the car asking for IDs, did you see anybody else talking to them?

A.   They just asked us for our IDs and took them with them to another vehicle.

Q.   What ID did you give?

Sanchez Alfaro - Direct/Adlam

55

A.    My license and my work permit.

Q.    What license are you referring to?

A.    A New York license.

Q.    Is that a driver's license?

A.    Yes.

Q.    When did you come into the United States?

A.    2018.

Q.    How old were you when you came into the United States?

A.    I was 17 -- 18 years old.

Q.    When you came into the United States, were you detained by immigration?

A.    Yes.

Q.    When you were detained, where were you held?

A.    At a house, like a home house.

Q.    Were there other people living in that house?

A.    Yes.

Q.    Adults or children?

A.    Children.

Q.    How long did you stay in that house with children?

A.    About a month.

Q.    And were you released?

A.    Yes.

Q.    And who were you released to?

A.    Daniella Soriano.

Sanchez Alfaro - Direct/Adlam

56

Q.   And who is that person?

A.   My father's wife.

Q.   Now, since you have been in the United States, you testified you have work authorization.

You also have something called Special Immigrant Juvenile Status.

Is that correct?

A.   Yes.

Q.   On the day of your arrest you still had that same approved petition.

Is that correct?

A.   Yes.

Q.   And with that you had a work authorization with deferred action.

Is that correct?

A.   Yes.

Q.   Prior to your arrest, you still had that work authorization that was approved with the deferred action?

A.   Yes.

Q.   And before you were arrested, did you ever receive any kind of notice saying that your Special Immigrant Juvenile Status or your work authorization or your deferred action had been revoked?

A.   No.

Q.   And when you first came into the United States, did

57

you receive any papers from immigration to go to immigration court?

A.   Yes.

Q.   Did those papers have a time and date for you to go to court?

A.   Yes.

Q.   Did you ever receive any notice from the court?

A.   Yes.

Q.   The immigration court or could you be talking about family court?

A.   Family.

Q.   When you went to family court, was that for the special immigrant juvenile papers so your dad could get custody?

A.   Can you repeat the question?

Q.   When you went to family court, what was family court for?

A.   I don't understand the question.

        THE COURT:  I'm going to stop you there.

        This is kind of outside of his competence.

        MS. ADLAM:  Thank you, Your Honor.

        I'll withdraw the question.

BY MS. ADLAM:

Q.   Since being in the United States, have you been complying with all of the immigration requirements, to

58

your knowledge?

A.   Yes.

Q.   Have you ever been arrested in the United States for committing a crime?

A.   No.

MS. ADLAM:  Your Honor, I have no further questions.

THE COURT:  Any cross-examination?

MR. PRICE:  Yes, Your Honor.

CROSS-EXAMINATION

BY MR. PRICE:

Q.   Mr. Alfaro, good afternoon.

I just want to confirm.  So when you said that you -- after you had been detained initially you were released into the custody of your father's wife.

Is that correct?

A.   Yes.

Q.   But that was not your biological mother?

A.   No.

Q.   Have you been actually living with your father then -- strike that.

At the time that you were released into the custody of your father's wife, were you also living with your father at the same time?

A.   Yes.

They live together.

Q.  So basically you have been -- since you were released, you have been living with your father the whole time.

Is that correct?

A.  Yes, but she looked after me.

MR. PRICE:  I don't have anything further, Your Honor.

THE COURT:  Just one quick thing.

The day you were arrested, was it your stepfather that was with you or your father?

THE WITNESS:  My dad.

THE COURT:  Was he arrested too?

THE WITNESS:  Yes.

THE COURT:  Has he been released?

THE WITNESS:  Yes.

THE COURT:  What about the third person in the car?

Was he arrested?

THE WITNESS:  Yes.

THE COURT:  Has he been released?

THE WITNESS:  No.

He's still detained.

THE COURT:  Okay.

Anyone want to follow up on any of that?

60

MS. ADLAM:  No, Your Honor.

MR. PRICE:  No, Your Honor.

THE COURT:  You can step down, sir.

Thank you.

(Witness steps down.)

THE COURT:  Any further witnesses?

MS. ADLAM:  No, Your Honor.

THE COURT:  Anything further?

MR. PRICE:  None for respondent.

THE COURT:  Okay.

So I have the petition -- counsel, have you filed a brief in response or you haven't as yet?

MR. PRICE:  To the petition itself?

THE COURT:  Yes.

MR. PRICE:  No, Your Honor.

THE COURT:  Do you wish to do so?

MR. PRICE:  Yes, Your Honor.

We raised the issue of potential jurisdictional issue and the initial hearing and, as I understand it, I believe Your Honor just recently issued a standing order. I don't know if that would apply retroactively in terms of briefing the underlying petitions.

THE COURT:  I don't think so because this one's a little bit different.

I'm just trying to ease the burdens with that

order.  I don't know if it's going to work.  Can you get me whatever brief you would like to file within ten days?

MR. PRICE:  Yes, Your Honor.

THE COURT:  Okay.

And if you have any brief reply you will do it three days thereafter.

MS. ADLAM:  Thank you, Your Honor.

THE COURT:  Anything else anybody needs to raise for today?

MR. PRICE:  Nothing from respondent, Your Honor.

MS. ADLAM:  No.

THE COURT:  One thing you might want to think about in the briefing, both sides, there's some language in the statute around SIJ status that the individual would be deemed paroled for certain purposes.

Now, the testimony today suggested that might not matter anyway, but I'm not sure it wouldn't matter.  But if you have anything to say about that I would be interested.

MS. ADLAM:  Yes, Your Honor.

MR. PRICE:  Yes, Your Honor.

THE COURT:  Anything further?

MS. ADLAM:  Your Honor, I wanted to make sure that the court got my last two submissions.

THE COURT:  Wait.  One was a visa bulletin?

62

MS. ADLAM:  One is the visa bulletin.

THE COURT:  And the other was the juvenile records.

MS. ADLAM:  Yes.

THE COURT:  I got both of those.

MS. ADLAM:  Okay.

THE COURT:  I don't know who has the work authorization card.

Do you still have it or not?

MS. ADLAM:  I'm going to ask my client.

Normally they take it.

(There was a pause in the proceedings.)

MS. ADLAM:  It's still with his property in New Jersey he said.

THE COURT:  A, we should get him -- what other property is there?

MS. ADLAM:  His telephone, his driver's license and his clothing.

THE COURT:  Okay.

MS. ADLAM:  And his wallet.

THE COURT:  Counsel, can we arrange to get him his property back, to the extent that it's returnable?

MR. PRICE:  Yes, Your Honor.

THE COURT:  Okay.

Do that as soon as we can.  But I'd like to see

63

the back of the work authorization card because I think it provides some things and I'd be interested in that. Whoever has it, get me the back of the work authorization card, please.

One other thing I was going to ask. The NTA that was issued in this case, and I don't think any of the witnesses were familiar with it otherwise I would have asked them, but it said there was a list of attorneys attached for representational purposes, attorneys who can represent you for free or something.

I'm wondering if that happened and, if so, I'd like to see the list, okay?

MR. PRICE: Yes, Your Honor.

THE COURT: Excellent.

Anything further?

MS. ADLAM: Nothing, Your Honor.

I'm checking to see if I have a copy of the back.

THE COURT: You only gave me the front.

MS. ADLAM: I don't have a copy of the back.

THE COURT: Okay.

Good work, everybody. Thank you for your time.

MS. ADLAM: Thank you, Your Honor.

THE COURT: Have a great day.

MS. ADLAM: Thank you.

64

MR. PRICE:  Thank you, Your Honor.

THE COURT:  Good day to you all.

(The matter concluded.)

PAUL J. LOMBARDI, CERTIFIED REALTIME REPORTER
Official Court Reporter

# I N D E X

Witnesses                                                        Page


**JASON MASCIA**                                                   3

DIRECT EXAMINATION

BY MR. PRICE                                                       4

CROSS-EXAMINATION

BY MS. ADLAM                                                      14

REDIRECT EXAMINATION

BY MR. PRICE                                                      23

RECROSS-EXAMINATION

BY MS. ADLAM                                                      23


**PETER HASSELL**                                                 25

DIRECT EXAMINATION

BY MR. PRICE                                                      25

CROSS-EXAMINATION

BY MS. ADLAM                                                      31


**GERALDO PAOLI**                                                 33

DIRECT EXAMINATION

BY MR. PRICE                                                      34

CROSS-EXAMINATION                                                 42

BY MS. ADLAM

REDIRECT EXAMINATION

BY MR. PRICE                                            49

RECROSS-EXAMINATION

BY MS. ADLAM                                            50


**WILLIAM ENRIQUE SANCHEZ ALFARO**                     51

DIRECT EXAMINATION

BY MS. ADLAM                                            52

CROSS-EXAMINATION

BY MR. PRICE                                            58


                          **E X H I B I T S**


                                                       Page

1

## 1

**100** [1] - 1:21
**11722** [3] - 1:14, 1:18, 1:21
**14** [1] - 65:10
**15** [2] - 9:1, 16:17
**16** [1] - 26:8
**17** [1] - 55:10
**18** [1] - 55:10
**1:30** [1] - 1:8

