

lawyers@dms.law

www.dms.law

@immigrationattorneyli

Wednesday, April 29, 2026

VIA ECF
Honorable Gary R. Brown
United States District Judge
Eastern District of New York
100 Federal Plaza
Central Islip, NY 11722


RE:     *Sanchez Alfaro v. Almodovar et al.,* No. 26:cv-00766 (Brown, J.)


Dear Judge Brown:

This office, through undesigned counsel, represents the petitioner Mr. William Enrique Sanchez Alfaro. Petitioner respectfully submits this Notice of Supplemental Authority to advise the Court of a precedential decision issued by the United States Court of Appeals for the Second Circuit on April 28, 2026, one day after this Court's Memorandum & Order denying respondents' motion for reconsideration.

The United States Court of Appeals for the Second Circuit's recent decision in *Cunha v. Freden,* No. 25-3141-pr (2d Cir. Apr. 28, 2026) rejected respondents' asserted position that a long-term interior noncitizen is subject to detention under 8 U.S.C. § 1225(b)(2)(A) and held that detention in those circumstances arises under 8 U.S.C. § 1226(a). Petitioner provides this authority solely as supplemental notice with respect to that statutory issue previously raised by respondents.

Petitioner further notes, however, that as this Court expressly recognized at pages 15–16 of its April 27, 2026 Order, the issues presented here extend beyond the Section 1225/1226 dispute. This Court identified separate and independent concerns regarding respondents' authority to effect the warrantless arrest at issue, together with the additional circumstances surrounding petitioner's detention and subsequent agency conduct.

Petitioner, therefore, submits *Cunha* only as recent controlling authority relevant to one aspect of respondents' prior arguments, while recognizing that this Court's analysis rests on broader and independent grounds.

Thank you for Your Honor's consideration of this submission.

Respectfully Submitted,

Chartrisse A. Adlam, Esq.
Law Offices of David M. Sperling
*Counsel for Petitioner*

*cc: By ECF*
Thomas R. Price, Esq.
*Assistant United States Attorney*

Encl.

25-3141-pr
*Cunha v. Freden*

# United States Court of Appeals
# For the Second Circuit

August Term 2025
Argued: April 6, 2026
Decided: April 28, 2026

No. 25-3141-pr

RICARDO APARECIDO BARBOSA DA CUNHA,

*Petitioner-Appellee,*

*v.*

JOSEPH E. FREDEN, Deputy Field Office Director, U.S. Immigration and Customs
Enforcement,

*Respondent-Appellant.*\*

Appeal from the United States District Court

---

\* The Clerk of Court is respectfully directed to amend the official case caption as set forth
above.

for the Western District of New York
No. 6:25-cv-6532, Meredith A. Vacca, *Judge.*

---

Before:        CABRANES, BIANCO, and NATHAN, *Circuit Judges.*

The government appeals from a grant of a writ of habeas corpus. Petitioner-Appellee Ricardo Aparecido Barbosa da Cunha ("Petitioner") is a noncitizen from Brazil, who entered the United States without inspection and admission in or around 2005 and has lived in the United States ever since. He applied for asylum in 2016 and was granted a valid work permit. In September 2025, the government arrested him on an administrative warrant, placed him in removal proceedings, and asserted that, while his removal proceedings are pending, he must be detained pursuant to 8 U.S.C. § 1225(b)(2)(A). After an immigration judge found that he was subject to mandatory detention under Section 1225(b)(2)(A), Petitioner brought this habeas petition challenging his detention.

The district court agreed with Petitioner that Section 1225(b)(2)(A) did not apply to him and that, instead, his detention was governed by 8 U.S.C. § 1226(a), under which he was eligible for release on bond. Thus, the district court ordered the government to either provide him with a bond hearing or release him. An immigration judge held such a hearing and, after determining that Petitioner did not present a flight risk or danger to persons or property, ordered him released on bond.

On appeal, the government argues Petitioner is subject to mandatory detention under Section 1225(b)(2)(A). We disagree. The plain text of both Sections 1225(b)(2)(A) and 1226(a) make clear that only one applies to a noncitizen like Petitioner: Section 1226(a). Section 1225(b)(2)(A) does not apply to noncitizens, such as Petitioner, who are present in the United States after entering the country without inspection and admission, and who were not apprehended at

2

or near the border at the time of entry.

This result is dictated by the plain text of these provisions, and further confirmed by the statute's context, structure, history, and purpose. It likewise comports with the Supreme Court's established understanding of Sections 1225 and 1226. It reflects Executive Branch practice over thirty years and across five Presidential administrations. Moreover, it explains why Congress has never challenged that settled practice despite making numerous amendments to the immigration laws. Finally, even if the government's newfound interpretation of Section 1225(b)(2)(A) were plausible—and it is not—we would nonetheless reject it based on our obligation to construe these statutes in a manner that would avoid the serious constitutional questions attendant to what would be the broadest mass-detention-without-bond mandate in our Nation's history for millions of noncitizens.

Accordingly, we conclude that Petitioner's detention is governed by Section 1226(a), not Section 1225(b)(2)(A), and we **AFFIRM** the district court's grant of the writ of habeas corpus.

Judge Cabranes concurs in the judgment and opinion of the Court and files a separate opinion.

---

TIBERIUS T. DAVIS, Counsel to the Assistant Attorney General (Brett A. Shumate, Assistant Attorney General, Civil Division; Yaakov M. Roth, Principal Deputy Assistant Attorney General; Drew Ensign, Deputy Assistant Attorney General; Benjamin Hayes, Senior Counsel to the Assistant Attorney General; Jessica R. Lesnau, Trial Attorney, *on the brief*), U.S. Department of Justice, Washington, DC, *for* Respondent-Appellant.

MICHAEL K.T. TAN, American Civil Liberties Union Foundation, San Francisco, CA (My Khanh Ngo, Oscar Sarabia Roman, American Civil Liberties Union

Foundation, San Francisco, CA; Judy Rabinovitz, Natalie Behr, American Civil Liberties Union Foundation, New York, NY; Amy Belsher, New York Civil Liberties Union, New York, NY; Paul O'Dwyer, Law Office of Paul O'Dwyer, PC, New York, NY, *on the brief*), *for* Petitioner-Appellee.

Amit Jain, Roderick & Solange MacArthur Justice Center, Washington, DC, *for Amici Curiae Immigration Law Scholars, in support of Petitioner-Appellee.*

Suchita Mathur and Emma Winger, American Immigration Council, Washington, DC, *for Amici Curiae American Immigration Council and American Immigration Lawyers Association, in support of Petitioner-Appellee.*

JOSEPH F. BIANCO, *Circuit Judge*:

Petitioner-Appellee Ricardo Aparecido Barbosa da Cunha ("Petitioner") is a noncitizen from Brazil who has lived in the United States for more than twenty years after entering the country without inspection and admission. He owns a home in Massachusetts, is married with two children, and has never been convicted of a crime. Because he has had an asylum application under agency review since 2016, he was granted legal authorization to work, and he operates a small construction business. Then, in 2025, immigration officials arrested Petitioner on his drive to work, detained him, and sought his removal from the United States.

Petitioner, hoping to return to his family during the removal proceedings, requested a bond hearing. For nearly thirty years, that request would have been granted and Petitioner—whom the government concedes poses no danger to the community nor risk of flight—would have been released during the pendency of his removal proceedings, pursuant to 8 U.S.C. § 1226. However, in July 2025, the government changed that long-settled practice. *See* U.S. Immigr. & Customs Enf't, Interim Guidance Regarding Detention Authority for Applicants for Admission (July 8, 2025). To justify detaining noncitizens (or "aliens"[1]) who clearly meet the government's own criteria for release, the government began arguing that 8 U.S.C. § 1225(b)(2)(A) prohibits the setting of bond for all inadmissible noncitizens, like Petitioner, unlawfully present in the United States—

---

[1] "The term 'alien' means any person not a citizen or national of the United States." 8 U.S.C. § 1101(3).

by all accounts, millions of men, women, and children. The government claims that mandatory detention must continue regardless of how long removal proceedings take—even if the noncitizen poses no danger to the community or risk of flight.

That is not what the law says. Today, although we part ways with two other circuits that have addressed this question, we join the overwhelming majority of federal judges across the Nation to consider it and conclude that the government's novel interpretation of the immigration statutes defies their plain text. That text makes clear that Section 1226(a) governs detention of noncitizens like Petitioner. Section 1225(b)(2)(A) does not apply to such noncitizens, who are present in the United States after entering the country without inspection and admission, and who were not apprehended while entering the country or shortly thereafter.

This result is dictated by the plain text of these provisions, and further confirmed by the statute's context, structure, history, and purpose. It likewise comports with the Supreme Court's established understanding of Sections 1225 and 1226. It reflects Executive Branch practice over thirty years and across five Presidential administrations. Moreover, it explains why Congress has never challenged that settled practice despite making numerous amendments to the immigration laws. Finally, even if the government's newfound interpretation of Section 1225(b)(2)(A) were plausible—and it is not—we would nonetheless reject it based on our obligation to construe these statutes in a manner that would avoid the serious constitutional questions attendant to what would be the broadest mass-detention-without-bond mandate in our Nation's history for millions of noncitizens.

6

To be clear, our holding does not alter Section 1225(b)'s mandate that the government detain noncitizens who are apprehended for removal proceedings while entering the country or shortly thereafter, nor Section 1226(c)'s mandate that the government detain noncitizens on certain criminal or terrorism-related grounds. Instead, consistent with the plain text of the statutory provisions at issue here, our holding allows noncitizens like Petitioner, who are already present in the United States and are determined not to be a flight risk or danger to the community, to be released on bond under Section 1226(a) while their removal proceedings are pending.

Accordingly, we conclude that Petitioner's detention is governed by Section 1226(a), not Section 1225(b)(2)(A), and we **AFFIRM** the district court's grant of the writ of habeas corpus.

## BACKGROUND

Petitioner, a citizen of Brazil, entered the United States without inspection and admission over twenty years ago (in either 2004 or 2005) and has remained here ever since. In 2016, he applied for asylum and was granted work authorization while his application was under review. He lives in Massachusetts with his wife and two U.S.-citizen children, owns his home, and owns and runs a small construction business. Petitioner has never been arrested for or charged with a crime.

On September 26, 2025, officers from U.S. Immigration and Customs Enforcement ("ICE") arrested Petitioner while he was driving to work in Norwood, Massachusetts, pursuant to an administrative warrant that cited Section 236 of the Immigration and

7

Nationality Act ("INA") (*i.e.*, 8 U.S.C. § 1226) as the basis for his arrest. The United States Department of Homeland Security ("DHS" or the "Agency") initiated removal proceedings pursuant to 8 U.S.C. § 1229a, and charged Petitioner with inadmissibility under 8 U.S.C. § 1182(a)(6)(A)(i) (presence in the United States without being admitted or paroled) and 8 U.S.C. § 1182(a)(7)(A)(i)(I) (lack of documentation). Petitioner requested a bond hearing, which an immigration judge denied based on a determination that he was subject to mandatory detention under Section 1225(b)(2)(A), and thus ineligible for bond under Section 1226(a). Petitioner then filed a habeas petition,[2] arguing that his putative detention under Section 1225(b)(2)(A) violated Section 1226, its associated regulations, and the Fifth Amendment's Due Process Clause. The respondent is Joseph E. Freden, a deputy field office director for ICE. The district court granted the petition and ordered the government to either provide a bond hearing or release Petitioner within ten days. An immigration judge, recognizing that Petitioner presents no danger to persons or property or risk of flight, released him on bond.

## DISCUSSION

The sole question presented by this appeal is whether Section 1226 or Section 1225 governs Petitioner's detention. If Section 1226 applies, then Petitioner is eligible for release on bond pending the

---

[2] Petitioner initially filed his petition in the District of Massachusetts, but the petition was transferred to the Western District of New York, on consent of the parties, because he had already been transported to an ICE detention facility in Buffalo.

8

duration of his removal proceedings, including adjudication of his requests for asylum and cancellation of removal. If Section 1225 applies, then he *must* be detained during the removal process with no opportunity for release on bond.

We review *de novo* a district court's grant of a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. *Black v. Decker*, 103 F.4th 133, 142 (2d Cir. 2024). We likewise review questions of statutory interpretation *de novo*. *Giovinco v. Pullen*, 118 F.4th 527, 530 (2d Cir. 2024).