## 2

**20** [2] - 14:5, 16:17
**2007** [1] - 34:20
**2008** [1] - 26:14
**2012** [1] - 4:11
**2015** [7] - 4:12, 26:10, 26:11, 34:19, 45:17, 45:19, 46:1
**2018** [1] - 55:7
**2026** [5] - 1:7, 4:16, 26:18, 52:12, 52:14
**212** [1] - 49:10
**23** [2] - 65:12, 65:14
**235** [1] - 23:14
**241(a)(2** [1] - 14:25
**25** [3] - 1:7, 65:16, 65:18
**26-766** [1] - 2:1
**26-cv-766** [1] - 1:4

## 3

**3** [1] - 65:6
**31** [1] - 65:20
**33** [1] - 65:22
**34** [1] - 65:24
**35** [3] - 4:24, 18:8, 52:13

## 4

**4** [1] - 65:8
**42** [1] - 65:25
**49** [1] - 66:3

## 5

**50** [1] - 66:5
**51** [1] - 66:7
**52** [1] - 66:9
**560** [1] - 31:23
**570** [1] - 1:21
**58** [1] - 66:11

## 6

**6** [5] - 4:16, 4:18, 26:18, 52:12, 52:14
**610** [1] - 1:17
**631** [1] - 1:21

## 7

**7** [1] - 52:19
**712-6106** [1] - 1:21

## 8

**8** [1] - 52:19
**81** [1] - 1:14

## A

**ability** [1] - 21:18
**able** [3] - 6:14, 18:3, 44:9
**access** [5] - 19:13, 49:16, 49:17, 49:20
**accessing** [1] - 49:14
**according** [1] - 30:9
**acknowledged** [1] - 12:23
**action** [32] - 10:18, 10:19, 10:24, 19:7, 19:22, 21:3, 22:15, 22:19, 22:21, 24:13, 24:21, 30:23, 32:2, 32:3, 32:14, 40:13, 40:17, 40:23, 43:17, 43:19, 43:20, 44:4, 44:5, 44:10, 45:13, 45:14, 45:20, 46:3, 50:15, 56:14, 56:18, 56:23
**activists** [1] - 7:4
**actual** [6] - 11:13, 12:22, 15:19, 16:2, 21:11, 35:1
**address** [7] - 4:24, 5:4, 5:6, 12:25, 18:6, 18:9
**adjacent** [3] - 5:9, 5:17, 18:10
**adjusted** [3] - 17:1, 48:7, 48:11
**adjustment** [1] - 32:4
**ADLAM** [51] - 1:13, 2:5, 2:10, 3:4, 14:13, 14:19, 14:20, 18:23, 23:17, 23:19, 24:24, 31:15, 31:17, 32:16, 33:10, 42:22, 42:24, 46:5, 50:8, 50:10, 51:1, 51:13, 51:17, 52:6, 52:8, 57:21, 57:23, 58:6, 60:1, 60:7, 61:7, 61:11, 61:20, 61:23, 62:1, 62:4, 62:6, 62:10, 62:13, 62:17, 62:20, 63:16, 63:20, 63:23, 63:25, 65:10, 65:14, 65:20, 66:1, 66:5, 66:9
**Adlam** [1] - 2:5
**admitted** [1] - 14:3
**adult** [2] - 9:11, 12:17
**adults** [2] - 12:18, 55:18
**affect** [2] - 22:20, 31:2
**afield** [1] - 21:11
**afternoon** [13] - 2:7, 2:8, 2:17, 14:14, 14:15, 25:24, 31:18, 31:19, 34:11, 42:25, 43:1, 52:20, 58:12

**agency** [2] - 24:9, 50:1
**agent** [4] - 22:4, 26:9, 34:21, 40:20
**agitator** [1] - 9:14
**agitators** [11] - 7:3, 7:4, 7:14, 7:25, 8:5, 8:8, 8:13, 9:3, 9:14, 16:13, 27:2
**ago** [3] - 11:22, 14:4, 14:5
**ahead** [2] - 8:19, 41:2
**akin** [1] - 7:22
**al** [1] - 1:7
**Alfaro** [4] - 2:2, 4:14, 52:11, 58:12
**ALFARO** [3] - 1:3, 52:1, 66:7
**allow** [1] - 43:21
**Almodovar** [1] - 2:2
**ALMODOVAR** [1] - 1:7
**amenability** [1] - 38:8
**amenable** [7] - 15:23, 23:7, 36:2, 37:9, 38:6, 47:15, 49:7
**angle** [1] - 18:11
**announce** [1] - 7:5
**answer** [4] - 39:25, 45:24, 50:21, 50:22
**answered** [1] - 11:12
**anyway** [2] - 13:8, 61:17
**app** [1] - 8:14
**appeal** [3] - 4:22, 15:3
**appear** [8] - 5:12, 20:20, 22:2, 22:10, 22:12, 22:22, 22:23, 37:13
**appearance** [1] - 2:3
**APPEARANCES** [1] - 1:12
**appearing** [1] - 5:12
**application** [1] - 44:25
**applications** [2] - 39:14, 43:13
**apply** [4] - 31:6, 46:17, 49:23, 60:21
**apprehend** [2] - 4:20, 28:19
**apprehension** [1] - 24:2
**approach** [2] - 6:23, 6:25
**approached** [6] - 6:6, 7:2, 7:10, 7:24, 12:10, 27:22
**approval** [1] - 32:6
**approved** [7] - 31:23, 39:15, 40:25, 44:25, 45:11, 56:10, 56:18
**area** [2] - 7:5, 7:8
**arrange** [1] - 62:21
**arrest** [11] - 4:13, 11:2, 19:25, 26:15, 30:10, 30:16, 31:3, 35:4, 48:22, 56:9, 56:17
**arrested** [9] - 13:8, 41:15, 47:18, 48:25, 56:20, 58:3, 59:10, 59:13, 59:19
**arrived** [2] - 9:1, 35:5

**agency** — see above

**assigned** [1] - 4:20
**assignment** [1] - 4:18
**assist** [1] - 7:17
**assistance** [2] - 8:1, 8:4
**Assistant** [1] - 2:18
**attached** [1] - 63:9
**attempt** [1] - 7:6
**attorney** [3] - 20:18, 38:22
**Attorney** [1] - 2:18
**attorneys** [2] - 63:8, 63:9
**AUSA** [1] - 1:16
**authority** [4] - 17:4, 17:5, 23:8, 23:10
**authorization** [25] - 13:22, 19:7, 29:23, 30:2, 30:5, 30:24, 31:1, 41:7, 41:9, 41:14, 41:21, 41:25, 42:13, 43:23, 43:25, 46:16, 46:18, 53:13, 56:4, 56:13, 56:18, 56:22, 62:8, 63:1, 63:3
**authorized** [1] - 53:11
**Ave** [1] - 1:14
**aware** [8] - 15:20, 15:21, 30:20, 30:22, 31:20, 32:1, 32:3, 32:9

## B

**backlogged** [2] - 32:10, 32:12
**based** [4] - 32:10, 36:12, 39:17, 47:5
**basis** [4] - 38:7, 39:22, 49:8, 49:11
**became** [2] - 12:19, 13:1
**become** [4] - 20:6, 32:1, 33:4, 49:22
**BEFORE** [1] - 1:10
**beginning** [1] - 9:13
**behalf** [1] - 2:19
**best** [1] - 27:11
**BIA** [4] - 4:22, 14:22, 15:3
**big** [1] - 50:3
**binoculars** [2] - 6:18, 6:19
**biographic** [1] - 13:11
**biological** [1] - 58:18
**birth** [1] - 48:5
**bit** [2] - 12:19, 60:24
**black** [3] - 5:19, 27:6, 53:4
**Block** [4] - 53:24, 53:25, 54:1, 54:2
**boot** [1] - 35:21
**border** [1] - 24:3
**Border** [1] - 24:5
**born** [4] - 47:9, 47:11, 48:10, 48:12
**breaking** [1] - 11:9
**brief** [3] - 60:12, 61:2, 61:5
**briefing** [2] - 60:22, 61:13
**briefly** [2] - 9:19, 23:2

**Brooklyn** [1] - 48:6
**brought** [1] - 20:18
**BROWN** [1] - 1:10
**bulletin** [2] - 61:25, 62:1
**bunch** [1] - 28:20
**burdens** [1] - 60:25
**BY** [33] - 4:3, 5:2, 6:13, 8:20, 10:8, 14:13, 14:20, 23:4, 23:19, 25:23, 27:19, 31:17, 34:10, 37:17, 42:10, 42:24, 49:5, 50:10, 52:8, 57:23, 58:11, 65:8, 65:10, 65:12, 65:14, 65:18, 65:20, 65:24, 66:1, 66:3, 66:5, 66:9, 66:11

## C

**calm** [1] - 9:13
**capability** [1] - 35:17
**capacity** [1] - 45:1
**car** [20] - 6:23, 7:11, 11:8, 11:10, 27:7, 27:15, 28:17, 28:21, 29:18, 44:21, 52:25, 53:1, 53:5, 53:16, 53:18, 53:21, 53:23, 54:9, 54:21, 59:18
**card** [8] - 29:24, 30:2, 32:5, 41:7, 41:22, 62:8, 63:1, 63:4
**cards** [2] - 32:10, 41:9
**care** [1] - 3:3
**Carleton** [1] - 1:14
**cars** [3] - 54:16, 54:18, 54:19
**case** [10] - 2:1, 11:18, 15:21, 17:21, 20:16, 21:21, 27:1, 27:2, 29:15, 63:6
**cases** [1] - 21:9
**CAT** [1] - 1:25
**categories** [2] - 46:11, 46:14
**center** [2] - 38:2
**Central** [4] - 1:6, 1:14, 1:18, 1:21
**certain** [2] - 49:15, 61:15
**certificates** [1] - 48:6
**chance** [1] - 7:1
**Chartrisse** [1] - 2:5
**CHARTRISSE** [1] - 1:13
**check** [14] - 11:23, 16:25, 17:2, 17:8, 17:10, 17:14, 17:20, 19:11, 36:1, 46:21, 47:13, 47:14, 48:3, 48:15
**checked** [2] - 17:6, 17:14
**checking** [3] - 46:22, 48:5, 63:17
**checks** [44] - 9:21, 10:24, 12:6, 12:14, 13:10, 13:13, 15:12, 15:17, 15:19, 16:2, 16:4, 16:7, 16:11, 16:18, 16:19, 17:22, 17:23, 23:6,