We interpret statutes "based on the traditional tools of statutory construction, not individual policy preferences." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 403 (2024). We begin "by examining the language of [the] statute, starting with the common meaning of the words in it." *Puello v. Bureau of Citizenship & Immigr. Servs.*, 511 F.3d 324, 328 (2d Cir. 2007). We "interpret the relevant words not in a vacuum, but with reference to the statutory context, structure, history, and purpose." *Abramski v. United States*, 573 U.S. 169, 179 (2014) (internal quotation marks and citation omitted); *see also Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.").

"When the statutory text is plain and unambiguous, our sole function is to enforce it according to its terms." *United States v. Bedi*, 15 F.4th 222, 226 (2d Cir. 2021) (internal quotation marks and citations omitted); *see also Peralta-Taveras v. Att'y Gen.*, 488 F.3d 580, 584 (2d Cir. 2007) ("[T]he well-established rules of statutory construction . . .

instruct that [the court's] inquiry begins with the plain language of the statute and where the statutory language provides a clear answer, it ends there as well.") (internal quotation marks and citation omitted). "If the statutory language is ambiguous, however, we resort first to canons of statutory construction, and, if the statutory meaning remains ambiguous, to legislative history, to see if these interpretive clues clearly reveal Congress's intent." *Mizrahi v. Gonzales*, 492 F.3d 156, 158 (2d Cir. 2007) (alteration adopted) (internal quotation marks and citation omitted). When interpreting an ambiguous statute, one of the available canons of statutory construction is that of constitutional avoidance, "which provides that if one of two competing statutory interpretations would raise a multitude of constitutional problems, the other should prevail." *Catskill Mountains Chapter of Trout Unlimited, Inc. v. EPA*, 846 F.3d 492, 519 (2d Cir. 2017) (internal quotation marks and citation omitted).

As set forth below, based on the plain language of Section 1225 and Section 1226, we agree with the district court that Petitioner's detention is governed by Section 1226 and that he is entitled to a bond hearing. That determination is reinforced by the statutory context, structure, history, and purpose, as well as the nearly three decades of Executive Branch practice enforcing the immigration laws with that understanding and the accompanying congressional silence in light of that practice. Finally, even if the statutory language was ambiguous, we would reach the same conclusion under the doctrine of constitutional avoidance.

Our holding is consistent with the decisions of over 370 district judges across the Nation who (as of mid-February 2026) have also

10

rejected the government's position. In other words, over ninety percent of district court judges have sided with Petitioner. *See* American Immigration Council and American Immigration Lawyers Association *Amici* Br. at 5 n.6 (citing Kyle Cheney, *Even Trump's Own Appointees are Ruling Against ICE's Mass Detention Strategy*, POLITICO (Feb. 12, 2026) [https://tinyurl.com/yc7e5sbd]). Indeed, in this Circuit, as of mid-February 2026, the government has prevailed in only approximately fifteen cases, while losing in approximately 145 cases. *Id.* at 27–32. The Seventh Circuit has preliminarily reached the same conclusion in reviewing a stay motion. *See Castañon-Nava v. U.S. Dep't of Homeland Sec.*, 161 F.4th 1048, 1062 (7th Cir. 2025). Although divided panels in two other circuits have agreed with the government, *see Buenrostro-Mendez v. Bondi*, 166 F.4th 494, 508 (5th Cir. 2026); *Avila v. Bondi*, 170 F.4th 1128, 1138 (8th Cir. 2026), we respectfully find the statutory analysis in those decisions, which largely mirrors the government's flawed arguments in this case, to be unpersuasive for the reasons discussed below.

## I.  Statutory Text

As is required, our analysis begins with the statutory text of the key provisions at issue. *See United States v. Helm*, 58 F.4th 75, 90 (2d Cir. 2023). We first analyze Section 1226(a), which was cited in Petitioner's warrant as the basis for the arrest, and then turn to Section 1225(b)(2)(A).

### A.  Section 1226(a)

An analysis of the plain text of Section 1226(a) demonstrates that it clearly applies to Petitioner. The provision provides:

11

> On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States.

8 U.S.C. § 1226(a).

In 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), amending portions of the Immigration and Nationality Act of 1952 ("INA"). Pub. L. No. 104-208, 110 Stat. 3009. "IIRIRA eliminated the bright-line distinction between exclusion and deportation, merging the two into proceedings for 'removal' and replacing the definition of 'entry' with that for 'admission.'" *Cruz-Miguel v. Holder*, 650 F.3d 189, 197 (2d Cir. 2011). IIRIRA distinguished between noncitizens who are "inadmissible" and those who are "deportable": "inadmissible aliens" are removable because they are "ineligible to be admitted to the United States," while "deportable aliens" are noncitizens subject to removal after previously being admitted. *Compare* 8 U.S.C. § 1182(a), *with id.* § 1227(a). Thus, removal proceedings cover noncitizens who are both inadmissible and deportable. *See id.* § 1229a(a)(1) (directing the immigration judge to "conduct proceedings for deciding the inadmissibility or deportability of an alien"); *see also id.* § 1229a(a)(2), (c)(2)(A), (e)(2)(A) (referring to charges and determinations of inadmissibility).

Under Section 1226(a), detention is discretionary and "the Attorney General . . . may release the alien on bond . . . or conditional parole," *id.* § 1226(a)(2)(A)–(B), with the exception of noncitizens involved in certain criminal or terrorism-related activity, *id.* § 1226(c).

Moreover, a noncitizen detained under Section 1226 may appeal the Agency's custody determinations, including the setting of bond, to an immigration judge, and may appeal an immigration judge's redetermination to the Board of Immigration Appeals ("BIA"). 8 C.F.R. § 1003.19(a), (f); *id.* § 1236.1(d)(1).

Here, it is undisputed that Petitioner (1) was served a warrant issued by the Attorney General, (2) is a noncitizen, (3) is subject to a decision on whether he is to be removed from the country, and (4) does not fall within any of the enumerated grounds for mandatory detention under Section 1226(c). Thus, the Attorney General may release Petitioner on bond under the plain language of Section 1226(a).

The government argues that Section 1226(a) applies only to "aliens who were admitted to the country but later become deportable and are subject to removal proceedings under [Section] 1229a—for example, admitted aliens who overstay or otherwise violate the terms of their visas." Appellant's Br. at 11. But the government's position is untenable based on the plain text of the statute, which obviously does not limit its application to that narrower category of noncitizens. To the contrary, the release authority in Section 1226 applies to "an alien . . . pending a decision on whether the alien is to be *removed"*—a word that sweeps in both inadmissible and deportable aliens, as discussed above. 8 U.S.C. § 1226(a) (emphasis added). If Congress had wanted to limit Section 1226(a)(2) only to those noncitizens charged with deportability as opposed to inadmissibility, it would have said so, as it did repeatedly in other parts of IIRIRA. *See Blake v. Carbone*, 489 F.3d 88, 96 n.6 (2d

13

Cir. 2007) ("IIRIRA consolidated [deportation and exclusion] proceedings into removal proceedings. Nevertheless, the distinction between deportable and excludable (also referred to as inadmissible) persons remains."). "We must presume that the legislature says in a statute what it means and means in a statute what it says there." *Dodd v. United States*, 545 U.S. 353, 357 (2005) (alteration adopted) (internal quotation marks and citation omitted); *see also Magwood v. Patterson*, 561 U.S. 320, 334 (2010) ("We cannot replace the actual text with speculation as to Congress' intent.").

In sum, Section 1226(a) plainly applies to noncitizens, like Petitioner, who are present in the United States, but charged as inadmissible for entering the country without inspection and admission. Although the government seeks to sidestep the clear language in Section 1226(a) and support its mandatory-detention position by pointing to Section 1225(b)(2)(a), we now examine how the plain text of that statute likewise soundly defeats the government's position.

**B.    Section 1225(b)(2)(A)**

The government asserts that Petitioner's mandatory detention is lawful pursuant to Section 1225(b)(2)(A), which provides:

> Subject to subparagraphs (B) and (C), in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a proceeding under section 1229a of this title.

14

8 U.S.C. § 1225(b)(2)(A). According to the government, "[u]nder the plain language of § 1225(b)(2), DHS is required to detain all aliens, like Petitioner, who are present in the United States without admission and are subject to removal proceedings—regardless of how long the alien has been in the United States or how far inland from the border they managed to migrate before being detained." Appellant's Br. at 21. We disagree.

The government contends that Petitioner is subject to mandatory detention because he is an "applicant for admission" who "is not clearly and beyond a doubt entitled to be admitted." However, the government's proposed statutory construction suffers from a fatal defect:  it disregards the second requirement for this provision to apply. Section 1225(b)(2)(A) applies "in the case of an alien who is an applicant for admission" and provides for detention of "an alien seeking admission." It therefore applies only to a noncitizen who is both an "applicant for admission" and who is "seeking admission." Petitioner may be an "applicant for admission," but he is not "seeking admission."

First, "applicant for admission" is defined by statute to mean any noncitizen who is present in the United States and has not been admitted, or is arriving in the United States. 8 U.S.C. § 1225(a)(1). More specifically, Section 1225(a)(1) provides:

> An alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters) shall

15

> be deemed for purposes of this chapter an applicant for admission.

*Id.*

Second, "admission" is defined by statute as "the lawful entry of the alien into the United States after inspection and authorization." *Id.* § 1101(a)(13)(A). "Entry," which has no statutory definition, commonly means "the act of entering." *Entry*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 759 (1993); *see also Entry*, BLACK'S LAW DICTIONARY (7th ed. 1999) ("Immigration. Any entrance of an alien into the United States, whether voluntary or involuntary."). And to "enter" means "to go or come into a material place." *Enter*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 756 (1993). That common meaning was articulated by the Supreme Court long ago, when it noted that "'entry' by its own force implies a coming from outside." *United States ex rel. Claussen v. Day*, 279 U.S. 398, 401 (1929); *see also United States ex rel. Volpe v. Smith*, 289 U.S. 422, 425 (1933) (defining "entry" as the "coming of an alien from a foreign country into the United States").

Third, although also not defined in the statute, the term "seek" means, as the government agrees, to "request" or "ask for." Appellant's Br. at 26–27 (quoting *Seek*, WEBSTER'S NEW WORLD COLLEGE DICTIONARY 1299 (4th ed.)); *see also Seek*, MERRIAM WEBSTER ONLINE, https://www.merriam-webster.com/dictionary/seek [https://perma.cc/XRA7-RPYF] (last visited Apr. 27, 2026) (defining "seek" as, *inter alia*, "to go in search of; look for" or "to try to acquire or gain; aim at" or "to make an attempt"). The term "seeking" is in the present participle form, which expresses present action. *See Present Participle,*

16

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1794 (1993).

Together, Section 1225(b)(2) therefore applies only to (1) noncitizens who are present and have not been admitted, and (2) are requesting (3) lawful entry into the United States after inspection and authorization. Here, although Petitioner is an applicant for admission under the statutory definition because he is present in the country and has never been admitted, it simply cannot be said that he is "seeking admission," as he is not requesting lawful entry into the United States.

By total contrast, Petitioner entered the interior unlawfully twenty years ago and is now seeking only relief from removal. Therefore, because Section 1225(b)(2)(A) applies only to a noncitizen who is both an "applicant for admission" and "seeking admission," it does not apply to Petitioner. *See also Castañon-Nava*, 161 F.4th at 1061 ("[W]hile a noncitizen arrested in the Midwest might qualify as 'an alien present in the United States who had not been admitted,' § 1225(a)(1), the mandatory detention provision upon which Defendants rely, limits its scope to an 'applicant for admission' who is 'seeking admission,' § 1225(b)(2)(A)."). Instead, Section 1225(b)(2)(A) applies to those noncitizens who present themselves at a port of entry for admission, or who cross the physical border into the United States but are apprehended at the "threshold of initial entry." *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 107, 140 (2020) (holding that a noncitizen "apprehended just 25 yards from the border" had not effected an "entry"); *see also Leng May Ma v. Barber*, 357 U.S. 185, 189 (1958) (treating noncitizens paroled into the country "as [if] stopped at the boundary line").

17

We cannot ignore the phrase "seeking admission," as the government's interpretation would have us do. Doing so would render it "mere surplus," *Hechavarria v. Sessions*, 891 F.3d 49, 55 (2d Cir. 2018), *as amended* (May 22, 2018), and "[i]t is our duty to give effect, if possible, to every clause and word of a statute," *id.* (quoting *United States v. Menasche*, 348 U.S. 528, 538–39 (1955)). Here, it *is* possible to give effect to each term, as each has a clear statutory definition or, if undefined by the statute, an ordinary, judicially-settled meaning. *See Feliciano v. Dep't of Transp.*, 605 U.S. 38, 45 (2025).