28:16, 28:22, 31:20, 31:21, 35:9, 35:10, 35:14, 35:18, 35:24, 36:12, 36:21, 36:22, 37:9, 42:5, 42:6, 43:2, 43:5, 43:9, 43:12, 43:16, 47:1, 47:4, 48:2, 49:13, 50:12
**children** [3] - 55:18, 55:19, 55:20
**circled** [1] - 9:4
**CIS** [1] - 50:1
**citizen** [9] - 47:12, 47:18, 47:19, 47:25, 48:1, 48:2, 48:4, 48:9, 48:16
**City** [1] - 4:9
**civil** [1] - 2:1
**classification** [2] - 20:5, 24:8
**clear** [6] - 13:1, 13:25, 33:4, 37:18, 42:11, 44:9
**CLERK** [9] - 2:1, 3:17, 3:20, 25:14, 25:17, 33:23, 34:3, 51:22, 52:3
**client** [7] - 15:19, 16:1, 16:3, 17:11, 43:10, 44:19, 62:10
**client's** [1] - 17:21
**closer** [1] - 26:5
**clothing** [1] - 62:18
**code** [1] - 43:25
**color** [2] - 8:17, 53:3
**coming** [2] - 21:5, 53:7
**commenced** [3] - 21:23, 22:11, 22:17
**committing** [1] - 58:4
**communicate** [1] - 16:1
**community** [1] - 7:7
**company** [1] - 13:23
**competence** [1] - 57:20
**complied** [1] - 28:6
**comply** [1] - 28:4
**complying** [1] - 57:25
**computer** [1] - 35:21
**concept** [1] - 48:18
**concluded** [1] - 64:3
**confer** [1] - 20:3
**confirm** [2] - 48:3, 58:13
**confirms** [1] - 48:2
**confusing** [1] - 20:7
**congressional** [1] - 32:13
**considered** [1] - 50:16
**contact** [1] - 12:5
**contacted** [1] - 31:25
**context** [1] - 22:16
**continuously** [2] - 21:8, 21:19
**conversation** [3] - 10:14, 43:3, 43:5
**conversations** [6] - 9:6, 10:15, 13:19, 27:24, 28:8, 38:13

**convey** [1] - 39:1
**cooperative** [4] - 9:12, 9:16, 11:9, 11:11
**copy** [2] - 63:17, 63:20
**Coram** [2] - 52:13
**corner** [3] - 5:9, 5:19, 18:9
**correct** [25] - 4:5, 5:7, 6:11, 14:23, 24:3, 24:21, 25:25, 26:12, 26:22, 26:23, 29:19, 30:11, 32:7, 34:12, 34:13, 35:24, 35:25, 44:23, 50:5, 53:9, 56:7, 56:11, 56:15, 58:16, 59:5
**correctly** [2] - 20:22, 22:23
**counsel** [16] - 2:3, 2:16, 3:2, 4:1, 8:19, 14:11, 14:17, 23:1, 31:11, 33:15, 34:8, 37:16, 42:21, 52:4, 60:11, 62:21
**Counsel** [1] - 25:21
**country** [3] - 14:4, 16:25, 23:14
**couple** [1] - 50:8
**course** [1] - 5:11
**COURT** [160] - 1:1, 1:10, 2:8, 2:11, 2:15, 2:20, 3:1, 3:6, 3:13, 3:25, 4:25, 6:4, 6:10, 6:12, 7:19, 8:9, 8:18, 10:1, 10:5, 11:17, 11:22, 12:7, 13:1, 13:4, 13:7, 13:15, 14:1, 14:6, 14:8, 14:11, 14:17, 18:25, 19:7, 19:10, 19:13, 19:15, 19:18, 19:21, 19:24, 20:2, 20:11, 20:13, 20:21, 20:24, 21:13, 21:21, 22:3, 22:8, 22:13, 22:25, 23:16, 24:25, 25:2, 25:6, 25:9, 25:11, 25:21, 27:17, 29:15, 29:20, 29:23, 30:1, 30:4, 30:8, 30:12, 30:16, 30:20, 30:23, 31:2, 31:9, 31:13, 32:15, 32:18, 32:21, 32:23, 33:3, 33:7, 33:11, 33:15, 33:18, 33:20, 34:8, 36:4, 36:7, 36:11, 36:15, 36:18, 36:25, 37:3, 37:15, 39:16, 39:21, 39:24, 40:8, 40:12, 40:15, 40:19, 41:1, 41:5, 41:10, 41:14, 41:21, 42:9, 42:20, 45:23, 46:7, 46:21, 46:24, 47:5, 47:8, 47:11, 47:22, 48:3, 48:10, 48:17, 48:21, 48:24, 49:2, 50:7, 50:18, 50:21, 51:2, 51:4, 51:8, 51:11, 51:14, 51:19, 52:4, 57:19, 58:8, 59:9, 59:13, 59:15, 59:17, 59:21, 59:24, 60:3, 60:6, 60:8, 60:10, 60:14, 60:16, 60:23, 61:4, 61:8, 61:12,

61:22, 61:25, 62:2, 62:5, 62:7, 62:15, 62:19, 62:21, 62:24, 63:14, 63:19, 63:21, 63:24, 64:2
**Court** [1] - 1:20
**court** [17] - 2:11, 20:23, 22:24, 23:21, 23:24, 23:25, 24:14, 24:18, 57:2, 57:5, 57:7, 57:9, 57:10, 57:12, 57:16, 61:24
**Courthouse** [1] - 1:5
**courtroom** [1] - 2:25
**crime** [1] - 58:4
**criminal** [1] - 43:9
**cross** [1] - 58:8
**CROSS** [8] - 14:12, 31:16, 42:23, 58:10, 65:9, 65:19, 65:25, 66:10
**cross-examination** [1] - 58:8
**CROSS-EXAMINATION** [8] - 14:12, 31:16, 42:23, 58:10, 65:9, 65:19, 65:25, 66:10
**cuffed** [1] - 29:10
**cursing** [1] - 16:15
**custody** [32] - 11:1, 11:24, 14:6, 15:22, 16:5, 17:3, 17:4, 18:1, 18:21, 18:22, 20:15, 21:2, 21:5, 21:7, 21:17, 21:20, 23:11, 36:9, 37:11, 38:1, 38:12, 38:17, 38:18, 43:21, 44:3, 45:3, 45:6, 46:10, 46:20, 57:14, 58:15, 58:23
**Customs** [1] - 24:6

## D

**dad** [2] - 57:13, 59:12
**daniella** [1] - 55:25
**database** [1] - 50:3
**databases** [12] - 13:11, 16:22, 19:4, 19:11, 49:14, 49:16, 49:17, 49:19, 49:23, 49:25, 50:2
**date** [2] - 24:18, 57:4
**David** [1] - 1:13
**days** [2] - 61:2, 61:6
**decision** [7] - 17:25, 20:11, 21:24, 30:16, 36:19, 37:5, 37:6
**decisions** [1] - 16:12
**deemed** [1] - 61:15
**deferral** [3] - 20:6, 20:7
**deferred** [29] - 19:7, 19:22, 21:3, 22:15, 22:19, 22:21, 24:13, 24:21, 30:23, 32:1, 32:3, 32:14, 40:13, 40:16, 40:22, 43:17, 43:19, 43:20, 44:4, 44:5, 44:10, 45:13, 45:14, 45:20, 46:3, 50:15,

56:14, 56:18, 56:23
**denied** [2] - 4:23, 15:5
**departed** [1] - 6:3
**department** [1] - 32:11
**Department** [2] - 46:24, 47:1
**deportation** [12] - 3:11, 4:8, 4:12, 22:6, 26:4, 26:6, 26:9, 30:6, 34:16, 34:18, 34:19, 45:16
**Deportation** [2] - 25:7, 33:16
**deported** [1] - 40:24
**description** [1] - 5:12
**detail** [1] - 45:12
**detain** [1] - 21:22
**detained** [12] - 20:8, 23:14, 24:20, 28:12, 30:12, 38:19, 42:4, 49:7, 55:12, 55:14, 58:14, 59:23
**detaining** [3] - 29:8, 42:7, 43:7
**detention** [12] - 10:21, 11:14, 13:14, 17:4, 17:5, 22:6, 23:7, 23:10, 34:22, 38:6, 49:8
**determination** [2] - 31:2, 36:25
**determinations** [1] - 20:15
**DHS** [1] - 50:1
**different** [6] - 6:7, 27:1, 33:2, 49:14, 49:20, 60:24
**DIRECT** [8] - 4:2, 25:22, 34:9, 52:7, 65:7, 65:17, 65:23, 66:8
**direct** [2] - 20:14, 41:4
**direction** [2] - 8:6, 8:21
**disclosing** [1] - 8:11
**dismissal** [1] - 14:22
**dismissed** [2] - 4:23, 15:4
**distract** [1] - 7:14
**DISTRICT** [3] - 1:1, 1:1, 1:10
**documents** [2] - 37:12, 38:21
**DOJ** [1] - 1:17
**DOJ-USAO** [1] - 1:17
**done** [1] - 20:15
**door** [2] - 3:9, 12:2
**doors** [1] - 54:8
**down** [13] - 4:25, 7:7, 7:15, 8:5, 8:6, 25:2, 25:4, 33:11, 33:14, 51:4, 51:7, 60:3, 60:5
**drive** [1] - 53:1
**driver** [6] - 18:13, 18:14, 27:22, 27:24, 29:10
**driver's** [5] - 27:22, 47:24, 54:9, 55:4, 62:17
**driveway** [1] - 5:25
**driveways** [2] - 5:19, 18:11
**driving** [1] - 27:3
**drove** [2] - 8:21, 9:2