The government's arguments to the contrary neither ameliorate this superfluity problem nor overcome the plain text. First, the government, relying on the analysis in the Fifth Circuit and Eighth Circuit majority opinions, argues that "the ordinary meanings of the phrases 'applicant for admission' and 'seeking admission' are the same." Appellant's Rule 28(j) Ltr. (Mar. 26, 2026) at 1 (internal quotation marks and citation omitted); *see Buenrostro-Mendez*, 166 F.4th at 502 ("There is no material disjunction—by the terms of the statute or the English language—between the concept of 'applying' for something and 'seeking' something. When a person applies for something, they are necessarily seeking it. . . . The everyday meaning of the statute's terms confirms that being an 'applicant for admission' is not a condition independent from 'seeking admission.'") (internal quotation marks and citations omitted); *see also Avila*, 170 F.4th at 1134 ("[W]e agree with the Fifth Circuit that the ordinary meanings of the phrases 'applicant for admission' and 'seeking admission' are the same.").

That argument, however, mistakenly assumes that the statute

18

uses the ordinary meaning of "applicant for admission." It does not. Instead, it introduces an explicit definition and we must follow the statute. *See Digit. Realty Tr., Inc. v. Somers*, 583 U.S. 149, 160 (2018).

"Applicant" ordinarily means "one who applies for something." *Applicant*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 105 (1993). However, Section 1225(a)(1) gives "applicant for admission" an "artificial" meaning, covering "constructive" applicants who never applied for anything. *See Matter of Lemus-Losa*, 25 I. & N. Dec. 734, 743 n.6 (B.I.A. 2012). That must be the case, because the statutory meaning of "applicant for admission" extends to noncitizens who have not and could not apply for what the statute defines as "admission" — "lawful entry . . . into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A). A noncitizen like Petitioner is unlawfully present, and thus an "applicant for admission," but indisputably never sought or applied for lawful entry after inspection and authorization, and is not doing so now. To the contrary, he evaded immigration inspectors, snuck into the country, and today applies only for non-admission forms of relief, including asylum and cancellation of removal. Petitioner can therefore only be an "applicant for admission" *because* the statute uses "applicant" in a "specialized" way, rather than in its ordinary meaning. *Feliciano*, 605 U.S. at 45.

Congress reinforced this artificiality by using the word "deemed" in Section 1225(a). To "deem" a term is to "treat [it] as if (1) it were really something else, or (2) it has qualities that it does not have." *Deem*, BLACK'S LAW DICTIONARY (7th ed. 1999); *see also Shi Liang Lin v. U.S. Dep't of Just.*, 494 F.3d 296, 307 n.9 (2d Cir. 2007) (en

19

banc).  Congress therefore traditionally uses "deem" to "establish a legal fiction either positively by 'deeming' something to be what it is not or negatively by 'deeming' something not to be what it is." *Shi Liang Lin*, 494 F.3d at 307 n.9 (internal quotation marks and citations omitted).  "All other uses of the word should be avoided."  *Id.* (internal quotation marks and citations omitted); *see also Sturgeon v. Frost*, 587 U.S. 28, 47 (2019) (adopting this definition of "deemed").

Thus, Congress here deemed, "abracadabra-style," *Sturgeon*, 587 U.S. at 47, "applicant for admission" to cover noncitizens who literally cannot be applying for or seeking "admission."  By contrast, the statute is silent on the meaning of "seeking" and "applying" and does not establish a legal fiction as to those terms, leaving them with their ordinary meanings.  *See Feliciano*, 605 U.S. at 45.  We therefore cannot "abracadabra-style" deem Petitioner to be "seeking admission."

It is precisely because Congress employed a statutory term of art for "applicant for admission" but not for "seeking admission" that the analogy to an applicant for college, relied upon heavily by the government and our two sister circuits, is inapposite.  *See, e.g., Buenrostro-Mendez*, 166 F.4th at 502 ("Just as an applicant to a college seeks admission, an applicant for admission to the United States is 'seeking admission' to the same, regardless [of] whether the person actively engages in further affirmative acts to gain admission."); *accord Avila*, 170 F.4th at 1134.  Where a statute deems a term to have a particularized meaning, an analogy to its use in everyday conversation is of limited help.  Even sticking with it, though, for the college analogy to make sense here, a college would have to deem an

20

individual physically located on its campus at any point in time to be an "applicant for admission" to that college, including an individual who had never filed an application and had no intention of doing so. But giving "applicant for admission" such a technical meaning would not automatically affect the ordinary meaning of "seeking admission" merely because the two phrases appear similar.[3] Using the ordinary meaning of "seeking admission," no one would consider an individual who never applied to also be "seeking admission" to the college. Here is a better analogy. If someone sneaks into Yankee Stadium at the start of the game with no ticket for admission (and no intention of ever paying) and he is later found by security in a seat in the seventh inning, no one would consider that fan to be "seeking admission" to the game.

Even if it were appropriate in this context—and it is not—the government's ordinary meaning analysis is not even persuasive on its own terms. The government contends that "applicant for admission" is a subset of "alien seeking admission," such that all those who are "seeking admission" must also be "applicants for admission." This is incorrect. The difference between the two phrases is their temporal scope. While an "applicant for admission" may be either someone applying right now or someone who applied in the past, a noncitizen "seeking" admission refers only to a noncitizen currently seeking admission.

---

[3] The government acknowledges, as it must, that the phrases are not literally synonymous, as noncitizens may be "seeking admission" without being "applicants for admission" in the sense of Section 1225(a)(1). *See* Appellant's Br. at 27–28.

As we have already explained, "alien seeking admission" is a present participle, which "denotes the verb's action as being in progress or incomplete at the time expressed by the sentence's principal verb." THE CHICAGO MANUAL OF STYLE ¶ 5.114 (18th ed. 2024). Here, as the government conceded at oral argument, that principal verb is "is," such that "alien seeking admission" means an "alien *who is* seeking admission." This is reinforced by the statute's parallel use of "alien *who is* an applicant for admission" earlier in the same sentence, and by the fact that "the examining immigration officer determines [whether] an alien seeking admission *is* . . . entitled to be admitted." 8 U.S.C. § 1225(b)(2)(A) (emphasis added).[4] When the statute says, "alien seeking admission," it therefore refers to a noncitizen who is seeking admission *right now*, not one who sought admission in the past but no longer is. *See Carr v. United States*, 560 U.S. 438, 448 (2010) ("Consistent with normal usage, we have frequently looked to Congress' choice of verb tense to ascertain a statute's temporal reach.").

In contrast, the noun "applicant" lacks a defined "temporal scope." *Robinson*, 519 U.S. at 344. In other words, like most nouns, the word does not refer to any particular time period. For example, a job "applicant" can refer to individuals who are no longer applying, such as "[u]nsuccessful applicants or those who turn down a job

---

[4] Similarly, subsection (b)(2)(B) creates multiple exceptions for noncitizens using the present tense "is." 8 U.S.C. § 1225(b)(2)(B). And subsection (b)(2)(C) uses the parallel construction "an alien . . . who is arriving on land" to describe a subset of noncitizens covered by subsection (b)(2)(A). *Id.* § 1225(b)(2)(C).

22

offer." *Id.* Thus, employing the ordinary meaning of the terms, not everyone who is an "applicant for admission" is necessarily "seeking admission." While those "seeking admission" must be doing so in the present, "applicants for admission" may be presently "seeking" admission but need not be—as Petitioner's case illustrates.

The government's faulty analogy of a student applying to college again helps illuminate the difference. It would be natural to say that "the college rejected the applicant," referring to a student whose application had already been denied. However, no one would say that "the college rejected the person who *is* seeking admission." It would instead be natural to say that "the college rejected the person who *was* seeking admission" or "*sought* admission." Since the statute is written to refer to those "seeking admission," the government's college-applicant analogy cuts against its argument.

Finally, if the government were right that "applicant for admission" is a subset of "seeking admission," there would have been no reason for Congress to use both. The government argues that "applicant for admission" has *some* meaning because it narrows the scope of "seeking admission" in Section 1225(b)(2)(A). But Congress could have achieved the same outcome by using "applicant for admission" alone and omitting "seeking admission" entirely. *See Biden v. Texas*, 597 U.S. 785, 798 (2022) ("If Congress had wanted the provision to have that effect, it could have said so in words far simpler than those that it wrote."). It did not do so, and it is not our role to second-guess that choice by unilaterally editing the statute now.

In contrast, Petitioner's interpretation provides a clear explanation for what role both terms play in the statute. Only because

23

the statute includes both terms does it authorize bond for noncitizens who fit into only *one* category but mandate detention for noncitizens who fit into *both*. As we discuss further below regarding the structure and purpose of these provisions, Congress did not intend to mandate detention of noncitizens "seeking admission" who are not "applicants for admission," such as noncitizens who apply for a visa at a consulate abroad. *See Lemus-Losa*, 25 I. & N. Dec. at 741. Nor did Congress intend to mandate detention of noncitizens who are "applicants for admission" but not "seeking admission," such as illegal entrants, like Petitioner, who have nonetheless lived in the United States for a substantial time. That result makes sense, as the strong rationale for detaining noncitizens who are *both* "applicants for admission" and "seeking admission" does not apply to noncitizens who are one but not the other.

In sum, our commonsense reading of the text in Section 1225(b)(2)(A) squares with the plain meaning of "seeking admission" and gives effect to each clause and word that Congress chose to write.

## II.    Other IIRIRA Provisions

Given Section 1225(b)(2)(A)'s straightforward text, the government attempts to cobble together language from other parts of IIRIRA with similar phrases or terms—including Sections 1225(a)(3), 1225(a)(4), 1225(a)(5), 1182(a)(9)(B)(i)(I), and 1225(b)(2)(B)(iii)—and argues that inferences drawn from those provisions shed light on congressional intent with respect to the language in Section 1225(b)(2)(A), and support the government's position. We reject each argument in turn.

24

### A.    Section 1225(a)(3)

Section 1225(a)(3) provides for inspection of "[a]ll aliens . . . who are applicants for admission or otherwise seeking admission or readmission to or transit through the United States."   8 U.S.C. § 1225(a)(3).  From the phrase "or otherwise," the government infers that "applicants for admission" must be a subset of "seeking admission."   However, that is only one possible meaning of "or otherwise," and is one that fits poorly with the statute here.

Although the government is correct that "or otherwise" can sometimes mean "in a different way or manner," it can also simply "refer to something that is different from something already mentioned."  *Or otherwise*, MERRIAM-WEBSTER ONLINE, https://www. merriam-webster.com/dictionary/or%20otherwise [https://perma.cc/ 9F9H-PH6Q] (last visited Apr. 27, 2026); *see also Otherwise*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1598 (1993) (defining otherwise as "in a different way or manner," but also as "in different circumstances," "under other conditions," and "in other respects").

The Supreme Court has rejected the argument that "or otherwise" mandates the subset-superset interpretation urged by the government.    Particularly,  in  *Helsinn  Healthcare  S.A.  v.  Teva Pharmaceuticals USA, Inc.*, the Court considered language in the America Invents Act, 35 U.S.C. § 102(a)(1), barring patents on any invention that was "in public use, on sale, *or otherwise* available to the public before the effective filing date of the claimed invention."  586 U.S. 123, 125 (2019) (emphasis added).  The plaintiff argued that "or otherwise" must mean that "on sale" is just one way of describing something "available to the public," and that the statute therefore

25

only covers sales to the public, not to private buyers. *Id.* at 132.  The Court disagreed, explaining that, "[l]ike other such phrases, 'otherwise available to the public' captures material that does not fit neatly into the statute's enumerated categories but is nevertheless meant to be covered." *Id.*  Thus, the Court rejected the plaintiff's contention that such a construction "reads 'otherwise' out of the statute," and concluded that the statute covers even sales that do not "make the claimed invention available to the public." *Id.*

Similarly, the Supreme Court has long rejected arguments that the phrase "or otherwise" in criminal residual clauses means that language after the catchall limits the types of crimes enumerated before the catchall.  Therefore, a criminal statute covering "burglary," as well as conduct that "or otherwise" involves a "serious potential risk" of harm, covers even burglaries that involve no actual risk of harm at all. *Taylor v. United States*, 495 U.S. 575, 597 (1990).  That result was possible only because burglary is not a mere subset of harmful conduct.