**duly** [4] - 3:19, 25:16, 34:2, 52:2
**duration** [1] - 28:7
**during** [4] - 2:25, 5:3, 5:11, 7:3
**duties** [1] - 21:12

## E

**ease** [1] - 60:25
**EASTERN** [1] - 1:1
**effected** [1] - 19:25
**effort** [1] - 5:24
**either** [3] - 3:8, 24:5, 46:8
**employed** [2] - 25:25, 53:9
**encounter** [1] - 24:9
**encountered** [1] - 44:19
**end** [1] - 21:4
**ended** [2] - 27:3, 27:4
**enforcement** [3] - 5:24, 26:9, 34:20
**Enforcement** [1] - 24:6
**English** [5] - 13:17, 13:18, 13:21, 39:1, 39:4
**ENRIQUE** [3] - 1:3, 52:1, 66:7
**Enrique** [1] - 52:11
**enrolled** [1] - 15:25
**entered** [3] - 16:24, 27:6, 44:15
**entity** [1] - 24:12
**entry** [1] - 23:13
**EOIR** [1] - 17:19
**ESQ** [1] - 1:13
**essentially** [10] - 4:20, 5:16, 7:14, 8:3, 9:20, 11:2, 12:1, 13:12, 20:5, 20:14
**estimating** [1] - 9:1
**et** [1] - 1:7
**evening** [1] - 52:20
**eventually** [3] - 9:3, 9:15, 16:13
**evident** [1] - 12:19
**EVIDENTIARY** [1] - 1:9
**exactly** [6] - 14:4, 16:6, 16:20, 45:8, 47:2, 49:19
**EXAMINATION** [24] - 4:2, 14:12, 23:3, 23:18, 25:22, 31:16, 34:9, 42:23, 49:4, 50:9, 52:7, 58:10, 65:7, 65:9, 65:11, 65:13, 65:17, 65:19, 65:23, 65:25, 66:2, 66:4, 66:8, 66:10
**examination** [1] - 58:8
**excellent** [1] - 63:14
**exclude** [2] - 3:3, 3:4
**excuse** [1] - 14:17
**exhausted** [1] - 15:7
**expedite** [1] - 35:14
**Expedition** [5] - 5:20, 6:2,

26:25, 27:6, 53:2
**experience** [2] - 39:18, 47:5
**explain** [3] - 34:25, 36:5, 37:2
**extended** [1] - 16:10
**extent** [1] - 62:22

## F

**facility** [2] - 10:22, 11:14
**fact** [1] - 12:8
**fall** [1] - 17:5
**familiar** [4] - 19:21, 40:12, 48:18, 63:7
**family** [5] - 57:10, 57:11, 57:12, 57:16
**far** [2] - 21:11, 54:2
**fascinating** [2] - 21:13, 21:14
**father** [7] - 10:7, 18:17, 52:16, 58:20, 58:24, 59:3, 59:11
**father's** [3] - 56:2, 58:15, 58:23
**FCRR** [1] - 1:20
**February** [6] - 1:7, 4:16, 4:18, 26:18, 52:12, 52:14
**Federal** [2] - 1:17, 1:21
**field** [1] - 22:4
**file** [7] - 21:25, 23:22, 23:24, 24:7, 24:9, 32:6, 61:2
**filed** [10] - 15:3, 15:4, 17:19, 20:22, 22:23, 23:21, 24:8, 24:11, 24:14, 60:12
**filming** [1] - 16:15
**findings** [2] - 17:18, 17:20
**fine** [1] - 50:23
**fingerprinted** [1] - 53:14
**finish** [2] - 21:16, 47:11
**first** [5] - 2:22, 12:10, 12:11, 12:12, 56:25
**fit** [1] - 5:12
**five** [1] - 54:18
**follow** [13] - 8:4, 11:18, 14:9, 19:1, 19:2, 23:1, 29:16, 31:10, 32:19, 46:7, 46:8, 49:3, 59:25
**follow-up** [1] - 49:3
**followed** [2] - 7:3, 7:25
**following** [1] - 27:12
**follows** [4] - 3:19, 25:16, 34:2, 52:2
**forcing** [1] - 11:10
**Ford** [4] - 5:20, 26:24, 27:6, 53:2
**forwarded** [1] - 35:9
**free** [1] - 63:10
**friend** [2] - 52:16, 52:22
**front** [11] - 5:18, 9:10, 9:11, 9:15, 10:14, 11:4, 12:21, 13:20, 18:12, 18:15, 63:19

**full** [1] - 52:9

## G

**GARY** [1] - 1:10
**gentleman** [1] - 29:20
**Geraldo** [2] - 33:17, 34:6
**GERALDO** [2] - 34:1, 65:22
**given** [7] - 9:17, 10:3, 16:2, 16:4, 38:7, 49:7, 49:10
**government** [2] - 24:12, 51:8
**Government** [1] - 41:11
**granted** [3] - 22:21, 45:13, 53:13
**grants** [1] - 45:14
**GRB** [1] - 1:4
**great** [2] - 45:12, 63:24
**green** [2] - 32:5, 32:10
**group** [1] - 7:4
**guess** [3] - 12:3, 40:1, 42:4
**guys** [3] - 28:21, 38:18

## H

**H-A-S-S-E-L-L** [1] - 25:20
**hand** [4] - 3:17, 25:14, 33:23, 51:22
**handcuffs** [1] - 29:8
**harassed** [1] - 27:2
**Hassell** [4] - 10:13, 25:8, 25:20, 25:24
**HASSELL** [2] - 25:15, 65:16
**head** [2] - 45:8, 46:13
**heard** [1] - 32:23
**hearing** [2] - 2:21, 60:19
**HEARING** [1] - 1:9
**held** [1] - 55:14
**hinder** [1] - 7:6
**history** [1] - 43:10
**hold** [2] - 10:1, 39:16
**holding** [1] - 28:17
**home** [1] - 55:15
**honestly** [2] - 18:18, 29:25
**Honor** [61] - 2:6, 2:7, 2:17, 2:23, 3:5, 3:11, 10:4, 14:10, 14:19, 18:23, 21:10, 23:15, 23:17, 25:1, 25:7, 31:12, 31:15, 32:17, 32:20, 33:9, 33:10, 39:20, 40:11, 40:14, 40:18, 41:13, 41:17, 42:22, 46:5, 48:20, 48:23, 49:1, 50:6, 50:8, 51:1, 51:3, 51:10, 51:13, 51:17, 52:6, 57:21, 58:6, 58:9, 59:8, 60:1, 60:2, 60:7, 60:15, 60:17, 60:20, 61:3, 61:7, 61:10, 61:20, 61:21, 61:23, 62:23, 63:13, 63:16, 63:23, 64:1
**HONORABLE** [1] - 1:10

hopes [1] - 8:7
hoping [1] - 7:23
Horse [4] - 53:24, 53:25, 54:1, 54:2
house [7] - 5:10, 5:19, 18:10, 55:15, 55:16, 55:20

## I

I-200 [1] - 20:16
ICE [18] - 4:5, 4:7, 4:8, 4:11, 7:11, 8:10, 19:13, 24:5, 25:25, 26:2, 26:13, 34:12, 34:14, 36:9, 42:4, 49:16, 50:1
ID [10] - 9:17, 10:3, 28:22, 29:4, 29:17, 29:24, 41:6, 47:24, 54:15, 54:25
identification [4] - 28:2, 28:3, 28:10, 28:15
identify [1] - 54:11
IDs [9] - 12:4, 33:6, 35:7, 35:8, 35:13, 47:21, 54:14, 54:21, 54:23
IEA [1] - 34:20
immediately [1] - 27:8
Immigrant [3] - 45:9, 56:5, 56:21
immigrant [1] - 57:13
Immigration [1] - 24:6
immigration [19] - 15:2, 16:22, 19:4, 23:25, 26:9, 34:20, 36:23, 38:19, 41:11, 42:1, 42:18, 44:6, 45:3, 55:12, 57:1, 57:2, 57:9, 57:25
INA [4] - 14:25, 23:14, 49:10, 50:16
include [1] - 17:16
including [1] - 29:20
individual [16] - 6:15, 7:9, 7:10, 13:24, 14:1, 14:16, 18:20, 19:5, 20:17, 24:9, 32:25, 33:2, 33:5, 42:12, 50:2, 61:14
individual's [1] - 18:20
individually [2] - 49:21, 49:24
individuals [14] - 5:21, 5:23, 6:23, 8:2, 11:1, 11:14, 13:16, 18:22, 28:12, 29:8, 30:10, 48:18, 54:11, 54:15
information [5] - 13:11, 19:10, 29:5, 39:1, 43:19
informed [6] - 9:17, 10:25, 11:23, 17:11, 38:6, 39:7
initial [3] - 20:18, 24:2, 60:19
initiate [1] - 27:13
inside [1] - 35:7
instance [3] - 15:19, 22:21,