As these cases illustrate, determining whether a particular catchall phrase is "conjunctive" or "disjunctive" requires a context-specific approach. *See Flora v. United States*, 362 U.S. 145, 149–50 (1960).  Here, the text and context strongly suggest that "or otherwise" in Section 1225(a)(3) has its disjunctive meaning.  In the government's cited cases, the statutes at issue were structured to set forth a list of specific examples followed by an "or otherwise" catchall clause.  For example, *Kleber* and *Villarreal* interpreted a section of the Age Discrimination in Employment Act making it unlawful "to limit, segregate, or classify his employees in any way which would deprive

26

or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee." *Kleber v. CareFusion Corp.*, 914 F.3d 480, 482 (7th Cir. 2019) (quoting 29 U.S.C. § 623(a)(2)); *see also Villarreal v. R.J. Reynolds Tobacco Co.*, 839 F.3d 958, 963 (11th Cir. 2016) (en banc). Similarly, *Wynn* interpreted a provision of the Foreign Agents Registration Act covering persons "engaged in or about to engage in any acts which constitute or will constitute a violation of any provision of this subchapter, or regulations issued thereunder, or whenever any agent of a foreign principal fails to comply with any of the provisions of this subchapter or the regulations issued thereunder, *or otherwise* is in violation of the subchapter." *Att'y Gen. v. Wynn*, 104 F.4th 348, 353–54 (D.C. Cir. 2024) (emphasis added) (quoting 22 U.S.C. § 618(f)). Such texts easily warrant a subset-superset interpretation. When Congress uses "a list of specific items separated by commas and followed by a general or collective term," it raises the "inference . . . that Congress remained focused on the common attribute when it used the catchall phrase." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 225 (2008) (discussing the similar, but distinct, *ejusdem generis* canon).

By contrast, "applicant for admission" is not narrower or more specific than "alien seeking admission," nor does the statute enumerate multiple examples of "seeking admission." In fact, it does the opposite, beginning with the general "applicant for admission" and then following "or otherwise" with a more specific list—"seeking admission or readmission to or transit through the United States." 8 U.S.C. § 1225(a)(3). Petitioner's interpretation thus fits well with that framework—Section 1225(a)(3) applies to applicants for

27

admission, and also applies to three further categories of noncitizens, which may overlap with but are not the same as "applicant for admission."

**B.    Section 1225(a)(4)**

Section 1225(a)(4) omits "applicant for admission" entirely, instead providing that "[a]n alien applying for admission may . . . be permitted to withdraw the application for admission and depart immediately from the United States."   8 U.S.C. § 1225(a)(4).   The government nevertheless argues that the fact that a noncitizen "applying for admission" can withdraw his application shows that "applying for admission" is the same as being an "applicant for admission."

As an initial matter, this argument is circular, assuming the very point it aims to prove (that "alien applying for admission" is synonymous with "applicant for admission").   But even more fundamentally, the text of Section 1225(a)(4) undermines the government's argument.   Where Congress wanted to write a tailored provision that applies only to those noncitizens currently seeking "lawful entry," it used "alien applying for admission" (a present participle) instead of "applicant for admission" (a noun). Grammatically, the section works only if, as explained above, the implied finite verb corresponding to "applying" is the present-tense "is."   It would make no sense for a noncitizen who *was* rather than *is* applying for admission to withdraw his application—there would be nothing to withdraw.

Petitioner's interpretation of Section 1225(a)(4) also fits well

28

with its function. The section allows a noncitizen to voluntarily depart and thereby avoid the initiation of removal proceedings, after which the noncitizen would be subject to a strict waiting period before reapplying for admission. *See* 8 U.S.C. § 1182(a)(9)(B)(i) (setting the waiting period at three years for those who voluntarily depart prior to removal proceedings, but ten years for those who do not). The Agency's own regulations confirm that this voluntary withdrawal provision is available "only [to] an arriving alien." 8 C.F.R. § 1240.1(d). That makes sense. There is simply no reason for a noncitizen who unlawfully entered twenty years ago to request permission from the Attorney General to "withdraw" anything, because he never submitted anything in the first place.

That reading aligns with the Agency's own interpretation of "applying for admission" in other sections. For example, Section 1182(h) allows certain noncitizens who have committed a crime involving moral turpitude to apply for a waiver of inadmissibility if the Attorney General "has consented to the alien's applying . . . for admission to the United States." 8 U.S.C. § 1182(h)(2). As the Agency has explained, being an "'applicant for admission' under [Section 1125(a)(1)] is distinguishable from 'applying . . . for admission to the United States' within the meaning of [Section 1182(h)]." *Matter of Y-N-P-*, 26 I. & N. Dec. 10, 13 (B.I.A. 2012). The Section 1125(a)(1) language "merely entitles [a noncitizen] to a removal hearing," "despite her actual presence in the United States." *Id.* By contrast, the phrase "applying . . . for admission" in Section 1182(h) refers only to those noncitizens who "have some *basis* for being admitted" and are not already present. *Id.* (emphasis in original). Where a

29

noncitizen like Petitioner "does not contend that there is any basis for [his] admission to the United States," and instead "is requesting that the Attorney General exercise his discretion to cancel [his] removal" or provide asylum, he is not applying for (or seeking) admission. *Id.; see also Garcia-Mendez v. Lynch*, 788 F.3d 1058, 1065 (9th Cir. 2015) (adopting *Matter of Y-N-P-* at *Chevron* step two); *Arevalo v. Att'y Gen.*, 872 F.3d 1184, 1195 (11th Cir. 2017) (same); *Torres v. Barr*, 976 F.3d 918, 929 (9th Cir. 2020) (invoking *Matter of Y-N-P-* for the principle that the "deeming provision of § 1225(a)(1) 'merely' determines a respondent's legal status for purposes of removal proceedings"). That interpretation is correct. Not all applicants for admission are applying for or seeking admission at all points in time. To hold otherwise would disregard the distinctions that Congress wrote into the statutes.

### C.    Section 1225(a)(5)

The government also turns to Section 1225(a)(5), at least in its reply brief.[5] That section permits immigration officers to require applicants for admission to "state under oath any information sought by an immigration officer regarding the purposes and intentions of the applicant in seeking admission to the United States." 8 U.S.C.

---

[5]    Generally, we would not consider an argument not raised in an appellant's opening brief. *See Tripathy v. McKoy*, 103 F.4th 106, 118 (2d Cir. 2024). However, given our preference for resolving disputes on the merits and the importance of the question presented, we exercise our discretion to consider the substance of the government's argument about Section 1225(a)(5).

§ 1225(a)(5). The government argues that this means all applicants for admission are necessarily "seeking admission."

The text does not bear this weight. Instead, Section 1225(a)(5) provides that applicants for admission "*may* be required to state under oath" certain information, implicitly recognizing that some applicants for admission will not be required to do so. *Id.* (emphasis added); *see also Yoo v. United States*, 43 F.4th 64, 72 (2d Cir. 2022) ("The use of the word 'may'—in contrast to words like 'shall' or 'must'—authorizes, rather than commands."). That makes sense, because much of the information described—intended length of stay and intent to remain permanently—applies to only a subset of applicants for admission, such as those who are seeking temporary nonimmigrant visas. *See, e.g.*, USCIS Form I-134, Declaration of Financial Support, at 5–6 (Jan. 20, 2025) (requesting an applicant's anticipated length of stay and certification of ability "to pay for necessary expenses for the duration of [the applicant's] temporary stay in the United States"); USCIS Form I-192, Application for Advance Permission to Enter as a Nonimmigrant, at 6 (Jan. 20, 2025) ("Approximate Length of Stay in the United States"). It would be absurd for an immigration officer to ask someone like Petitioner—who entered unlawfully and has been living here for twenty years—to attest to his "intended length of stay." Section 1225(a)(5) is therefore consistent with the notion that some, but not all, applicants for admission are seeking admission. Just like Section 1225(b)(2)(A), Section 1225(a)(5) applies only to such noncitizens, who *may* be required to attest to their "purposes and intentions . . . in seeking admission."

31

Again, Petitioner is not presently "seeking admission," despite being deemed an applicant for admission. And Section 1225(a)(5) makes perfect sense as a matter of grammar and logic, even acknowledging that not all applicants for admission are also seeking admission. This subsection therefore does nothing to push the government's argument forward.

### D.    Section 1182(a)(9)(B)(i)(I)

The government also raises Section 1182(a)(9)(B)(i)(I), which renders inadmissible certain noncitizens who were "unlawfully present in the United States" and "again seek[] admission" after they depart or are removed. 8 U.S.C. § 1182(a)(9)(B)(i)(I). Even though the government focuses on subsection (B)(i)(I), "again seeks admission" is used in two other subsections within Section 1182(a)(9). Because Section 1182(a)(9)(B)(i)(I) does not explicitly exclude noncitizens who initially entered the United States unlawfully, the government reads "again" to mean that all such noncitizens must have at some point sought admission by operation of law. The government then takes the additional step of inferring that if such noncitizens once *sought* admission, they must still be *seeking* admission in the present.

Although the Agency has espoused that view of Section 1182(a)(9) for some time, *see Lemus-Losa*, 25 I. & N. Dec. at 743 n.6, it is such a counterintuitive reading of the text that the Agency initially held that "the word 'again' [w]as an apparent drafting mistake that has no bearing on the" scope of § 1182(a)(9), *In Re Lemus-Losa*, 24 I. & N. Dec. 373, 376 n.3 (B.I.A. 2007). In any event, we are not bound by the BIA's interpretation of Section 1182(a)(9). *See Loper Bright Enters.*,

32

603 U.S. at 385–86, 400–01; *see also Penaranda Arevalo v. Bondi*, 130 F.4th 325, 336 (2d Cir. 2025) (making a determination independent of a BIA decision).

The most natural reading of "again seeks admission" in Section 1182(a)(9)(B)(i)(I) is the one that is consistent with Petitioner's reading of the plain text of Section 1225(b)(2)(A).  Seeking admission means seeking lawful entry, and there is no reason to diverge from the plain reading that "again seeks admission" applies only to those noncitizens who previously sought lawful entry.  The government assumes that this would be a problem only because it cherry-picks portions of Section 1182(a)(9) and reads them in isolation.  For example, the government worries that limiting Section 1182(a)(9)(B)(i)(I) to those who actually seek lawful admission would create inequities between them and noncitizens who evade inspection at the border.  That concern is misplaced.  Any noncitizen who evades inspection at the border, is removed, and later "seeks admission" is covered not by Section 1182(a)(9)(B)(i)(I), but instead by the harsher provision of Section 1182(a)(9)(A)(ii).  Unlike subsection (B)(i)(I), which imposes waiting periods of either three or ten years and includes exceptions for, *inter alia*, minors, asylees, battered women, and victims of sex trafficking, subsection (A)(ii) imposes a flat ten-year waiting period and includes only one exception for readmission with the Attorney General's consent.

This interpretation also honors Congress's use of different terminology throughout Section 1182(a)(9).  Some subsections use "again seeks admission," 8 U.S.C. § 1182(a)(9)(B)(i)(I), some use only "seeks admission," *id.* § 1182(a)(9)(A)(ii), and others use "enters or

33

attempts to reenter," *id.* § 1182(a)(9)(C)(i)(II).  We presume that such choices by Congress are meaningful.  *See FDA v. R.J. Reynolds Vapor Co.*, 606 U.S. 226, 238–39 (2025) ("When Congress uses 'one term in one place, and a materially different term in another, the presumption is that the different term denotes a different idea.'") (quoting A. SCALIA & B. GARNER, READING LAW 170 (2012)).  If the government were correct that every "applicant for admission" has, by operation of law, sought admission, then there would be no need to specify "again," nor would there be any difference between "again seeks admission" and "seeks admission."  In addition, if entering the country unlawfully amounted to constructively seeking admission, then "enters or attempts to reenter" too would cover the exact same people as "seeks admission" and "again seeks admission."

Finally, even if *Lemus-Losa* were correct, it would not support the government's position in this case.  More specifically, even if noncitizens like Petitioner are construed as having sought admission at some point in the past, it does not follow that they are presently seeking admission.  That is because someone who is presently "seeking admission" cannot "again" seek admission.  *Cf. Lemus-Losa*, 25 I. & N. Dec. at 743 n.6; *Buenrostro-Mendez*, 166 F.4th at 503.  Thus, for *Lemus-Losa*'s interpretation of Section 1182(a)(9) to work, noncitizens who "again seek admission" must have at some point stopped seeking admission.  But merely departing the country does not necessarily end one's process of "seeking admission" because, as the BIA recognized, "many aliens . . . will be outside the United States and seeking admission from abroad."  *Lemus-Losa*, 25 I. & N. Dec. at 741 (emphasis omitted).  If anything, then, the use of "again" in

34

Section 1182(a)(9) supports Petitioner's view that he at least is no longer "seeking admission," even if the government were right that he once was.