23:10
intent [1] - 32:13
interaction [1] - 9:6
interested [2] - 61:19, 63:2
interpreter [3] - 2:11, 2:14, 51:20
invoke [1] - 3:2
involved [6] - 11:13, 16:18, 16:20, 29:7, 29:11, 35:1
Island [1] - 4:9
Islip [4] - 1:6, 1:14, 1:18, 1:21
issuance [2] - 20:20, 22:11
issuances [1] - 17:16
issue [3] - 22:2, 60:18, 60:19
issued [11] - 17:19, 20:16, 21:1, 21:3, 22:22, 24:19, 41:11, 44:14, 48:13, 60:20, 63:6
issues [1] - 16:9
issuing [1] - 22:10
itself [2] - 8:7, 60:13

## J

Jason [2] - 3:12, 3:23
JASON [2] - 3:18, 65:6
Jersey [1] - 62:14
job [1] - 23:24
judge [1] - 15:2
JUDGE [1] - 1:10
judgment [1] - 7:12
jurisdictional [1] - 60:18
juvenile [3] - 45:7, 57:13, 62:2
Juvenile [3] - 45:9, 56:6, 56:22

## K

kind [4] - 35:14, 53:1, 56:21, 57:20
knowledge [6] - 44:4, 44:7, 44:14, 50:1, 50:20, 58:1
known [2] - 8:12, 8:17
knows [1] - 12:23

## L

language [1] - 61:13
last [6] - 3:21, 25:18, 34:4, 34:6, 54:5, 61:24
Law [1] - 1:13
lawful [2] - 20:4, 46:15
lawfully [2] - 14:2, 16:25
lead [1] - 8:7
learn [1] - 12:7
leave [1] - 5:22
led [1] - 26:24
legal [1] - 41:18
legally [1] - 31:7

less [1] - 39:23
level [1] - 49:20
license [7] - 8:15, 47:24, 55:1, 55:2, 55:3, 55:4, 62:17
limited [1] - 28:1
list [2] - 63:8, 63:12
live [1] - 59:1
living [5] - 52:12, 55:16, 58:20, 58:23, 59:3
loaded [1] - 5:24
local [1] - 27:1
locate [1] - 7:5
location [4] - 7:12, 16:10, 16:14, 24:19
Lombardi [1] - 1:20
looked [4] - 6:20, 9:20, 11:19, 59:6
looking [6] - 5:6, 6:6, 14:21, 15:14, 16:18, 18:11
lost [1] - 9:3

## M

M-A-S-C-I-A [2] - 3:12, 3:24
ma'am [3] - 14:15, 17:13, 23:23
magnification [1] - 6:18
mail [1] - 24:17
male [2] - 9:11, 12:17
management [3] - 20:15, 21:8, 21:18
marked [2] - 7:19, 27:17
Mascia [6] - 3:12, 3:23, 4:4, 23:5, 26:20, 27:5
MASCIA [2] - 3:18, 65:6
matter [3] - 61:17, 64:3
mean [12] - 21:6, 36:5, 36:20, 39:25, 41:22, 44:4, 44:5, 44:25, 45:5, 46:4, 46:15, 47:17
meaning [4] - 13:16, 14:24, 14:25, 22:3
means [4] - 19:22, 22:15, 44:7
mechanical [1] - 1:24
mentioned [2] - 39:8, 46:9
method [1] - 23:13
Michael [1] - 29:3
microphone [1] - 14:18
might [6] - 26:5, 37:4, 41:23, 46:9, 61:12, 61:16
minutes [4] - 9:2, 16:17, 54:3
moment [2] - 11:22, 40:2
month [1] - 55:21
morning [6] - 4:4, 4:18, 32:25, 52:14, 52:20, 52:21
mother [1] - 58:18
motion [3] - 4:23, 15:4
moved [1] - 12:25

MR [55] - 2:17, 2:23, 3:11, 4:3, 5:2, 6:13, 8:20, 10:8, 11:16, 14:10, 21:10, 23:2, 23:4, 23:15, 25:1, 25:7, 25:23, 27:19, 29:14, 31:12, 32:20, 33:9, 33:16, 34:10, 37:17, 41:3, 42:10, 42:19, 45:22, 49:5, 50:6, 50:17, 50:19, 51:3, 51:10, 58:9, 58:11, 59:7, 60:2, 60:9, 60:13, 60:15, 60:17, 61:3, 61:10, 61:21, 62:23, 63:13, 64:1, 65:8, 65:12, 65:18, 65:24, 66:3, 66:11
MS [50] - 2:5, 2:10, 3:4, 14:13, 14:19, 14:20, 18:23, 23:17, 23:19, 24:24, 31:15, 31:17, 32:16, 33:10, 42:22, 42:24, 46:5, 50:8, 50:10, 51:1, 51:13, 51:17, 52:6, 52:8, 57:21, 57:23, 58:6, 60:1, 60:7, 61:7, 61:11, 61:20, 61:23, 62:1, 62:4, 62:6, 62:10, 62:13, 62:17, 62:20, 63:16, 63:20, 63:23, 63:25, 65:10, 65:14, 65:20, 66:1, 66:5, 66:9

## N

name [10] - 3:21, 3:23, 25:18, 34:4, 34:6, 34:7, 52:9
natural [1] - 47:11
nature [1] - 45:10
necessarily [2] - 15:5, 21:6
need [2] - 20:25, 24:16
needs [3] - 24:15, 24:17, 61:8
neighborhood [1] - 7:12
never [4] - 17:19, 22:14, 24:11, 24:14
NEW [1] - 1:1
new [3] - 21:2, 24:18, 24:19
New [5] - 1:6, 1:21, 4:8, 55:3, 62:14
next [3] - 11:3, 25:6, 33:21
nine [1] - 54:3
nobody [3] - 12:14, 12:15, 28:18
none [1] - 60:9
normal [2] - 45:19, 46:2
normally [1] - 62:11
noted [1] - 21:14
nothing [9] - 24:24, 36:22, 38:11, 42:7, 42:19, 43:6, 44:2, 61:10, 63:16
notice [9] - 20:20, 22:2, 22:10, 22:12, 22:22, 22:23, 37:13, 56:21, 57:7
notified [2] - 28:12, 38:16

**notifying** [1] - 7:7
**notion** [1] - 40:12
**NTA** [10] - 17:18, 21:2, 23:20, 24:10, 24:11, 24:14, 24:18, 44:14, 44:16, 63:5
**NTAs** [2] - 17:16, 24:7
**numbers** [1] - 8:15
**NY** [2] - 1:14, 1:18

## O

**O'Donoghue** [2] - 29:3, 50:13
**object** [3] - 21:10, 28:5, 50:18
**objection** [5] - 21:14, 32:15, 45:22, 50:17, 50:19
**observation** [2] - 5:11, 6:17
**observe** [1] - 6:15
**observed** [1] - 5:21
**observing** [2] - 5:6, 7:13
**obtains** [1] - 45:11
**obviously** [2] - 17:21, 32:24
**occupant** [1] - 10:15
**occupants** [7] - 9:6, 9:23, 10:16, 10:21, 27:25, 28:8, 38:14
**occurs** [1] - 37:24
**OF** [2] - 1:1, 1:9
**office** [4] - 4:9, 38:20, 45:14, 46:1
**Officer** [7] - 14:14, 25:8, 25:24, 31:18, 33:16, 42:25, 50:13
**officer** [42] - 3:12, 3:14, 4:8, 4:12, 7:17, 8:1, 10:10, 10:13, 10:25, 11:16, 11:24, 12:3, 12:4, 18:2, 19:15, 22:7, 23:5, 26:4, 26:6, 26:9, 26:20, 28:15, 29:4, 29:6, 30:19, 32:23, 34:11, 34:16, 34:18, 34:19, 35:6, 35:13, 35:23, 36:21, 39:17, 43:18, 45:16, 46:25, 49:6, 49:22, 50:11
**officers** [4] - 28:21, 35:9, 37:10, 42:6
**Offices** [1] - 1:13
**Official** [1] - 1:20
**often** [3] - 7:3, 8:14, 24:5
**old** [2] - 55:8, 55:10
**once** [8] - 9:5, 15:12, 27:20, 28:19, 33:6, 37:8, 38:16, 49:22
**one** [28] - 4:25, 5:23, 6:4, 9:22, 10:9, 11:17, 13:19, 14:18, 20:25, 21:3, 27:6, 32:21, 33:16, 38:22, 39:10, 41:5, 43:14, 45:11, 46:8, 47:3, 50:3, 51:13, 59:9,

61:12, 61:25, 62:1, 63:5
**one's** [1] - 60:23
**operations** [2] - 7:3, 7:6
**opposite** [1] - 8:6
**option** [1] - 24:17
**order** [8] - 4:21, 14:22, 14:24, 31:7, 32:4, 32:5, 60:20, 61:1
**ordered** [2] - 4:22, 15:2
**orders** [1] - 30:6
**original** [1] - 24:14
**otherwise** [1] - 63:7
**outside** [8] - 3:9, 7:23, 12:1, 50:19, 54:8, 54:9, 57:20
**own** [1] - 50:2
**owned** [1] - 13:23