In any event, whatever "again" means in Section 1182(a)(9), no reasonable interpretation of that provision supports the government's present understanding of Section 1225(b)(2). We need not conclusively determine the scope of Section 1182(a)(9) to decide that Congress did not indirectly and implicitly mandate the detention of millions of noncitizens—a proverbial "elephant[]"—by inserting a surreptitious "again" into an unrelated section of the INA—the epitome of all "mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

### E.    Section 1225(b)(2)(B)(iii)

The government, relying on the Eighth Circuit's decision in *Avila*, also argues that Section 1225(b)(2)(B)(iii), which exempts "stowaway[s]" from Section 1225(b)(2)(A), supports its interpretation. In *Avila*, the majority reasoned that there would be no reason to exclude stowaways from Section 1225(b)(2)(A) unless a stowaway could otherwise be an "applicant for admission" who is "seeking admission." *Avila*, 170 F.4th at 1135. Any reliance on this exemption to support the government's position is misplaced.

First, the majority in *Avila* failed to consider at all that Section 1225(a)(2) states that "[i]n no case may a stowaway be considered an applicant for admission or eligible for a hearing under section 1229a of this title." 8 U.S.C. § 1225(a)(2). Thus, the *Avila* majority started from the premise that a stowaway could be an "applicant for

admission" but for Section 1225(b)(2)(B)(iii), even though that possibility is flatly foreclosed by Section 1225(a)(2).

Second, the *Avila* majority decided without basis that a stowaway "unquestionably" cannot seek lawful entry to the United States. *Avila*, 170 F.4th at 1135. The statute defines "stowaway" as "any alien who obtains transportation without the consent of the owner, charterer, master or person in command of any vessel or aircraft through concealment aboard." 8 U.S.C. § 1101(a)(49). The definition thus speaks only to the noncitizen's journey to the United States, not to the way the noncitizen seeks entry once he arrives (such as pursuant to a valid visa). The definition also covers a noncitizen who completes only a portion of his journey as a stowaway but otherwise disembarks lawfully at a port of entry. But for the exclusion of stowaways in Section 1225(a)(2), such a noncitizen could seek lawful entry just like anyone else presenting at the border.

Accordingly, the only coherent interpretation of Section 1225(b)(2)(B)(iii) is that it clarifies that Section 1225(b)(2)(A)'s broad referral of noncitizens to full removal proceedings under Section 1229a does not apply to stowaways.

*     *     *

In sum, the plain meaning of "seeking admission" in Section 1225(b)(2)(A)—presently pursuing lawful entry into the United States—is not undermined by any of the other statutory provisions to which the government retreats to find support. Therefore, we find no basis to justify departing from the unambiguous meaning of the text, under which Petitioner is not

36

subject to mandatory detention, because he is not "seeking admission" under Section 1225(b)(2)(A).

## III.   Statutory Context and Structure

Our interpretation of Sections 1225 and 1226, based on their plain text, is reinforced by the broader context and structure of those provisions in the overall statutory scheme. *See United States v. Epskamp*, 832 F.3d 154, 162 (2d Cir. 2016); *see also Gundy v. United States*, 588 U.S. 128, 141 (2019) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.") (internal quotation marks and citation omitted).

As an initial matter, the Supreme Court has long understood IIRIRA exactly how Petitioner does. *See Jennings v. Rodriguez*, 583 U.S. 281, 287 (2018). In rejecting the Ninth Circuit's view that the doctrine of constitutional avoidance imposed an implicit six-month time limit on detention under Sections 1225(b) and 1226, the Court explained that Section 1225 operates *"at the Nation's borders and ports of entry, where the Government must determine whether an alien seeking to enter the country is admissible," id.* (emphasis added), and "U.S. immigration law authorizes the Government to detain certain aliens seeking admission into the country under §§ 1225(b)(1) and (b)(2)," *id.* at 289. By contrast, the Court described Section 1226 as "authoriz[ing] the Government to detain certain aliens *already in the country* pending the outcome of removal proceedings under §§ 1226(a) and (c)." *Id.* (emphasis added).

Although the government suggests that there is also language

in *Jennings* that supports its reading—because the Court noted that Section 1225(b)(2) "serves as a catchall provision that applies to all applicants for admission not covered by § 1225(b)(1)," *id.* at 287—we are unpersuaded. Indeed, the Court left no doubt as to its view regarding the differences between Sections 1225 and 1226, which squarely fits with Petitioner's interpretation, because it repeated later in the opinion that Section 1226 "applies to aliens already present in the United States." *Id.* at 303. Thus, as the Court explained, Section 1226 "creates a default rule for those aliens by permitting—but not requiring—the Attorney General to issue warrants for their arrest and detention pending removal proceedings" and "permits the Attorney General to release those aliens on bond, except as provided in subsection (c)." *Id.* (alteration adopted) (internal quotation marks omitted).

To the extent that the government alternatively attempts to downplay the language in *Jennings* as mere dicta, it is well settled that "we are obligated to accord great deference to Supreme Court dicta, absent a change in the legal landscape." *United States v. Harris*, 838 F.3d 98, 107 (2d Cir. 2016) (typeface altered) (internal quotation marks and citation omitted); *see also Clemente v. Lee*, 72 F.4th 466, 474 (2d Cir. 2023). The government points to no change in the legal landscape, and thus we afford great deference to the Court's description of the statutory scheme in *Jennings*.

Even without deferring, though, the framework set forth in *Jennings* makes good sense in light of Congress' overall approach to immigration detention. The statute creates a tiered scheme that makes detention and removal easier for noncitizens who have weaker

38

legal claims and who are either particularly dangerous or about whom the government lacks information. Noncitizens who just arrived without documentation or who misrepresented themselves are subject to expedited removal and must be detained. 8 U.S.C. § 1225(b)(1)(A)(i). Noncitizens who snuck across the border less than two years ago may be treated the same way, but only if so designated by the Attorney General. *Id.* § 1225(b)(1)(A)(iii). Noncitizens who present themselves to immigration officials at the border but are likely inadmissible for reasons other than a lack of documentation or misrepresentation must be detained, but they get full (not expedited) removal proceedings. *Id.* § 1225(b)(2)(A). Finally, noncitizens who have been in the United States for more than two years get full removal proceedings, may be detained, and may be granted release on bond or conditional parole, *id.* § 1226(a), unless they have committed certain crimes, *id.* § 1226(c). Only that construction reads the detention and removal provisions as a "symmetrical and coherent" statutory scheme that fits "all parts into an harmonious whole." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (internal quotation marks and citation omitted).

We are equally unpersuaded by the government's contention that its reading "brings the statute in line with the longstanding 'entry fiction'" repeated throughout Supreme Court precedent, suggesting that noncitizens like Petitioner can be treated "as if stopped at the border" because they have never lawfully entered. Appellant's Br. at 43–44 (quoting *Thuraissigiam*, 591 U.S. at 139). Under the government's reading, Petitioner is still "seeking admission" because he had not lawfully entered. However, that approach overreads the

Supreme Court's "entry fiction" precedents and disregards a century of immigration law establishing the meaning of "entry" as the "coming of an alien from a foreign country into the United States." *Volpe*, 289 U.S. at 425. Indeed, it has long been settled that a noncitizen can effect an entry even by crossing the border illegally. *See Yamataya v. Fisher*, 189 U.S. 86, 99–102 (1903). The pre-1996 INA sought to "giv[e] due recognition to the[se] judicial precedents" by defining entry as the "coming of an alien from a foreign port or place or an outlying possession into the United States." *Landon v. Plasencia*, 459 U.S. 21, 29 n.6 (1982) (quoting S. Rep. No. 1137, at 4 (1952)). While IIRIRA replaced that statutory definition of "entry" with "admission," it did not redefine "entry" or give any indication that it departed from these longstanding precedents.

Although the "entry fiction" doctrine allows the government to treat physical entrants as if still "on the threshold" if they are "detained shortly after unlawful entry," the reach of that doctrine is sharply limited. *Thuraissigiam*, 591 U.S. at 140 (internal quotation marks omitted). While the doctrine may extend further than the twenty-five yards and twenty-four hours at issue in *Thuraissigiam*, *id.* at 113, no one could seriously contend that it applies to a noncitizen like Petitioner who has been living in the United States for decades. Under settled Supreme Court precedent, "aliens who have once passed through our gates, *even illegally*, may be expelled only after proceedings conforming to traditional standards of fairness encompassed in due process of law." *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 212 (1953) (emphasis added). That is, "once an alien enters the country, the legal circumstance changes, . . .

whether their presence here is lawful, unlawful, temporary, or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001). The government's reading runs afoul of these fundamental principles.

Moreover, the government's argument turns on Section 1225 existing in a vacuum. The government argues that Section 1225(b)(2)(A) applies to Petitioner because all "applicants for admission" necessarily fall into one of two exhaustive categories set forth in Section 1225 that mandate detention pending removal. According to the government, some subset falls under Section 1225(b)(1), which requires detention pending expedited removal proceedings for noncitizens who are inadmissible on certain grounds and "who (1) are 'arriving in the United States,' or (2) have 'not been admitted or paroled into the United States' and have not 'affirmatively shown . . . that [they] ha[ve] been physically present in the United States continuously for the 2-year period immediately prior to the date of the determination of inadmissibility.'" Appellant's Br. at 9 (quoting 8 U.S.C. § 1225(b)(1)(A)(i)–(iii)).[6] All other applicants for admission, the government argues, fall into Section 1225(b)(2)(A) as a "catchall." The sole exception from mandatory detention is parole, granted "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A).

However, the government's argument rests on an unjustified

---

[6] Noncitizens in the latter category are only subject to detention and expedited removal under Sections 1225(b)(1)(A)(i) and (iii) if so "designated" by the Attorney General in his discretion. 8 U.S.C. § 1225(b)(1)(A)(iii)(I).

41

assumption that every "applicant for admission" must be covered by either Section 1225(b)(1) or Section 1226(b)(2).  There is no textual basis in Section 1225 for that assumption, and it undermines the central role that Section 1226 plays in the statutory scheme.

For one, the government's interpretation reduces the applicability of Section 1226(a) to a subset of applicants for admission (*i.e.*, "the detention of any of the multitude of aliens who have overstayed their visas," Appellant's Br. at 38) narrower than the statutory text authorizes.  Had Congress intended Section 1226(a) to apply more narrowly, it would not have written the section to cover "an alien" without any further qualifications.  8 U.S.C. § 1226(a).  Section 1226's breadth is reinforced by its title, which refers broadly to "[a]pprehension and detention of aliens"—again with no qualifying language.  *Cf. Dubin v. United States*, 599 U.S. 110, 120–21 (2023) ("[T]he title of a statute and the heading of a section are tools available for the resolution of a doubt about the meaning of a statute.") (internal quotation marks and citation omitted); *see also* Pub. L. 104-208, 110 Stat. 3009, 585 (1996) (enacting Section 1226 with its present title).

The government's interpretation also renders superfluous much of Section 1226(c), including amendments to that provision in the Laken Riley Act, which was passed by Congress in 2025.  *See* Pub. L. No. 119-1, 139 Stat. 3 (2025).  As enacted in IIRIRA, Section 1226(c) mandates detention without bond or parole for noncitizens who enter the United States illegally, are released pending removal, and *inter alia* are inadmissible for certain reasons, including having committed a crime involving moral turpitude, 8 U.S.C. § 1226(c)(1)(A), or having

42

engaged in terrorist activity, *id.* § 1226(c)(1)(D).  It thereby acts as "a limit on the authority conferred by subsection [1226](a)," "subtract[ing] some of [the Agency's] discretion when it comes to the arrest and release of criminal aliens."  *Nielsen v. Preap*, 586 U.S. 392, 409 (2019) (emphasis omitted).

If, as the government argues, all applicants for admission are subject to mandatory detention under Section 1225(b)(2), Section 1226(c) would apply only to two narrow subsets of noncitizens: "admitted aliens who overstayed visas and are deportable" and then also commit an enumerated crime, Appellant's Br. at 19; and the rare criminal detainee who receives humanitarian parole under Section 1182(d)(5)(A).[7]  The vast majority of noncitizens covered by Section 1226(c)'s text, however, would be completely unaffected in the government's view, since they would already have been subject to mandatory detention without bond under Section 1225(b).  It would be surprising if Congress wrote Section 1226(c) so broadly if it were meant to apply to so few individuals.