## P

**P-A-O-L-I** [1] - 34:7
**p.m** [1] - 1:8
**Page** [2] - 65:3, 66:14
**Paoli** [5] - 29:6, 33:17, 34:6, 34:11, 49:6
**PAOLI** [2] - 34:1, 65:22
**papers** [4] - 38:3, 57:1, 57:4, 57:13
**paperwork** [2] - 37:20, 37:23
**parole** [1] - 50:14
**paroled** [4] - 48:19, 48:22, 48:24, 61:15
**parolee** [1] - 50:16
**part** [7] - 20:6, 34:22, 39:6, 40:19, 43:16, 44:20
**participate** [2] - 4:13, 26:15
**particular** [1] - 32:25
**pass** [1] - 27:7
**passenger** [2] - 10:14, 18:15
**passenger's** [5] - 9:10, 9:11, 9:15, 11:4, 54:10
**passport** [4] - 47:20, 48:13, 48:15, 48:16
**Path** [6] - 4:24, 18:8, 27:4, 52:13, 54:2
**patrol** [1] - 24:3
**Patrol** [1] - 24:5
**Paul** [1] - 1:20
**Pauls** [6] - 4:24, 18:8, 27:4, 52:13, 54:2
**pause** [6] - 3:10, 25:10, 32:22, 33:19, 51:16, 62:12
**peeked** [1] - 12:13
**pending** [8] - 17:9, 17:12, 21:22, 36:11, 39:14, 42:1, 42:18, 43:13
**people** [9] - 13:16, 27:15, 28:20, 29:18, 30:6, 35:15, 40:10, 48:24, 55:16
**perform** [1] - 16:19
**period** [1] - 16:10

**permanent** [1] - 46:15
**permit** [1] - 55:1
**person** [23] - 9:15, 10:2, 11:3, 11:19, 12:16, 12:18, 12:21, 12:25, 13:20, 14:21, 14:25, 15:7, 16:24, 40:21, 44:10, 46:19, 48:16, 50:11, 50:15, 54:5, 56:1, 59:17
**person's** [1] - 16:23
**personally** [1] - 5:3
**persons** [1] - 54:21
**Peter** [2] - 25:8, 25:20
**PETER** [2] - 25:15, 65:16
**petition** [5] - 31:6, 31:24, 56:10, 60:11, 60:13
**petitioner** [18] - 2:5, 4:14, 6:5, 6:20, 9:22, 10:2, 11:19, 12:8, 13:4, 13:16, 15:13, 26:16, 30:17, 33:5, 34:23, 42:15, 51:11, 51:18
**Petitioner** [2] - 1:5, 1:13
**petitioner's** [1] - 2:9
**petitions** [4] - 17:8, 17:10, 17:12, 60:22
**Ph** [1] - 1:21
**phone** [4] - 12:6, 28:25, 43:3, 43:4
**physical** [1] - 26:21
**physically** [2] - 11:5, 29:7
**pick** [7] - 38:8, 38:11, 52:16, 52:22, 52:24, 52:25, 53:7
**picked** [1] - 47:8
**pickup** [2] - 5:25, 6:1
**picture** [2] - 12:22, 12:24
**pictures** [1] - 8:15
**place** [8] - 20:9, 36:16, 37:11, 37:18, 38:16, 40:4, 44:12, 45:3
**placed** [11] - 21:1, 21:5, 30:10, 36:9, 37:4, 39:13, 40:5, 40:6, 40:16, 40:22, 41:19
**placing** [4] - 36:23, 38:11, 44:3, 45:2
**plans** [1] - 52:15
**plate** [1] - 8:15
**Plaza** [2] - 1:17, 1:21
**point** [5] - 13:2, 20:17, 28:11, 35:4, 35:24
**position** [7] - 4:7, 4:10, 22:8, 26:2, 26:7, 34:14, 34:17
**possible** [2] - 16:8, 35:16
**possibly** [1] - 5:22
**post** [3] - 4:21, 14:22, 14:24
**posts** [1] - 8:14
**potential** [1] - 60:18
**preclude** [2] - 42:3, 46:14
**precluding** [2] - 42:7, 43:6
**presence** [1] - 7:5
**present** [2] - 5:3, 18:3

**presume** [1] - 19:19
**pretty** [1] - 28:17
**previously** [2] - 39:12, 42:5
**PRICE** [56] - 1:16, 2:17, 2:23, 3:11, 4:3, 5:2, 6:13, 8:20, 10:8, 11:16, 14:10, 21:10, 23:2, 23:4, 23:15, 25:1, 25:7, 25:23, 27:19, 29:14, 31:12, 32:20, 33:9, 33:16, 34:10, 37:17, 41:3, 42:10, 42:19, 45:22, 49:5, 50:6, 50:17, 50:19, 51:3, 51:10, 58:9, 58:11, 59:7, 60:2, 60:9, 60:13, 60:15, 60:17, 61:3, 61:10, 61:21, 62:23, 63:13, 64:1, 65:8, 65:12, 65:18, 65:24, 66:3, 66:11
**Price** [1] - 2:18
**price** [2] - 2:20, 2:21
**procedure** [2] - 45:20, 46:2
**proceed** [4] - 4:1, 25:21, 34:8, 52:5
**Proceedings** [1] - 1:24
**proceedings** [53] - 3:10, 15:1, 15:7, 15:24, 15:25, 16:24, 17:15, 20:9, 20:19, 21:1, 21:4, 21:6, 21:22, 21:25, 22:11, 22:16, 22:20, 25:10, 32:22, 33:19, 36:2, 36:10, 36:11, 36:14, 36:17, 36:23, 36:24, 37:5, 37:10, 37:11, 37:14, 37:19, 38:4, 39:13, 39:19, 40:4, 40:6, 40:7, 40:16, 40:22, 41:12, 41:16, 41:20, 42:8, 43:8, 43:22, 44:13, 45:4, 45:21, 46:2, 47:16, 51:16, 62:12
**process** [1] - 35:15
**processing** [2] - 38:2
**produced** [1] - 1:25
**prohibiting** [2] - 36:22, 38:11
**promoted** [1] - 34:18
**properly** [2] - 23:21, 23:22
**property** [4] - 5:21, 62:13, 62:16, 62:22
**provided** [3] - 29:17, 41:6, 41:7
**provides** [1] - 63:2
**pull** [2] - 7:17, 47:12
**pulled** [3] - 5:20, 7:16, 35:5
**pulls** [1] - 8:3
**purposes** [2] - 61:15, 63:9
**put** [8] - 20:19, 39:19, 41:15, 43:21, 45:4, 45:20, 46:2, 46:10
**putting** [6] - 6:2, 29:8, 37:13, 42:8, 43:7, 45:6

## Q

**questions** [12] - 18:24, 23:15, 31:10, 31:14, 32:16, 42:12, 46:6, 49:3, 50:6, 50:8, 51:1, 58:7
**quick** [2] - 19:1, 59:9
**quickly** [2] - 16:8, 35:16

## R

**radio** [2] - 7:17, 27:15
**radios** [2] - 27:11, 27:14
**raise** [5] - 3:17, 25:14, 33:23, 51:22, 61:8
**raised** [1] - 60:18
**ran** [5] - 28:16, 30:7, 36:21, 46:25, 50:11
**reaching** [1] - 28:18
**ready** [3] - 2:22, 5:22, 52:4
**Real** [2] - 47:21, 47:24
**really** [4] - 17:24, 24:1, 28:10, 39:25
**reason** [2] - 17:3, 49:10
**receive** [6] - 15:18, 17:24, 43:2, 56:20, 57:1, 57:7
**received** [2] - 17:25, 33:6
**recently** [2] - 12:25, 60:20
**recognize** [1] - 9:22
**record** [31] - 2:4, 3:22, 15:12, 15:19, 16:7, 17:20, 25:19, 34:5, 35:9, 35:14, 36:12, 36:21, 36:22, 37:9, 42:5, 42:6, 43:2, 43:5, 43:9, 43:12, 43:16, 46:21, 46:25, 47:13, 47:14, 48:1, 48:3, 48:14, 49:13, 50:12, 52:10
**recorded** [1] - 1:24
**records** [19] - 9:21, 10:24, 11:23, 12:6, 12:14, 15:12, 15:17, 16:2, 16:4, 16:18, 16:19, 17:22, 17:23, 23:6, 35:10, 35:17, 46:22, 46:24, 62:3
**RECROSS** [4] - 23:18, 50:9, 65:13, 66:4
**RECROSS-EXAMINATION** [4] - 23:18, 50:9, 65:13, 66:4
**REDIRECT** [4] - 23:3, 49:4, 65:11, 66:2
**referring** [1] - 55:2
**refiled** [1] - 24:13
**regards** [1] - 44:6
**relayed** [1] - 43:18
**released** [7] - 55:22, 55:24, 58:15, 58:22, 59:3, 59:15, 59:21
**remain** [4] - 2:24, 3:15, 21:7, 25:13