When Congress amended Section 1226 in the Laken Riley Act, it enumerated additional crimes requiring detention, including "burglary, theft, larceny, shoplifting, or assault of a law enforcement officer, . . . or any crime that results in death or serious bodily injury to another person."  8 U.S.C. § 1226(c)(1)(E).  Again, Congress added no language suggesting that Section 1226 was limited to noncitizens

---

[7] The parties dispute whether Section 1226(c) restricts humanitarian parole granted pursuant to Section 1182(d)(5)(A).  We assume without deciding that the government is correct that Section 1226(c) prohibits humanitarian parole, not just conditional parole under Section 1226(a)(2)(B).

43

who overstay visas. Moreover, it would have been odd for Congress to address the dangers posed by "inadmissible . . . unadmitted criminal aliens," Appellant's Br. at 42, by amending a narrow provision that the government contends applies primarily to *admitted* noncitizens who have subsequently become *deportable*.[8] *See Stone v. INS*, 514 U.S. 386, 397 (1995) ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect.").

By nullifying nearly all applications of Sections 1226(a) and 1226(c), the government's interpretation "violate[s] the canon against interpreting any statutory provision in a manner that would render another provision superfluous." *Bilski v. Kappos*, 561 U.S. 593, 607–08 (2010); *see also Castañon-Nava*, 161 F.4th at 1061 (rejecting the government's construction of Section 1225(b)(2) because it would "render superfluous another part of the same statutory scheme") (internal quotation marks omitted). That canon is "strongest when," as here, "an interpretation would render superfluous another part of the same statutory scheme." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013); *Henderson v. United States*, 568 U.S. 266, 281 (2013) (Scalia,

---

[8] Indeed, the noncitizen who murdered Laken Riley and inspired the Act—Jose Antonio Ibarra—entered the country illegally before being paroled pending further proceedings and had not overstayed a visa. *See* Debate Concerning the Laken Riley Act, 171 Cong. Rec. S161-01, S165 (daily ed. Jan. 15, 2025) (Sen. Ricketts); *see also* Daniella Silva, *Man Found Guilty of Murdering Georgia Nursing Student Laken Riley and Is Sentenced to Life*, NBC NEWS (Nov. 20, 2024), https://www.nbcnews.com/news/us-news/man-found-guilty-murder-killing-georgia-nursing-student-laken-riley-rcna180377 [https://perma.cc/4NCL-5C8S] (last visited Apr. 27, 2026).

*J.,* dissenting) ("A rudimentary principle of textual interpretation—so commonsensical that it scarcely needs citation—is that if one interpretation of an ambiguous provision causes it to serve a purpose consistent with the entire text, and the other interpretation renders it pointless, the former prevails."). And the canon applies to these provisions even though the Laken Riley Act was enacted later in time. *See Bilski,* 561 U.S. at 608.

As explained above, the more coherent explanation is that Section 1226(a) sets forth the default rule for discretionary detention of noncitizens, which Sections 1225(b) and 1226(c) modify for certain subsets of high-risk noncitizens. That interpretation of the statutory scheme honors the text of each section and fits them together into a "symmetrical and coherent" whole. *Brown & Williamson,* 529 U.S. at 133 (internal quotation marks and citation omitted).

In sum, Petitioner's interpretation of "seeking admission" under Section 1225(b)(2)(A) is completely consistent with the consideration of that provision in the overall structure and context of the detention framework set forth in the statutory scheme.

## IV.    Statutory History and Purpose

The government roots much of its argument in "Congress's manifest purposes" in adopting Section 1225(b)(2)(A). Appellant's Br. at 21. It claims that "one of IIRIRA's express objectives," *id.* at 43, was to prevent unlawful entrants from obtaining "equities and privileges in immigration proceedings that [were] not available to aliens who present[ed] themselves for inspection," *id.* (quoting H.R. Rep. No. 104-469, pt. 1, at 225 (1996) [hereinafter House Report I]).

45

As a threshold matter, the government's argument about the legislative history is irrelevant because the plain statutory text controls. *See Mohamad v. Palestinian Auth.*, 566 U.S. 449, 458 (2012) ("[R]eliance on legislative history is unnecessary in light of the statute's unambiguous language.") (internal quotation marks and citation omitted); *see also Lee v. Bankers Tr. Co.*, 166 F.3d 540, 544 (2d Cir. 1999) ("Legislative history and other tools of interpretation may be relied upon only if the terms of the statute are ambiguous."). In any event, the government's conclusions from the legislative history are incorrect. Indeed, the government's use of legislative history illustrates the worst pitfalls of that method, derided as "looking over a crowd and picking out your friends." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005) (internal quotation marks and citation omitted). Fittingly, the government derives its view of "congressional purpose" from a single quote in the legislative history and omits the first half of the quoted sentence. As a result, the government erroneously concludes that IIRIRA sought to abolish all distinctions between arriving and already present noncitizens. It did not. Rather, IIRIRA had the much more modest goal of altering *"certain aspects* of the [then] current 'entry doctrine'": namely, it reoriented "whether or not the alien has been lawfully admitted" as "the pivotal factor in determining an alien's status." House Report I, at 225 (emphasis added).[9]

_____

[9] The key to understanding this is the focus on *status* rather than *detention.* One aim of IIRIRA was to eliminate the dual track for removal that had previously placed some noncitizens into exclusion proceedings and others into deportation proceedings. That regime granted substantial legal

The statutory lineage of Section 1226(a) further reinforces this reading. The same House Judiciary Committee Report on which the government relies explains that Section 1226(a) "restates the [then] current provisions in [Section 1252(a)(1)] regarding the authority of the Attorney General to arrest, detain, and release on bond an alien who is not lawfully in the United States." House Report I, at 229; *see also* H.R. Rep. No. 104-828, at 210 (1996) (Conf. Rep.) (same). The old Section 1252(a)(1) authorized bond for "any alien" pending deportation, not exclusion, proceedings—that is, noncitizens like Petitioner whom the government wants to exclude from bond under Section 1226(a). 8 U.S.C. § 1252(a)(1) (1995). The report gave no indication that bond eligibility under Section 1226(a) was intended to be narrower than under the old Section 1252(a)(1), despite explicitly noting that certain judicial review provisions in the old Section 1252(a)(1) were "not retained." House Report I, at 229. The only relevant change that IIRIRA made to the old Section 1252(a)(1) was replacing "[p]ending a determination of deportability" with "pending a decision on whether the alien is to be removed"—a shift

---

privileges and rights only to noncitizens in deportation proceedings, including rights to notice and direct appeal. *See Landon*, 459 U.S. at 25–27. Those were the "equities and privileges" that IIRIRA aimed to standardize. Appellant's Br. at 43. As we have explained, IIRIRA's consolidation of deportation and exclusion proceedings into the singular removal proceeding did not eliminate all distinctions between deportable (admitted) and inadmissible (unadmitted) noncitizens. *See Blake*, 489 F.3d at 96 n.6. There are no clues in the House Report, or anywhere else in the legislative record, that Congress understood the detention regime as one of the "certain aspects" of the prior system it sought to change.

that broadened, rather than narrowed, the section's scope. *Compare* 8 U.S.C. § 1252(a)(1) (1995), *with id.* § 1226(a) (2026).

The administrability safeguards that Congress wrote into IIRIRA provide further evidence that Section 1225 was not meant to have a broader scope than Section 1226. *See Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 483 (1999) (interpreting IIRIRA by reference to its transitional provisions). The enacting Congress estimated the number of criminal noncitizens then covered by Section 1226(c)'s detention mandate was in the range of 100,000 to 200,000. *See* House Report I, at 118–20. To account for the government's then-limited detention capacity, IIRIRA included a safety-valve provision, allowing the Attorney General to delay enforcement of Section 1226(c) for up to two years upon notifying Congress "that there is insufficient detention space and . . . personnel available to carry out section [1226(c)]." Pub. L. No. 104–208, § 303(b)(2), 110 Stat. 3009, 586–87 (1996). Following passage of IIRIRA, the Attorney General immediately triggered the safety valve and delayed implementation. *See* Margaret H. Taylor, *The 1996 Immigration Act: Detention and Related Issues*, 74 INTERPRETER RELEASES 209, 216–17 (1997).

By contrast, Congress apparently made no effort to estimate the number of individuals covered by Section 1225(b)(2)(A)'s detention mandate, nor included any similar safety-valve provision applying to that section of IIRIRA. The government offers no explanation for why the same Congress that was so concerned with the detention of 100,000 people under Section 1226(c) would have turned a blind eye to the consequences of mandating detention for all applicants for admission under Section 1225—an estimated two million people at

the time.  *See* Oral Argument at 11:15–24 (acknowledging that the number was "likely" "at least millions" in the late 1990s and that the number "has obviously increased" over time).  Moreover, it is even harder to explain why the government, if tasked with detaining the huge number of noncitizens covered by Section 1225, would have neglected for almost *thirty years* to increase its detention capacity enough to actually implement that mandate.  Even without the government's suggested expansion of Section 1225(b)(2)(A), "DHS has never had sufficient detention capacity to maintain in custody every single person described in" that section.  *Biden*, 597 U.S. at 792 (internal quotation marks and citation omitted).

Finally, the government's interpretation undermines the very purpose that it purports to advance—treating similarly situated noncitizens alike.  If the government is correct about Section 1225(b)(2)(A), then an unlawfully present noncitizen who entered illegally must be detained, but an unlawfully present noncitizen who overstayed a once-valid visa need not be, even if both noncitizens are identical in all other respects.  Thus, even if both noncitizens had lived in the country for many years and were enmeshed in their communities, only the unlawful entrant would need to be detained, even though both noncitizens violated our immigration laws.  At bottom, an illegal entrant and a visa overstayer who have both lived in the country for many years are much more similar to each other than to an unknown noncitizen who has just arrived at the border for inspection and admission.  The government's interpretation therefore results in a much more problematic form of unequal treatment than Petitioner's does.

49

Overall, IIRIRA retained much of the preexisting law's differential treatment of noncitizens at the border and in the country's interior. For instance, IIRIRA retained the distinction between deportability and inadmissibility grounds for removal. *Blake*, 489 F.3d at 96 n.6. While there is overlap between them, they are not coterminous. For instance, while noncitizens who have engaged in terrorist activity are both deportable and inadmissible, *see* 8 U.S.C. §§ 1182(a)(3)(B), 1227(a)(4)(B), a noncitizen who commits domestic violence or stalking offenses is only deportable, not inadmissible, *see id.* § 1227(a)(2)(E). As was true before IIRIRA, certain features of inadmissibility (as opposed to deportability) apply specifically to arriving (rather than already present) noncitizens. *See, e.g., id.* § 1225(b)(1)(A)(i) (providing for expedited removal of "arriving" noncitizens deemed inadmissible under Sections 1182(a)(6)(C) and 1182(a)(7)). IIRIRA's nuanced retention of some but not other distinctions between deportable and excludable noncitizens reflects the well-established principle that "[l]aws are the product of compromise, and no law pursues its purposes at all costs." *Luna Perez v. Sturgis Pub. Schs.*, 598 U.S. 142, 150 (2023) (alterations adopted) (internal quotation marks and citation omitted).

In sum, neither the government's reliance on legislative history nor Congress's overall purpose in enacting IIRIRA can rescue the newfound interpretation of Section 1225(b)(2)(A), which casts aside the plain text and the context, structure, and history that supports our reading of that provision.

## V.    Prior Executive Practice and Congressional Silence

Even assuming *arguendo* that ambiguity existed in Section 1225(b)(2) with respect to its application to Petitioner and such ambiguity could support the government's position, the fact that the Executive Branch has for nearly three decades acted inconsistently with the newfound interpretation strongly counsels against adopting it.

It is well-settled that we may consider the "consistency" of an agency's interpretation of a statute in deciding how persuasive it is. *See Loper Bright Enters.*, 603 U.S. at 388 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).  In particular, the Supreme Court has explained:

> Authority actually granted by Congress of course cannot evaporate through lack of administrative exercise.  But just as established practice may shed light on the extent of power conveyed by general statutory language, so the want of assertion of power by those who presumably would be alert to exercise it, is equally significant in determining whether such power was actually conferred.

*FTC v. Bunte Bros.*, 312 U.S. 349, 352 (1941).  Accordingly, "[w]hen an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, we typically greet its announcement with a measure of skepticism." *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) (internal quotation marks and citation omitted).