**removable** [1] - 31:5
**removal** [45] - 13:14, 20:7, 20:9, 20:19, 21:1, 21:4, 21:22, 21:25, 22:11, 22:16, 22:20, 36:2, 36:9, 36:14, 36:16, 36:23, 36:24, 37:5, 37:10, 37:11, 37:14, 37:18, 37:20, 37:23, 38:3, 39:13, 39:19, 40:4, 40:6, 40:16, 40:22, 41:15, 41:19, 42:8, 43:8, 43:21, 44:13, 45:4, 45:21, 46:2, 46:17, 47:15, 48:22
**remove** [5] - 11:3, 11:5, 11:6, 15:2, 44:8
**removed** [3] - 4:22, 44:9, 44:11
**reopen** [1] - 4:23
**repeat** [4] - 18:6, 45:25, 49:9, 57:15
**replied** [1] - 12:15
**reply** [1] - 61:5
**report** [1] - 39:6
**Reporter** [1] - 1:20
**represent** [1] - 63:10
**representational** [1] - 63:9
**request** [2] - 28:4, 49:21
**requirements** [1] - 57:25
**resemble** [1] - 5:23
**residence** [9] - 5:16, 5:20, 6:6, 6:7, 6:8, 6:11, 7:13, 7:23
**respect** [1] - 40:9
**respondent** [2] - 60:9, 61:10
**respondents** [1] - 2:19
**Respondents** [2] - 1:8, 1:16
**response** [1] - 60:12
**result** [1] - 46:9
**results** [5] - 35:24, 36:1, 38:5, 43:2, 43:4
**retroactively** [1] - 60:21
**returnable** [1] - 62:22
**returned** [1] - 35:24
**reveal** [1] - 43:9
**revealed** [1] - 31:21
**review** [2] - 21:8, 21:19
**reviewed** [1] - 17:21
**revoked** [1] - 56:23
**RMR** [1] - 1:20
**road** [1] - 27:7
**role** [2] - 35:10, 45:1
**rooms** [1] - 3:8
**rule** [1] - 3:2
**run** [9] - 16:11, 16:21, 17:23, 28:22, 35:9, 42:5, 42:6, 47:13, 48:1
**running** [6] - 12:6, 13:10, 35:10, 35:14, 35:17, 36:21
**runs** [1] - 47:1
**rushed** [1] - 16:16

**RUSSELL** [1] - 1:16

## S

**Sanchez** [3] - 2:1, 4:14, 52:11
**SANCHEZ** [3] - 1:3, 52:1, 66:7
**saw** [3] - 41:21, 43:23, 53:19
**scene** [15] - 8:24, 9:1, 9:4, 9:5, 10:19, 12:7, 12:11, 16:17, 17:24, 17:25, 18:5, 29:4, 30:15, 33:4, 35:4
**scope** [1] - 50:19
**screaming** [1] - 7:11
**seat** [6] - 2:15, 3:16, 12:21, 13:20, 18:12, 29:22
**seated** [4] - 3:20, 25:17, 34:3, 52:3
**second** [7] - 4:25, 6:4, 11:17, 32:21, 39:16, 41:5, 51:13
**secure** [1] - 12:2
**security** [1] - 28:17
**see** [14] - 7:24, 13:12, 16:23, 16:24, 17:1, 17:2, 17:6, 17:8, 17:15, 41:25, 54:22, 62:25, 63:12, 63:17
**serve** [3] - 24:17, 38:3, 38:21
**served** [4] - 24:15, 24:16, 24:18, 44:16
**set** [1] - 51:21
**setting** [1] - 9:14
**show** [9] - 9:14, 15:13, 15:17, 15:24, 16:13, 17:22, 19:10, 43:12, 43:16
**showed** [6] - 12:21, 12:22, 12:24, 15:15, 31:20, 42:6
**side** [11] - 3:8, 5:17, 9:10, 9:11, 9:15, 11:4, 18:10, 27:22, 48:8, 54:9, 54:10
**sides** [1] - 61:13
**sign** [2] - 38:23
**significant** [2] - 30:1, 30:3
**signs** [1] - 37:12
**SIJ** [14] - 19:5, 19:21, 20:3, 30:21, 31:1, 31:5, 31:24, 32:10, 32:13, 39:7, 39:9, 40:10, 43:15, 61:14
**SIJS** [4] - 44:22, 44:25, 45:5, 45:11
**sit** [2] - 16:10, 30:20
**sitting** [3] - 7:22, 29:21, 53:16
**situation** [1] - 35:16
**slow** [3] - 4:25, 7:14, 8:5
**slowing** [1] - 7:7
**someone** [9] - 5:11, 6:5, 10:3, 13:7, 45:13, 47:25, 48:10, 48:21, 49:6
**sometimes** [4] - 24:7, 46:15,

46:16, 46:18
**soon** [1] - 62:25
**Soriano** [1] - 55:25
**sorry** [9] - 8:19, 10:23, 12:17, 13:23, 14:8, 14:19, 15:10, 15:11, 45:23
**Spanish** [4] - 13:17, 39:1, 39:3, 39:5
**speaking** [4] - 12:16, 13:15, 35:23
**speaks** [1] - 13:21
**special** [2] - 45:7, 57:13
**Special** [3] - 45:9, 56:5, 56:21
**specific** [3] - 20:7, 21:3, 49:10
**specifically** [1] - 18:5
**specifics** [2] - 38:7, 49:7
**spell** [3] - 3:21, 25:18, 34:4
**spelled** [1] - 34:7
**Sperling** [1] - 1:13
**stakeout** [1] - 7:22
**stand** [5] - 2:13, 3:14, 25:12, 33:21
**standing** [6] - 3:15, 11:3, 12:1, 13:12, 25:13, 60:20
**star** [1] - 47:21
**start** [1] - 26:13
**started** [8] - 7:11, 16:15, 26:8, 27:12, 28:20, 28:21, 34:19, 39:4
**State** [3] - 46:24, 47:1, 50:1
**state** [5] - 2:3, 3:21, 25:18, 34:4, 52:9
**STATES** [2] - 1:1, 1:10
**States** [20] - 1:5, 2:18, 31:8, 41:19, 44:9, 44:15, 44:17, 47:9, 48:9, 48:14, 48:19, 53:11, 53:14, 55:6, 55:9, 55:11, 56:3, 56:25, 57:24, 58:3
**stating** [1] - 44:10
**Status** [2] - 56:6, 56:22
**status** [21] - 17:1, 17:2, 17:7, 19:21, 20:3, 20:4, 24:8, 30:21, 31:5, 31:7, 32:5, 39:7, 40:10, 41:18, 41:22, 46:9, 46:16, 48:7, 48:11, 48:12, 61:14
**statute** [1] - 61:14
**stay** [5] - 11:17, 21:19, 29:15, 41:5, 55:20
**stenography** [1] - 1:24
**step** [7] - 3:7, 3:14, 10:9, 25:2, 33:11, 51:4, 60:3
**stepfather** [1] - 59:11
**steps** [6] - 15:6, 25:4, 28:14, 33:14, 51:7, 60:5
**still** [12] - 8:1, 12:13, 21:5, 24:20, 30:7, 39:13, 44:12,

56:9, 56:17, 59:23, 62:9, 62:13
**stood** [2] - 7:12, 7:13
**stop** [24] - 4:13, 6:4, 8:5, 8:7, 8:24, 9:2, 9:5, 10:10, 11:11, 26:15, 26:21, 26:24, 27:8, 27:13, 27:15, 27:20, 28:7, 34:22, 35:1, 40:5, 44:20, 45:2, 45:5, 57:19
**stopped** [11] - 8:22, 8:23, 44:20, 44:21, 53:21, 53:23, 54:4, 54:7, 54:13, 54:19
**stopping** [1] - 44:3
**street** [8] - 5:9, 5:17, 6:14, 8:6, 16:15, 18:7, 18:10, 53:19
**strike** [2] - 34:25, 58:21
**strongly** [1] - 5:23
**stuff** [2] - 5:24, 6:1
**sub** [1] - 4:9
**sub-office** [1] - 4:9
**subject** [9] - 4:19, 11:2, 13:13, 14:24, 15:13, 15:15, 36:24, 39:12, 48:22
**subjects** [6] - 35:7, 37:9, 39:12, 40:24, 42:7, 43:7
**submissions** [1] - 61:24
**substantive** [1] - 10:19
**suggest** [3] - 6:5, 46:10, 47:15
**suggested** [1] - 61:16
**Suite** [1] - 1:21
**supervisor** [3] - 22:1, 22:3, 37:12
**supervisory** [2] - 22:3, 22:6
**support** [3] - 27:13, 27:16, 27:20
**suspicion** [1] - 49:15
**sustain** [1] - 32:15
**swear** [1] - 2:12
**sworn** [8] - 2:14, 3:15, 3:19, 25:13, 25:16, 33:22, 34:2, 52:2

## T

**target** [15] - 5:7, 5:12, 5:24, 6:15, 6:21, 7:24, 11:20, 12:8, 12:13, 12:14, 12:20, 12:22, 13:5, 15:6, 27:6
**targeted** [1] - 33:5
**targeting** [4] - 4:19, 15:1, 32:25, 33:1
**telephone** [1] - 62:17
**ten** [4] - 6:18, 9:2, 54:3, 61:2
**terms** [4] - 19:5, 22:16, 49:6, 60:21
**testified** [11] - 3:19, 14:16, 14:21, 17:6, 23:5, 25:16, 26:20, 34:2, 43:23, 52:2,