51

Here, although the parties quarrel over whether regulations issued in 1997 when IIRIRA was enacted support their respective interpretations of Section 1225(b)(2), *see* 8 C.F.R. §§ 1003.19(a) & (h)(2), 1236.1(d), there can be no debate that the Department of Justice's contemporaneous understanding of the statute was the same as Petitioner's. *See* Detention and Removal of Aliens, 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997) ("Despite being applicants for admission, aliens who are present without having been admitted or paroled . . . will be eligible for bond and bond redetermination."). The government argues that this regulation shows that the Department of Justice in 1997 thought that noncitizens like Petitioner were "applicants for admission." Appellant's Reply Br. at 21–22; *see also Buenrostro-Mendez*, 166 F.4th at 506–07. But again, this makes the mistake of ignoring the phrase "seeking admission." Of course the interim regulation acknowledges that "aliens who are present without having been admitted or paroled" are "applicants for admission," because that is what Section 1225(a)(1) deems them to be. But the regulation clarifies that such noncitizens are still eligible for bond because they are not also "seeking admission." It is therefore consistent with Petitioner's interpretation of the statute, not the government's.

In any event, the government concedes that, for five Presidential administrations over nearly three decades, it did consistently release detainees on bond whom the government now argues are covered by Section 1225(b)(2)(A). Even in President Trump's first term (and the first few months of his second), the Agency adhered to the decades-old understanding on the relative scopes of Sections 1225 and 1226. Under these circumstances, "[t]he

52

fact that no President has ever found such power [in the statute] is strong evidence that it does not exist." *Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 643 (2026); *see also id.* at 641 (plurality opinion) (explaining that the "breadth of authority" the government claims, coupled with its "lack of historical precedent," "is a telling indication" that the claimed power "extend[s] beyond the President's legitimate reach") (internal quotation marks and citation omitted).[10]

Congressional silence, too, is instructive. Despite enacting numerous amendments to IIRIRA over the years, Congress never inserted any language correcting the Executive's supposed misinterpretation of Section 1225 or consistent application of Section 1226. As noted *supra*, even when it enacted the Laken Riley Act in January 2025, Congress mandated detention only for a narrow subset

---

[10] The government suggests that this reliance on Executive Branch inaction also "falls short" because, *inter alia*, "the Executive has not wholly failed to exercise the power it now claims" and "every prior administration interpreted and applied § 1225(b)(2)(A) to mandate detention of *some* aliens—just a subset of those subject to § 1225(b)(2)(A)." Appellant's Reply Br. at 22 (alterations adopted) (emphasis in original) (internal quotation marks and citation omitted). That argument, however, misses the mark. Even when an agency has historically exercised *some* power pursuant a statute, its longstanding lack of any prior assertion of the expanded power that it now seeks to employ under that same statute can still be "significant in determining whether such power was actually conferred." *Bunte Bros.*, 312 U.S. at 352; *see id.* at 351–52 (holding that, even though the Federal Trade Commission exercised authority under a statute against business practices employed in *interstate* commerce, it was significant "[t]hat for a quarter century the Commission has made no such claim" of similar power with respect to *intrastate* transactions).

of criminal noncitizens, effectively blessing the practice of releasing non-criminal noncitizens, like Petitioner, on bond. As with agency practice, "Congress' failure to repeal or revise the statute in the face of such administrative interpretation is persuasive evidence that that interpretation is the one intended by Congress." *CBS, Inc. v. FCC*, 453 U.S. 367, 385 (1981) (alterations adopted) (internal quotation marks and citation omitted); *see also United States v. Chestman*, 947 F.2d 551, 560 (2d Cir. 1991) (en banc) ("Congressional silence in the face of administrative construction of a statute lends support to the validity of that interpretation.").

Of course, as the government argues, courts can reject a longstanding agency interpretation. *See Bankamerica Corp. v. United States*, 462 U.S. 122, 131 (1983) ("[T]he mere failure of administrative agencies to act is in no sense a binding administrative interpretation that the Government lacks the authority to act.") (internal quotation marks and citation omitted). But a longstanding, incorrect interpretation by an agency is more easily explained when the effect of that interpretation was to aggrandize an agency's power. *See, e.g., Pereira v. Sessions*, 585 U.S. 198, 202 (2018) (holding that DHS's notices to appear were inadequate). We recognize that agencies have strong incentives to maximize their own power and discretion. *See Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 119 (2022). Accordingly, where an agency has long failed to reach for a power and only later changes its mind, we may consider that as persuasive evidence that the power was never conferred in the first place. *See id.*

To be sure, we also agree with the government, and the Fifth

54

Circuit, that "[y]ears of consistent practice cannot vindicate an interpretation that is inconsistent with a statute's plain text." Appellant's Reply Br. at 22 (quoting *Buenrostro-Mendez*, 166 F.4th at 506). However, even if we are incorrect in our view that the unambiguous language of the statute unquestionably favors Petitioner's interpretation, it is hard to fathom how the plain text could be read to somehow unambiguously favor the government—especially where over 370 different judges across the Nation have rejected the government's plain text argument—such that we could not consider the long-standing agency practice that contradicts the government's position.

Moreover, "[i]n extraordinary cases[,] there may be reason to hesitate before accepting a reading of a statute that would, under more ordinary circumstances, be upheld." *West Virginia v. EPA*, 597 U.S. 697, 723–24 (2022) (alteration adopted) (internal quotation marks and citation omitted). Rather than credulously accepting that Congress meant to entirely overhaul the pre-IIRIRA detention regime through "ambiguous statutory text," "we typically greet assertions of extravagant statutory power . . . with skepticism." *Id.* (internal quotation marks and citation omitted). The government's interpretation of Section 1225(b)(2)(A) would send a seismic shock through our immigration detention system and society, straining our already overcrowded detention infrastructure, incarcerating millions, separating families, and disrupting communities. If Congress meant to achieve such a radical break from the past, it would not have done so in such an indirect and ambiguous way. As noted *supra*, Congress does not "hide elephants in mouseholes." *Whitman*, 531 U.S. at 468.

55

Given the enormous consequences of its interpretation and the "vast" breadth of our nation's immigration laws, the government here "seeks to cram a veritable legislative zoo" into an exceptionally small mousehole. *Patel v. Garland*, 596 U.S. 328, 365 (2022) (Gorsuch, J., dissenting); *see also Learning Res.*, 146 S. Ct. at 642 ("It stands to reason that had Congress intended to convey [this] distinct and extraordinary power . . . it would have done so expressly."); *see also id.* at 639 (plurality opinion) (emphasizing that "a practical understanding of legislative intent suggest[s] Congress would have not delegated highly consequential power through ambiguous language") (internal quotation marks and citation omitted).

## VI.    Constitutional Avoidance

Finally, even if there were ambiguity in the statutory text, we would reject the government's interpretation because of the grave constitutional concerns it raises.

"Under the constitutional-avoidance canon, when statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems." *Jennings*, 583 U.S. at 286. Importantly, "[t]he canon of constitutional avoidance comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction," and, otherwise, it "simply has no application." *Id.* at 296 (internal quotation marks and citations omitted). As we have extensively discussed, Petitioner's reading of "alien seeking admission" is the proper construction of Section 1225(b)(2)(A)'s plain

56

text and, thus, we need not rely here upon the doctrine of constitutional avoidance.

However, again assuming *arguendo* that the statutory language is ambiguous and the government's interpretation is a plausible one, it sounds constitutional alarms that would warrant its rejection. *See Biden v. Nebraska*, 600 U.S. 477, 509 (2023) (Barrett, *J.*, concurring) ("[I]f the better reading leads to a disfavored result (like provoking a serious constitutional question), the court will adopt an inferior-but-tenable reading to avoid it."). Petitioner is protected by the Fifth Amendment's Due Process Clause, requiring any civil detention to be "nonpunitive in purpose and effect." *Zadvydas*, 533 U.S. at 690; *see also Velasco Lopez v. Decker*, 978 F.3d 842, 850 (2d Cir. 2020) ("[T]he Due Process Clause covers noncitizens, whether their presence here is lawful, unlawful, temporary, or permanent."). While noncitizens can be detained temporarily to "give[] immigration officials time to determine an alien's status without running the risk of the alien's either absconding or engaging in criminal activity," *Jennings*, 583 U.S. at 286, that is not what is going on here, where detention is mandatory regardless of these risks. We discern no basis for subjecting all noncitizens in Petitioner's shoes to categorical detention without bond. As the government conceded at oral argument, Petitioner, like many unlawfully present noncitizens, presents no risk of flight nor any danger to the community. Indeed, when ordered by the district court to provide Petitioner with a bond hearing, the Agency agreed that he presented no such risks and released him.

The government's interpretation would also likely subject Petitioner to unconstitutionally prolonged detention. Before he was

57

arrested, Petitioner's asylum application was pending for nearly a decade, and it still has not been resolved. And while the government represents that removal is "practically attainable" for Petitioner, Appellant's Reply Br. at 32, proceedings have already lasted more than six months since his arrest with no clear end in sight. In fact, his next hearing is scheduled for June 28, 2027. *See EOIR Automated Case Info.*, EXEC. OFF. FOR IMMIGR. REV., https://acis.eoir.justice.gov/en (search by 209 454 653, Brazil, or access an archived version at https://perma.cc/257V-4KT2) (last visited Apr. 27, 2026). Detaining Petitioner without a bond hearing until then would "raise[] serious due process concerns" under our precedents. *Black*, 103 F.4th at 150; *see Velasco Lopez*, 978 F.3d at 855 (holding that continued detention of a noncitizen under Section 1226(a) for fifteen months pending removal violated due process).

These concerns are compounded by the fact that noncitizens have no right to counsel and are therefore often unrepresented in removal proceedings. *See* 8 U.S.C. § 1229a(b)(4)(A). Unlike criminals detained for punitive purposes, noncitizens like Petitioner thus lack the ability to reliably challenge their detention or the conditions in which they are being held.

The government cites *Demore v. Kim*, 538 U.S. 510 (2003), to argue that *Zadvydas*, *Velasco Lopez*, and *Black* do not apply because detention under Section 1225(b)(2)(A) is not "indefinite." Appellant's Reply Br. at 31–32 (emphasis omitted). But that assertion does not dispose of the constitutional concerns for two reasons. First, even if detention never becomes prolonged, the government's interpretation would require a legitimate rationale, which the government has not

attempted to articulate with respect to noncitizens like Petitioner. Whatever the duration of detention, it must still "serve its purported immigration purpose," *Demore*, 538 U.S. at 527, which must "outweigh[] the individual's constitutionally protected interest in avoiding physical restraint," *Zadvydas*, 533 U.S. at 690 (internal quotation marks and citation omitted). In *Demore*, that justification was satisfied because Section 1226(c) applies only to "criminal aliens." 538 U.S. at 517–23 (discussing at length Congress's specific concerns with removing criminals). In *Zadvydas*, it was not, because the statute at issue "applie[d] not only to terrorists and criminals, but also to ordinary visa violators." 533 U.S. at 697. Here, like in *Zadvydas*, mandatory detention of noncitizens like Petitioner (who cannot be said, as a categorical matter, to pose a danger to the community or risk of flight) for a substantial period of time would raise serious constitutional questions, especially because the government has failed to explain how it would bear a "reasonable relation" to any legitimate, non-punitive purpose. *Id.* at 690 (internal quotation marks and citation omitted). That conclusion is bolstered by our decision in *Velasco Lopez*. The core of our decision was that detention without justification serves "no public interest" that could outweigh the substantial harm it causes to detainees and the community. *Velasco Lopez*, 978 F.3d at 855. We explicitly declined to "establish a bright-line rule for when due process entitles an individual" to a bond hearing, instead holding that "the longer detention continues, the greater the need for the Government to justify its continuation." *Id.*

59

at 855 & n.13.[11]

Second, the Court in *Demore* assumed that detention would be relatively brief because of the criminal context. It focused on the narrow scope of Section 1226(c) and emphasized that "the detention at stake . . . lasts roughly a month and a half in the vast majority of cases . . . and about five months in the minority of cases in which the alien chooses to appeal." *Demore*, 538 U.S. at 530. The Court explained that proceedings against "criminal aliens" are typically completed so swiftly because they are prioritized by the Agency over the mine run of removal cases. *Id.* at 530 n.13. If the government is right that Section 1225(b)(2)(A) mandates detention of millions of non-criminal noncitizens, there is no reason to think that removal can be completed so swiftly for all or even most of those detained.[12]

It is not hyperbolic to project that the government's interpretation would result in Petitioner, and many similarly situated noncitizens, being detained longer than permissible under *Zadvydas* and its progeny. Thus, although this case can be resolved based on

---

[11] The detainee in *Velasco Lopez* had received an initial bond determination, as Section 1226(a) requires. 978 F.3d at 846–47.