56:4
**testify** [2] - 3:16, 18:3
**testifying** [1] - 31:25
**testimony** [3] - 2:25, 30:9, 61:16
**THE** [256] - 1:10, 2:1, 2:8, 2:11, 2:15, 2:20, 3:1, 3:6, 3:13, 3:17, 3:20, 3:23, 3:25, 4:25, 6:4, 6:8, 6:10, 6:11, 6:12, 7:19, 7:20, 8:9, 8:11, 8:18, 10:1, 10:4, 10:5, 10:6, 11:17, 11:21, 11:22, 11:25, 12:7, 12:9, 13:1, 13:3, 13:4, 13:6, 13:7, 13:9, 13:15, 13:18, 14:1, 14:3, 14:6, 14:7, 14:8, 14:11, 14:17, 18:25, 19:6, 19:7, 19:9, 19:10, 19:12, 19:13, 19:14, 19:15, 19:17, 19:18, 19:20, 19:21, 19:23, 19:24, 20:1, 20:2, 20:3, 20:11, 20:12, 20:13, 20:14, 20:21, 20:22, 20:24, 20:25, 21:13, 21:17, 21:21, 22:1, 22:3, 22:5, 22:8, 22:9, 22:13, 22:18, 22:25, 23:16, 24:25, 25:2, 25:5, 25:6, 25:9, 25:11, 25:14, 25:17, 25:20, 25:21, 27:17, 27:18, 29:15, 29:19, 29:20, 29:21, 29:23, 29:25, 30:1, 30:3, 30:4, 30:5, 30:8, 30:11, 30:12, 30:14, 30:16, 30:18, 30:20, 30:22, 30:23, 30:25, 31:2, 31:4, 31:9, 31:13, 32:15, 32:18, 32:21, 32:23, 33:1, 33:3, 33:6, 33:7, 33:11, 33:13, 33:15, 33:18, 33:20, 33:23, 34:3, 34:6, 34:8, 36:4, 36:6, 36:7, 36:8, 36:11, 36:13, 36:15, 36:16, 36:18, 36:20, 36:25, 37:2, 37:3, 37:7, 37:15, 39:16, 39:20, 39:21, 39:23, 39:24, 39:25, 40:8, 40:11, 40:12, 40:14, 40:15, 40:18, 40:19, 40:21, 41:1, 41:5, 41:8, 41:10, 41:13, 41:14, 41:17, 41:21, 41:24, 42:9, 42:20, 45:23, 46:7, 46:12, 46:21, 46:23, 46:24, 46:25, 47:5, 47:7, 47:8, 47:10, 47:11, 47:17, 47:22, 47:23, 48:3, 48:7, 48:10, 48:13, 48:17, 48:20, 48:21, 48:23, 48:24, 49:1, 49:2, 50:7, 50:18, 50:21, 51:2, 51:4, 51:6, 51:8, 51:11, 51:14, 51:19, 51:22, 52:3, 52:4, 57:19, 58:8, 59:9, 59:12, 59:13, 59:14, 59:15,

59:16, 59:17, 59:20, 59:21, 59:22, 59:24, 60:3, 60:6, 60:8, 60:10, 60:14, 60:16, 60:23, 61:4, 61:8, 61:12, 61:22, 61:25, 62:2, 62:5, 62:7, 62:15, 62:19, 62:21, 62:24, 63:14, 63:19, 63:21, 63:24, 64:2
**themselves** [1] - 54:11
**theory** [1] - 15:6
**thereafter** [1] - 61:6
**third** [1] - 59:17
**Thomas** [1] - 2:18
**THOMAS** [1] - 1:16
**three** [7] - 8:2, 18:22, 29:17, 30:9, 30:12, 54:8, 61:6
**throughout** [1] - 28:7
**title** [4] - 4:7, 26:2, 34:14, 34:16
**today** [4] - 18:3, 30:20, 61:9, 61:16
**together** [1] - 59:1
**took** [5] - 9:19, 23:10, 28:15, 28:21, 54:23
**top** [2] - 45:8, 46:13
**TPS** [3] - 42:2, 42:17, 46:9
**tracks** [1] - 8:14
**trained** [1] - 22:14
**training** [3] - 19:18, 39:18, 40:20
**TRANSCRIPT** [1] - 1:9
**Transcript** [1] - 1:25
**transport** [1] - 10:21
**transportation** [2] - 11:13, 29:11
**transported** [1] - 30:14
**truck** [2] - 5:25, 6:1
**try** [2] - 16:8, 35:15
**trying** [2] - 21:16, 60:25
**turned** [2] - 8:6, 27:11
**two** [5] - 5:19, 5:21, 7:9, 18:11, 61:24
**typically** [2] - 16:21, 42:11

## U

**ultimately** [2] - 30:12, 37:8
**under** [4] - 17:5, 23:14, 30:10, 50:15
**underlying** [1] - 60:22
**understood** [1] - 33:1
**unfamiliar** [1] - 40:1
**unfortunately** [1] - 8:16
**UNITED** [2] - 1:1, 1:10
**United** [20] - 1:5, 2:18, 31:8, 41:19, 44:9, 44:15, 44:17, 47:9, 48:9, 48:14, 48:19, 53:11, 53:14, 55:6, 55:9, 55:11, 56:3, 56:25, 57:24, 58:3

**unlawfully** [3] - 13:22, 14:2, 16:25
**unmarked** [3] - 7:21, 8:12, 27:18
**up** [36] - 2:13, 3:1, 3:14, 5:20, 9:14, 11:18, 14:9, 16:13, 19:1, 19:2, 19:10, 20:18, 23:1, 25:11, 27:3, 27:4, 29:16, 31:10, 32:19, 33:20, 35:21, 38:8, 38:11, 44:10, 46:7, 46:8, 47:8, 49:3, 51:20, 51:21, 52:16, 52:22, 52:24, 52:25, 53:7, 59:25
**US** [12] - 24:5, 41:11, 47:18, 47:19, 47:20, 47:25, 48:1, 48:2, 48:4, 48:15, 48:16
**USAO** [1] - 1:17
**USC** [1] - 48:8
**USCIS** [3] - 24:7, 45:15, 46:22

## V

**vehicle** [38] - 5:19, 6:3, 7:16, 7:18, 7:19, 7:21, 8:2, 8:3, 8:4, 8:5, 8:7, 8:12, 8:15, 8:16, 8:22, 9:7, 9:9, 9:10, 9:19, 9:23, 10:11, 11:11, 12:4, 12:5, 12:11, 26:21, 27:8, 27:12, 27:17, 27:23, 28:9, 35:2, 35:5, 35:7, 35:13, 38:14, 39:7, 54:24
**vehicles** [1] - 7:10
**versus** [1] - 2:2
**view** [2] - 5:17, 9:19
**visa** [6] - 39:11, 39:18, 39:22, 43:15, 61:25, 62:1
**visas** [1] - 40:25

## W

**wait** [5] - 4:25, 27:15, 36:4, 61:25
**waiting** [3] - 7:23, 9:21, 13:12
**walked** [3] - 9:9, 9:10, 12:12
**walking** [1] - 5:21
**wallet** [1] - 62:20
**wants** [1] - 19:2
**watching** [4] - 4:24, 5:16, 6:9, 18:7
**weapons** [1] - 28:18
**website** [1] - 47:2
**websites** [1] - 47:3
**whole** [2] - 37:14, 59:3
**wife** [3] - 56:2, 58:15, 58:23
**William** [2] - 52:9, 52:11
**WILLIAM** [3] - 1:3, 52:1, 66:7
**window** [1] - 12:17
**windows** [1] - 11:9
**wish** [1] - 60:16

**withdraw** [1] - 57:22
**withholding** [1] - 46:17
**witness** [7] - 2:22, 3:8, 3:14, 14:11, 25:6, 25:11, 33:21
**WITNESS** [88] - 3:23, 6:8, 6:11, 7:20, 8:11, 10:4, 10:6, 11:21, 11:25, 12:9, 13:3, 13:6, 13:9, 13:18, 14:3, 14:7, 19:6, 19:9, 19:12, 19:14, 19:17, 19:20, 19:23, 20:1, 20:3, 20:12, 20:14, 20:22, 20:25, 21:17, 22:1, 22:5, 22:9, 22:18, 25:5, 25:20, 27:18, 29:19, 29:21, 29:25, 30:3, 30:5, 30:11, 30:14, 30:18, 30:22, 30:25, 31:4, 33:1, 33:6, 33:13, 34:6, 36:6, 36:8, 36:13, 36:16, 36:20, 37:2, 37:7, 39:20, 39:23, 39:25, 40:11, 40:14, 40:18, 40:21, 41:8, 41:13, 41:17, 41:24, 46:12, 46:23, 46:25, 47:7, 47:10, 47:17, 47:23, 48:7, 48:13, 48:20, 48:23, 49:1, 51:6, 59:12, 59:14, 59:16, 59:20, 59:22
**Witness** [4] - 25:4, 33:14, 51:7, 60:5
**Witnesses** [1] - 65:3
**witnesses** [8] - 2:24, 3:3, 3:4, 3:7, 33:15, 51:9, 60:6, 63:7
**wondering** [1] - 63:11
**words** [6] - 6:1, 7:13, 15:23, 22:20, 37:4, 48:5
**worse** [1] - 8:8
**wow** [2] - 39:21, 49:2

## Y

**yard** [1] - 5:18
**year** [1] - 44:17
**years** [4] - 14:4, 14:5, 26:8, 55:10
**YORK** [1] - 1:1
**York** [4] - 1:6, 1:21, 4:8, 55:3
**yourself** [3] - 8:24, 31:7, 35:18
**youth** [2] - 45:20, 46:2