[12] Indeed, the average wait time today for an initial decision in removal proceedings is more than two years. *See Immigration Court Legal Representation Dashboard*, VERA INST., https://www.vera.org/ending-mass-incarceration/reducing-incarceration/detention-of-immigrants/advancing-universal-representation-initiative/immigration-court-legal-representation -dashboard [https://perma.cc/H56B-TV2P] (last visited Apr. 27, 2026). If the government were forced to detain all unlawfully present noncitizens until removal, it could not even complete removal of Section 1226(c) detainees as quickly as the Court assumed in *Demore*.

the text of Sections 1225(b)(2)(A) and 1226(a) alone, the serious constitutional concerns raised by the government's interpretation would alternatively warrant its rejection based on the constitutional-avoidance canon.

## CONCLUSION

Petitioner entered the United States unlawfully in 2004 or 2005 and has resided here ever since. He is therefore deemed to be an "applicant for admission" by Section 1225(a), but he is not "seeking admission" because he is not requesting lawful entry into the United States after inspection and authorization. The government's attempt to muddy these textually clear waters defies the statute's context, structure, history, and purpose; contradicts the Supreme Court's dicta in *Jennings* and longstanding Executive Branch practice; and its interpretation of the statute raises serious constitutional questions that should be avoided even if the statutory language were ambiguous. "If judges could add to, remodel, update, or detract from old statutory terms inspired only by extratextual sources and our own imaginations, we would risk amending statutes outside the legislative process reserved for the people's representatives." *Bostock v. Clayton Cnty.*, 590 U.S. 644, 654–55 (2020). We will not do so here.

Accordingly, we conclude that Petitioner's detention is governed by Section 1226(a), not Section 1225(b)(2)(A), and we **AFFIRM** the district court's grant of the writ of habeas corpus.

61

25-3141-pr
*Cunha v. Freden*

JOSÉ A. CABRANES, *Circuit Judge*, concurring in the judgment and opinion of the Court:

I join Judge Bianco's thoughtful and learned opinion wholeheartedly and without reservation. I also write separately to applaud that opinion and to emphasize key points.

\* \* \*

Twenty-one years ago, a Brazilian man crossed the southern border to enter the United States. He now has two children who are U.S. citizens and a small construction company. He has no criminal record. In September, near a Home Depot in Norwood, Massachusetts, immigration agents arrested him, launched removal proceedings against him, and detained him without bond, though he posed no flight risk or danger.[1]

The man applied for habeas corpus. Petitioner, as he became, argued that he was properly detained under 8 U.S.C. § 1226(a), which allows for release on bond, not § 1225(b)(2)(A), which mandates detention. The District Court agreed and ordered a bond hearing that led to his release.[2]

On appeal, Respondent argues that Congress clearly required the Executive to detain millions of people like Petitioner—parents of American children, owners of American businesses, members of American communities—but that some thirty years passed before

---

[1] *Post* at 5.
[2] *Id.* at 8.

1

anyone noticed. In the meantime, fifteen Congresses stood silently by as five presidents ignored the plain text of the statute. Immigration officials also failed to grasp that Congress had told them to round up people by the millions. The capacity to carry out the largest detention in American history went unbuilt.[3]

Today this Court, in the majority's exhaustive opinion, refuses to credit Respondent's tale. This is good news.

* * *

Respondent's basic argument is that § 1225(b)(2)(A) governs Petitioner's detention. This provision reads, "in the case of an alien who is an applicant for admission,[4] if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a [removal] proceeding." It is undisputed that Petitioner is "an applicant for admission." But the parties contest whether he is also "seeking admission." If he is, they agree that mandatory detention kicks in.

At first glance, Respondent's argument that Petitioner is "seeking admission" has some force. Petitioner is concededly an "applicant for admission," and an "applicant" for something—

---

[3] *Id.* at 48–49.

[4] "An alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters) shall be deemed for purposes of this chapter an applicant for admission." § 1225(a)(1).

2

whether a job, grant, or admission—is typically "seeking" it. Language elsewhere in § 1225 might be taken to back up this view, suggesting some relationship between applicants for admission and those seeking admission. *See* § 1225(a)(3) ("All aliens . . . who are applicants for admission *or otherwise seeking admission* . . . shall be inspected by immigration officers.") (emphasis added).

But Petitioner's reply—that he falls outside § 1225(b)(2)(A)'s reach because he is not "seeking admission"—counteracts Respondent's argument and then some. As Judge Bianco's opinion for the panel makes abundantly clear, this reading must prevail for three core reasons.

First, the Supreme Court has said that it is right. "U.S. immigration law authorizes the Government to detain certain aliens seeking admission into the country under §§ 1225(b)(1) and (b)(2). It also authorizes the Government to detain certain aliens already in the country pending the outcome of removal proceedings under §§ 1226(a) and (c)."[5] Because Petitioner was "already in the country" and not "seeking admission into" it, his detention is governed by § 1226.

Second, even if the Supreme Court's observations are dicta, as Respondent claims,[6] they are right. To see why, properly define

---

[5] *Jennings v. Rodriguez*, 583 U.S. 281, 289 (2018).

[6] Resp't's Br. at 46; *see also Buenrostro-Mendez v. Bondi*, 166 F.4th 494, 505 (5th Cir. 2026) (crediting this argument).

"seeking admission" within the meaning of the statute and ask if that is what Petitioner is doing.

Congress defined "admission" as "the lawful *entry* of the alien into the United States after inspection and authorization by an immigration officer."[7]   And, in an immigration case long ago, the Supreme Court confirmed the obvious:  "The word 'entry' by its own force implies a coming from outside."[8]  Now put those two definitions together.  To be "seeking admission," Petitioner must be seeking to come inside from outside.  Established judicial usage of the term "seeking admission" confirms this understanding.  The Supreme Court has repeatedly used that term to refer to aliens arriving from abroad—including, instructively, in the run-up to § 1225(b)(2)(A)'s enactment.[9]  In short, someone who is "seeking admission" is trying to go from the exterior to the interior.

Against this background, no one can seriously contend that Petitioner is "seeking admission" twenty-one years after he entered

---

[7] § 1101(a)(13)(A) (emphasis added).

[8] *United States ex rel. Claussen v. Day*, 279 U. S. 398, 401 (1929);  *see also post* at 40 (explaining that the definition of "entry" has not changed).

[9] *See, e.g., Trump v. Int'l Refugee Assistance Project*, 582 U.S. 571, 574, 583 (2017) ("[F]oreign nationals seeking admission have no constitutional right to entry."); *Landon v. Plasencia*, 459 U.S. 21, 30–33 (1982) ("The deportation hearing is the usual means of proceeding against an alien already physically in the United States, and the exclusion hearing is the usual means of proceeding against an alien outside the United States seeking admission."); *Reid v. INS*, 420 U.S. 619, 621 (1975) ("Section 212 of the Act as amended, 8 U.S.C. § 1182, specifies various grounds for exclusion of aliens seeking admission to this country.  Section 241 of the Act, 8 U.S.C. § 1251, specifies grounds for deportation of aliens already in this country.").

the country. The words, properly defined, are clear. That ought to be the end of the matter. Yet Respondent's counsel urges us to subordinate these settled definitions to his sense of "everyday meaning."[10] Because statutory definitions and established judicial constructions override everyday meaning,[11] the Court rightly passes on that offer.

And even if Petitioner were somehow seeking "entry," he surely is not seeking "entry . . . after *inspection*." Long-settled case law says that "inspection" ordinarily takes place at a port of entry,[12] not outside a Home Depot in Massachusetts.

Third, Respondent's argument that all "applicants for admission" are necessarily "seeking admission" turns that latter phrase into surplusage. If every "applicant for admission" were "seeking admission," as Respondent claims, Congress would not

---

[10] Resp't's Br. at 26–27.

[11] *See Tanzin v. Tanvir*, 592 U.S. 43, 47 (2020) ("When a statute includes an explicit definition, we must follow that definition, even if it varies from a term's ordinary meaning.") (cleaned up); *Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 243 (2011).

[12] *See Guamanrrigra v. Holder*, 670 F.3d 404, 406 (2d Cir. 2012) ("The term of art 'without inspection' . . . means entering the United States borders without being admitted or paroled by United States immigration officials *at a port of entry*.") (emphasis added); *Reid v. INS*, 492 F.2d 251, 255 (2d Cir. 1974) ("Next he must submit himself at the point of entry to an INS official for 'inspection' as an alien."), *aff'd*, 420 U.S. 619 (1975); *Posos-Sanchez v. Garland*, 3 F.4th 1176, 1183 (9th Cir. 2021) (holding that admission inspection must take place "at a port of entry"); *Ex parte Saadi*, 23 F.2d 334, 336 (S.D. Cal. 1927) ("'Inspection,' to my mind, as used in the Immigration Act, means that the immigration officers are given the opportunity to check the right of the alien to enter the United States when he presents himself as an alien."), *aff'd*, 26 F.2d 458 (9th Cir. 1928).

5

need to have written that mandatory detention applies only to those applicants for admission who are seeking admission.  As always, we are loath to find any of Congress's words hollow.

* * *

Zoom out to see the broader statutory context, and Petitioner's lead lengthens.  That is because "§ 1225(b) applies primarily to aliens seeking entry into the United States,"[13] the Supreme Court has said, whereas "§ 1226 applies to aliens already present in the United States."[14]  These observations suggest that § 1225(b)(2)(A)'s detention mandate does not cover those inland like Petitioner.

Once again, the statutory text confirms the Supreme Court's words.  Section 1225(b)(2)'s title, "[i]nspection of other aliens," refers to a process that, as just noted, takes place at the border.  Move along to § 1226, and its focus on the interior is likewise clear.  It provides for the detention of certain aliens who violate *state* law,[15] presumes that *local* authorities far from the border may investigate and detain the aliens in question,[16] and gives state attorneys general standing to sue when the release of an alien "harms [a] *State* or its residents."[17]

The history of the immigration laws is also in Petitioner's corner.  When Congress enacted § 1225(b)(2) in 1996, it said that the

---

[13] *Jennings*, 583 U.S. at 297.
[14] *Id.* at 303.
[15] § 1226(c)(1)(B) (citing § 1227(a)(2)(B)).
[16] § 1226(c)(3), (d)(1)(A).
[17] § 1226(f) (emphasis added).

provision would concern arriving aliens, not those inland like Petitioner. The Conference Report—"the most persuasive evidence of congressional intent" other than the text itself[18]—was not mealy-mouthed about this: it says § 1225(b) covers "aliens *arriving* in the United States."[19] And for the first twenty-nine years, nobody said otherwise. The Clinton, Bush, Obama, Trump I, and Biden administrations all agreed with Petitioner that § 1226, not § 1225, governs interior detention.[20] We give "substantial weight" to that "early (and consistent) view of [the] statute."[21] If Respondent is right that in 1996 Congress ordered the largest mass detention in American history, the world would have likely noticed sooner. Small wonder that some 90 percent of the hundreds of district judges across the land who have heard Respondent's argument have rejected it.[22]

One last fact is telling. In 1996 Congress mandated the detention of certain aliens, mostly criminals, under § 1226(c)(1). At the time, Congress knew that immigration-detention facilities had around 8,500 beds, enough to detain some 100,000 aliens yearly.[23] That might have been inadequate in light of the new detention

---

[18] *Disabled in Action of Metro. N.Y. v. Hammons*, 202 F.3d 110, 124 (2d Cir. 2000).

[19] H.R. Rep. No. 104–828, at 209 (1996) (Conf. Rep.) (emphasis added); *accord* H.R. Rep. No. 104–469, pt. 1, at 229 (1996).

[20] *Post* at 52–53.

[21] *Safdieh v. Comm'r of Internal Revenue*, 169 F.4th 102, 108 & n.31 (2d Cir. 2026); *accord Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386, 394 (2024).

[22] Kyle Cheney & Josh Gerstein, *Another Appeals Court Backs Trump Administration's Mass Detention Policy*, Politico (Mar. 25, 2026, at 12:25 PM), https://www.politico.com/news/2026/03/25/mandatory-detention-ruling-8th-circuit-00844386.

[23] H.R. Rep. No. 104-469, pt. 1, at 123 (1996).

mandates. So Congress gave the Attorney General two years during which certain aliens could be released while five hundred beds were added.[24] Notably, Congress allowed no such grace period for the mandatory detention of the *two million* aliens that Respondent says then came within § 1225(b)(2)'s sweep.[25] That discrepancy is inexplicable. And, as a final piece in the textual, structural, and historical puzzle, it is yet another reason why the judgment of the District Court has been quite rightly affirmed.

---

[24] 8 U.S.C. § 1368(a); Pub. L. No. 104–208, § 303(b)(2), 110 Stat. 3009, 586–87 (1996).

[25] *Post* at 48–49.

8